# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| EFRAIN MUNOZ, *et. al*, | ) | CASE NO. 1:08-cv-0759-AWI-BAM |
| | ) | |
| Plaintiffs, | ) | **FINDINGS & RECOMMENDATIONS ON** |
| | ) | **PLAINTIFFS' MOTION FOR CLASS** |
| v. | ) | **CERTIFICATION** |
| | ) | |
| PHH CORP. *et. al*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## I.   INTRODUCTION

In this action for violations of the Real Estate Settlement Procedures Act ("RESPA"), Plaintiffs move for class certification of all homeowners who obtained residential mortgage loans through PHH Corporation ("PHH")[1], and PHH's affiliated reinsurer, Atrium Insurance Corporation ("Atrium") (PHH and Atrium are collectively referred to as the "Defendants"). The matter was briefed extensively (Doc. 117, 129, 138, 160, 162, 185, 202, 208, 211), and a hearing was held on May 3, 2013. (Doc. 226.) Counsel Alan Plutzik, Jay Whitman and Terrance Ziegler appeared in person for Plaintiffs. Counsel David Souders and Joseph Genshiea appeared in person for Defendants. Having carefully considered the parties' submissions and the entire record in this case, the Court recommends Plaintiffs' Motion for Class Certification be GRANTED IN PART AND DENIED IN PART.

---

[1] Defendant PHH comprises a number of related companies, including PHH Corporation, PHH Mortgage Corporation, and PHH Home Loans, LLC.

## II.   BACKGROUND

**A.   Captive Reinsurance Arrangements**

This case concerns the relationship between consumers of private mortgage loans, lenders, private mortgage insurers, and lender-affiliated reinsurers.  Individuals who purchase a home with less than a 20% down payment must generally purchase private mortgage insurance to protect the lender against the risk of default.  Pls.' First Amended Complaint "FAC," ¶ 3, Doc. 96.  Borrowers in this situation pay an insurance premium in addition to their monthly mortgage payment, with all payments being collected by the lender, who later tenders insurance premiums to the insurer.  FAC ¶ 28. Private mortgage insurers typically are unaffiliated with the lender, and provide risk coverage for a percentage of the loan in the event of default.  FAC ¶ 26.  Typically, the lender, rather then the borrower, chooses the private mortgage insurance provider.  FAC ¶ 29.

Private mortgage insurers may reduce their exposure on the loans they insure by transferring part of the risk to a reinsurer.  FAC ¶ 42.  A reinsurer assumes a portion of the risk on a given pool of loans in exchange for a percentage of the private mortgage insurer's premiums (this is commonly referred to as a "premium cede").  FAC ¶ 42.  Certain lenders, seeking to capitalize on the billions of dollars borrowers pay to private mortgage insurers in premiums each year, have established their own affiliated or "captive" reinsurers.  FAC ¶ 47. These captive reinsurers provide reinsurance primarily or exclusively for loans originated by the lender that require the borrower to pay for private mortgage insurance.  FAC ¶ 47.  Under "captive reinsurance arrangements," the lender refers its borrowers to a private mortgage insurer who agrees to reinsure with the lender's captive reinsurer.  FAC ¶ 48.  These arrangements require the private mortgage insurer to cede a percentage of the borrowers' premiums to the lender's captive reinsurer.  FAC ¶ 48.

**B.   Defendants' Captive Reinsurance Arrangement**

PHH originates and services residential mortgage loans.  Plaintiffs are individuals who obtained mortgages from PHH and provided down payments of less than 20% of the total purchase price of their homes.  FAC ¶¶ 10-15.  Each of the named Plaintiffs have a residential mortgage loan with PHH that is insured by one of the following private mortgage insurers (the "Primary Insurers"): (1) CMG Mortgage Insurance Company ("CMG"); (2) Genworth Mortgage Insurance Company

1  ("Genworth"); (3) Radian Guaranty Inc. ("Radian"); and (4) AIG United Guaranty Mortgage

2  Insurance Company ("UGI"). FAC ¶¶ 10-15, 61.

3      Defendant Atrium, a wholly-owned subsidiary of PHH, is a captive reinsurer. Atrium

4  reinsured the Primary Insurers' obligations on PHH's loans to Plaintiffs. FAC ¶ 61. All of Atrium's

5  reinsurance agreements with the Primary Insurers were "excess-of-loss" agreements. Def.s' Opp.

6  to Class Cert., 10: 3-9, Doc. 129. An excess-of-loss agreement calls for the reinsurer to provide

7  reinsurance on annual pools of loans. These annual pools of loans are commonly referred to as

8  "books." A reinsurer such as Atrium will pay on reinsurance obligations once losses exceed a certain

9  percentage of losses (the "attachment point"), and only up to a certain percentage of losses (the

10  "detachment point"). *Id.* In insurance parlayance, this is commonly referred to as a specified

11  corridor or "band" of loss.[2] Pl.s' Mot. For Class Cert., 11: 26-27, Doc. 117. Atrium's bands of loss

12  with the four Primary Insurers varied, and sometimes varied for different book years. Doc. 129, 10:

13  9-10.

14      For each of Atrium's reinsurance agreements with the four Primary Insurers, the premium

15  cedes for all book years were pooled into one trust account. Doc. 117, 11: 5-14. Reinsurance

16  obligations are satisfied from all the funds in a given trust, not merely from those ceded premiums

17  on a given book year. *Id.* This pooling of premium cedes to cover obligations across book years is

18  referred to as cross-collateralization. Pl.s' Reply, 19: 1-8, Doc. 138.

19  **C.    Plaintiffs' Allegations**

20      Plaintiffs filed this putative class action on June 2, 2008. (Doc. 2.) Plaintiffs allege

21  Defendants PHH and Atrium have acted together to violate Sections 8(a) and (b) of RESPA by

22  entering into captive reinsurance arrangements for the purpose of receiving kickbacks, referral

23  payments and unearned fee splits.

24

25

26      [2] Take, for example, a reinsurance contract where the band of loss is five to fifteen percent (attachment
   point is five percent and the detachment point is fifteen percent). If the defaults in a given book of business totals
27  less than five percent, no reinsurance payment is triggered. Once the defaults equal five percent, reinsurance
   payments would continue to be triggered until the defaults equaled fifteen percent of the book of business, at which
28  point the reinsurer's obligation would "detach," and subsequent defaults would fall upon the primary insurer.

Plaintiffs allege the insurance premiums ceded to Atrium are, in fact, kickbacks from the Primary Insurers to PHH in exchange for PHH's referral of borrowers to the Primary Insurers for private mortgage insurance. Central to Plaintiffs' allegation that Atrium's premium cedes are provided as a kickback to PHH (rather than payment for Atrium's reinsurance services) is Plaintiffs' argument that Atrium never assumed real reinsurance risk. FAC ¶¶ 6, 53-55, 65, 70. First, Plaintiffs argue that because the reinsurance trusts were funded almost exclusively by ceded premiums, not Atrium's own capital, no real or commensurate risk was transferred. Second, Plaintiffs argue Atrium's reinsurance agreements with the Primary Insurers contained liability-limiting provisions that limited Atrium's potential exposure beyond the bands of loss. Absent the requisite transfer of risk, Plaintiffs argue, the reinsurance arrangements were illusory, and Atrium's acceptance of the ceded premiums from private mortgage insurers constituted an unlawful kickback to PHH in violation of Section 8. Accordingly, as permitted under RESPA, Plaintiffs seek recovery of three times the amount class members paid for PHH's settlement services.

**D.    Previous Merits Determinations**

On October 6, 2008, Defendants moved for judgment on the pleadings. (Doc. 30.) Defendants' motion for judgment on the pleadings advanced two arguments: (1) Reinsurance is not a "settlement service" under RESPA; and (2) Plaintiffs suffered no injury as their monthly insurance premiums were based on rates filed and approved by the applicable state department of insurance (the "filed rate doctrine"). On September 18, 2009, the court denied Defendants' motion for judgment on the pleadings. (Doc. 60.)

First, the Court found that the private mortgage insurance, rather than the reinsurance, was the relevant "settlement service" at issue. *Munoz v. PHH Corp.,* 659 F. Supp. 2d 1094, 1098 (E.D. Cal. 2009) ("Defendants treat the PMI reinsurance as the activity that must be evaluated . . .They have focused the analysis on the wrong step. Plaintiffs allege that PHH received a referral fee for directing PMI business to certain providers. The reinsurance is only the means by which the alleged fee is transferred; the PMI itself is the settlement service at issue. Under the plain terms of the HUD regulation, providing PMI does constitute a settlement service covered by Section 2607 of RESPA"); *See also,* 12 U.S.C. § 2602(3) (The term "settlement services" includes any service provided in

connection with a real estate settlement); 24 C.F.R. 3500.2(b) ("Settlement service means any service provided in connection with a prospective or actual settlement, including, but not limited to, any one or more of the following: ... (10) Provision of services involving mortgage insurance.")

Second, the Court found that the filed rate doctrine did not bar Plaintiffs' claims because Plaintiffs challenged an alleged unfair business practice, rather than the actual insurance premium rates. *Munoz,* 659 F. Supp. 2d at 1099-1101 ("Fundamentally, Plaintiffs are not challenging the PMI premium rates but an alleged unfair business practice. . . . The balance of case law suggests that the doctrine does not bar a RESPA claim in this case.")

**E.    Plaintiffs' Motion for Class Certification**

On February 11, 2011, Plaintiffs filed this motion for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure.  Plaintiffs seek to represent a class consisting of:

> All persons who obtained residential mortgage loans originated and/or acquired by PHH and/or its affiliates on or after January 1, 2004, and, in connection therewith, purchased private mortgage insurance and whose loans were included within PHH's captive mortgage reinsurance arrangements (the "Class").

Pl.'s Mot. For Class Cert., 1: 6-9, Doc. 117.  Plaintiffs seek to appoint named Plaintiffs Efrain Munoz, Leona Lovette, Stephanie Melani, Iris Grant, John Hoffman, and Daniel Maga, II, as Class representatives.  Plaintiffs also seek to appoint the law firm of Barroway Topaz Kessler Meltzer & Check, LLP as Lead Class Counsel, and the law firms of Bramson, Plutzik, Mahler & Birkhaeuser, LLP, Berke, Berke & Berke and Travis & Calhoun, P.C. as Class Counsel.

Plaintiffs' Motion for Class Certification has been the subject of considerable delay at the request of the parties.  The parties have requested no less fifteen modifications to the briefing and/or hearing schedule on Plaintiffs' Motion for Class Certification.  Doc. 51, 53, 56, 59, 62, 73, 75, 88, 92, 132, 156, 159, 186, 191, 194.  Additionally, this case was stayed for approximately ten months when the United States Supreme Court granted certiorari in *First American Financial Corporation v. Edwards,* No. 10-708.  Doc. 166, 171 (Certiorari was later dismissed as improvidently granted).

/./.

### III.   DISCUSSION

**A.    Background of RESPA and Requirements for a Viable RESPA Claim**

"Congress first passed RESPA in 1974 to, inter alia, promote competition within the real estate settlement services industry and to eliminate certain business practices that were artificially inflating the cost of settlement services." *Minter v. Wells Fargo Bank, N.A.,* 274 F.R.D. 525, 536 (D. Md. 2011).  RESPA proscribes a number of real estate related practices, but at issue here is Section 8, which essentially bans real estate settlement service providers from collecting unearned fees and kickbacks.  *See,* 12 U.S.C. § 2607 (a) & (b).  Section 8(a), codified at 12 U.S.C. § 2607, prohibits kickbacks for referrals:

> No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

Subsection (b) prohibits splitting charges:

> No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

These prohibitions are subject to the safe harbor of Rule 8(c), which provides that "[n]othing in this Section shall be construed as prohibiting ... the payment [of] ... compensation ... for services actually performed." 12 U.S.C. § 2607(c). "Any person or persons who violate the prohibitions or limitations of this section shall be jointly and severally liable to the person or persons charged for the settlement service involved in the violation in an amount equal to three times the amount of any charge paid for such settlement service."  12 U.S.C. § 2607(d)(2).

Plaintiffs claim that the reinsurance premiums received by Atrium constitute "fees, kickbacks or things of value" in exchange for PHH's referral of business to the Primary Insurers in violation of Section 8(a). FAC ¶ 91. Plaintiffs also allege that Atrium violated section 8(b) of RESPA by accepting a "portion, split or percentage of charges received by private mortgage insurers for the rendering of real estate settlement services other than for services actually performed[,]" because Atrium does not "actually perform" reinsurance services.  *Id.* ¶ 92.  Plaintiffs do not dispute that if

6

Atrium is deemed to provide a bona fide reinsurance service, Defendants' captive reinsurance arrangement is lawful under Section 8. Pl.s' Reply, 23-52, Doc. 138. Indeed, the parties agree the central question in this litigation is whether Atrium *actually* provides reinsurance services. *See, Id.;* Def.'s Sup. Opp., 8-11, Doc. 185.

**B.     The Parties' Positions On the Required Proof for a Section 8 Claim**

The parties dispute the types of evidence necessary to determine whether Atrium "actually performed" reinsurance services. Plaintiffs argue Atrium "actually performs" reinsurance services if it meets the criteria outlined in an opinion letter issued by the Department of Housing and Urban Development ("HUD"). Defendants, on the other hand, rely on three federal decisions to suggest that an entity actually performs reinsurance services so long as it either makes some reinsurance payments, or, is under contract to perform reinsurance services.

**1.     HUD's Opinion Letter On Whether Reinsurance Services Are Actually Performed**

HUD is the federal agency previously responsible for enforcing RESPA and promulgating the implementing rules thereunder.[3] HUD can "prescribe such rules and regulations" and "make such interpretations ... as may be necessary to achieve the purposes of [the Act]." *Id.* § 2617(a). HUD has never issued a formal regulation or policy statement concerning the legal standards for a valid captive reinsurance agreement. However, on August 6, 1997, HUD issued an opinion letter to Countrywide Funding Corporation (the "Countrywide Letter"), which requested clarification on the applicability of Section 8 to Countrywide's captive reinsurance arrangements. The Countrywide Letter has been relied upon by mortgage insurers, lender-owned reinsurers and courts alike to evaluate a captive reinsurance arrangement's compliance with Section 8. *See, e.g., McCarn v. HSBC USA, Inc.,* 2012 WL 7018363 (E.D. Cal. 2012) (citing the Countrywide Letter in evaluating when captive reinsurance arrangements are permissible under RESPA); *Kay v. Wells Fargo & Co.,* 247

---

[3]   On July 21, 2011, HUD's consumer-protection functions under the RESPA were transferred to the Bureau of Consumer Financial Protection. *See,* Dodd–Frank Wall Street Reform and Consumer Protection Act, §§ 1061(b)(7) and (d), 1062, 1098, 1100H, 124 Stat.2038, 2039–2040, 2103–2104, 2113. That day, the Bureau issued a notice stating that it would enforce HUD's RESPA regulations and that, pending further Bureau action, it would apply HUD's previously issued official policy statements regarding RESPA. 76 Fed.Reg. 43570–43571.

F.R.D. 572 (N.D. Cal. 2007) (while not directly citing the Countrywide Letter, both parties, as well as the court, agreed that the "substantiality of risk transfer" – a concept discussed in the Countrywide Letter – was a "crucial liability issue"); Def.'s Opp., 17: 17-19, Doc. 129 ("In guidance provided to Countrywide in August 1997, HUD issued a letter that, for lack of other guidance, has been relied upon by mortgage insurers and lender-owned reinsurers alike to maintain compliance with RESPA.")

The Countrywide Letter opined that captive reinsurance "arrangements are permissible under Section 8 if the payments to the reinsurer: (1) are for reinsurance services 'actually furnished or for services performed'; [and] (2) are bona fide compensation that does not exceed the value of such services." Doc. 114, Attach. 5 (Emphasis in original).  If either one of these requirements are lacking, the captive reinsurance arrangement violates Section 8.  *Id.*

To meet the first prong of the Countrywide Letter (the reinsurance services are actually furnished or performed), three requirements must be satisfied: (1) There must be a legally binding contract for reinsurance with terms and conditions conforming to industry standards; (2) The reinsurer must post capital and reserves satisfying the laws of the state in which it is chartered and the reinsurance contract between the primary insurer and the reinsurer must provide for the establishment of adequate reserves to ensure that, when a claim the reinsurer is made, funds will exist to satisfy the claim[4]; and (3) there must be a real transfer of risk.[5]  Doc. 114, Attach. 5, p. 6. To meet the second prong of the Countrywide Letter, several factors are considered to determine if the compensation (premium cedes) exceeds the value of the reinsurance services.[6]  *Id.* at 7 ("whether

---

[4] The HUD further opined that unless the reinsurer is adequately capitalized and adequate reserves and funds are available to pay claim, legitimate reinsurance services are not being provided.

[5] Elaborating on whether a real transfer of risk exists, the Countrywide Letter states that "[t]he reinsurance transaction cannot be a sham under which premium payments ... are given to the reinsurer even though there is no reasonable expectation that the reinsurer will ever have to pay claims."  With respect to a excess-loss arrangement (as is the case here), "this requirement can be met if the band of the reinsurer's potential exposure is such that a reasonable business justification would motivate a decision to reinsure that band.  Unless there is a real transfer of risk, no real reinsurance services are actually being provided."  *Id.*

[6] This inquiry may consider the following factors: (1) a comparison, "using relevant mathematical models, the risk borne by the captive reinsurer with payment provided by the primary insurer; (2) "Analyze the likelihood of losses occurring, the magnitude and volatility of possible losses, the amount of payments received, the timing of payments and potential losses, current market discount rates;" (3) take into account the relative risk exposure of the primary lender and the captive reinsurer; (4) consider the extent to which the lender or the firm controlling the

the compensation is commensurate with the risk ....")

Plaintiffs argue the Countrywide Letter provides the proper framework to evaluate the legitimacy of Defendants' captive reinsurance arrangement under Section 8.  Plaintiffs also argue the Countrywide considerations can be litigated on a classwide basis.

**2.    Defendants' Position on Section 8 Liability For Captive Reinsurance Arrangements**

Defendants, despite a fifty-page opposition to Plaintiffs' Motion for Class Certification, did not initially offer a legal standard to evaluate the legitimacy of its captive reinsurance arrangement under Section 8.  Defendants' opposition states that "Plaintiffs assert 'the parties will agree that the central RESPA liability question raised by this litigation concerns the bona fides of Defendants' captive reinsurance arrangements and whether they resulted in a transfer of risk." Def.s' Opp., 16: 12-15, Doc. 129.  However, Defendants do not dispute "Plaintiffs assertion."

Defendants state that "the reinsurance arrangements entered into by Atrium were structured in strict adherence to state regulatory requirements [and] met with the requirements outlined by HUD in the so-called 'Countrywide Letter.'"  Def.s' Opp., 16: 17-21, Doc. 129.  Defendants discuss the Countrywide Letter and acknowledge that it has "been relied upon by mortgage insurers and lender-owned reinsurers alike to maintain compliance with RESPA."  Def.s' Opp., 17: 17-19, Doc. 129. Notwithstanding these apparent concessions, Defendants then state "that [the Countrywide Letter] lacks the force of law and is not entitled to deference" because it is an informal opinion letter, rather than a formal resolution issued pursuant to HUD's rulemaking authority.  Def.s' Opp., 17, n. 10, Doc. 129.  Defendants, however, do not articulate any basis to evaluate captive reinsurance liability under Section 8.

Defendants' supplemental brief presents a more distilled position on Section 8 liability. Defendants now maintain captive reinsurance arrangements invoke Section 8 liability only when the reinsurer "performed **no** services (i.e., that it assumed no risk)" in exchange for its premium cedes.

captive reinsurer is shielded from potential losses by inadequate reserves and a corporate structure that segregates risks; (5) examine other transactions between the lender, primary insurer and captive reinsurer to determine whether they are related to the reinsurance agreement; and (6) examine whether the ceding commission is commensurate with the administrative costs assumed by the primary insurer.  *Id.*

Def.s' Sup. Opp., 10: 1-2, Doc. 185.  In support of this position, Defendants cite the following cases: *Freeman v. Quicken Loans, Inc.,* – U.S. – , 132 S. Ct. 2034, 2038 (2012); *Martinez v. Wells Fargo Home Mortg., Inc.,* 598 F.3d 549 (9th Cir. 2010); and *Kay v. Wells Fargo & Co.*, 247 F.R.D. 572, 576 (N.D. Cal. 2007).

In *Freeman,* the Supreme Court addressed the scope of Section 8(b); specifically, whether Section 8(b) "prohibits the collection of an unearned charge by a single settlement-service provider—what we might call an undivided unearned fee—or whether it covers only transactions in which a provider shares a part of a settlement-service charge with one or more other persons who did nothing to earn that part." *Freeman,* 132 S. Ct. at 2039.  To determine whether Section 8 covered undivided unearned fees,  *Freeman* analyzed a 2001 HUD policy statement that, among other proclamations, stated Section 8(b) was not limited to situations where at least two persons split or share an unearned fee.  *Id.  Freeman* rejected HUD's interpretation because the plain language of Section 8(b) requires a showing that the settlement service charge was divided by two or more persons. *Id.*  at 2044.

In dictum, *Freeman* also addressed a separate HUD interpretation in this 2001 policy statement that Defendants argue is relevant to Plaintiffs' claims.  This separate HUD interpretation opined that overcharges for settlement services could result in Section 8 liability.  *See, Id.* at 2039 ("in addition to facing liability when [the settlement service provider] collects a fee that is entirely unearned, a provider may also "be liable under [Section 8(b)] when it charges a fee that exceeds the reasonable value of goods, facilities, or services provided . . . .")  *Freeman* determined that overcharges for a settlement service could not result in Section 8 liability, and HUD's contrary interpretation of Section 8 was "manifestly inconsistent with the statute HUD purported to construe," *Id.* at 2039.

In *Martinez v. Wells Fargo Home Mortg., Inc.,* 598 F.3d 549 (9th Cir. 2010), the Ninth Circuit specifically considered the question of whether a settlement service provider who overcharges for settlement services is liable under Section 8.  Referring to HUD's 2001 Policy Statement interpreting Section 8(b) as prohibiting overcharges  – "[i]f the payment of a thing of value bears no reasonable relationship to the market value of the goods or services provided, then the excess is not for services

or goods actually performed or provided[,]" *See* RESPA Statement of Policy 2001–1, 66 Fed.Reg. 53,052, 53,057–58 (Oct. 18, 2001) (citing 24 C.F.R. § 3500.14(g)(2) – *Martinez* found that "[t]he language of Section 8(b) prohibits only the practice of giving or accepting money where no service whatsoever is performed in exchange for that money . . . By negative implication, Section 8(b) cannot be read to prohibit charging fees, excessive or otherwise, when those fees are for services that were actually performed." *Martinez,* 598 F.3d at 553-4. *Martinez's* decision that Section 8(b) does not prohibit overcharges is in line with other federal circuits. *See Friedman v. Mkt. St. Mortgage*, 520 F.3d 1289, 1291 (11th Cir. 2008) (holding that "subsection 8(b) does not apply to settlement fees that are alleged to be excessive"); *Santiago v. GMAC Mortgage Group, Inc*., 417 F.3d 384, 385 (3d Cir. 2005) (finding that "RESPA does not provide a cause of action for overcharges"); *Krzalic v. Republic Title Co.*, 314 F.3d 875, 881 (7th Cir. 2002) ("We conclude that section 8(b) clearly and unambiguously does not extend to overcharges."); *Freeman,* 132 S. Ct. at 2039 (in dictum, noting that HUD's position on Section 8 overcharges was "manifestly inconsistent with the statute HUD purported to construe").

The final case Defendants rely upon is *Kay v. Wells Fargo & Co.*, 247 F.R.D. 572, 576 (N.D. Cal. 2007). In *Kay,* under facts very similar to those present here, the plaintiffs brought a class action alleging Section 8 violations predicated on a captive reinsurance arrangement. *Id.* at 574. At the class certification stage, plaintiffs argued that equitable estoppel should toll the statute of limitations for some unnamed class members because the lender/reinsurer "affirmatively represented to the putative class members that any amount it received from its captive reinsurance arrangements was for services actually performed when, in actuality, little or no risk was transferred at all in the transaction." *Id.* at 578. Rejecting this argument, *Kay* stated that:

> it is an indisputable fact in this case that North Star was and remains obligated to operate as the reinsurer for each borrower's private mortgage insurance. That North Star has yet to be called upon to make any payments in no way means that it does not continue to be liable in the event that any of the requisite contingencies occur. North Star continues to provide a service, namely reinsurance. By definition, therefore, North Star has provided and will continue to provide a service. Even if North Star was paid excessively, the fact remains that North Star has and will continue to provide a service, contrary to the conclusory wording of the complaint.

*Id.* at 577 (despite denying equitable tolling for class members, *Kay* certified this substantially

similar captive reinsurance class action.  *See, Id.* at 578-9).  Based on the decision in *Kay,* Defendants argue they "actually perform" reinsurance services so long as they are contractually obligated to provide reinsurance upon the occurrence of a contingency.[7]

Defendants synthesize these three cases as the foundation for its standard of decision for Section 8 liability.  Based on the decisions in *Freeman* and *Martinez*, Defendants argue that Section 8 liability for captive reinsurance arrangements can not be predicated on a finding that Atrium overcharged for its reinsurance services. Relying on language found in *Martinez* and *Kay,* Defendants also argue that a captive reinsurance arrangement complies with Section 8 under the following circumstances: (1) if the reinsurer pays on any claim, the reinsurer has necessarily performed the service of reinsurance; **or** (2) even if a reinsurer never pays a single claim, as long as the reinsurer is liable for some kind of reinsurance in the event a requisite contingency occurs, the reinsurer is providing a "reinsurance" service.  Def.s' Sup. Opp., 9-10, Doc. 185.

The parties' disagreement on the standard of decision presents an unusual challenge at the class certification stage.  The Court can not determine whether classwide proceedings are capable of generating common answers to necessary liability inquiries until it knows the right questions.  The right questions concern the type of evidence that must be offered to determine whether Atrium actually performs reinsurance services.  Nonetheless, the Court finds it need not determine which standard for liability will ultimately prevail, so long as both standards meet the requirements of Rule 23, the proposed class may be certified.[8]  In the sections that follow, the Court will address the

---

[7] Notably, *Kay* does not suggest this reasoning applies to Section 8 liability.  On the contrary, *Kay* discussed the "substantiality of risk transfer" as the fundamental determination on the validity of a captive reinsurance arrangement under Section 8. *Id.* at 576.

[8] The Court has exhaustively searched for any case discussing the Countrywide Letter or otherwise offering a different  standard of decision to evaluate a captive reinsurance Section 8 claim.  It does not appear, however, that any case dealing with allegations of an unlawful captive reinsurance arrangement has reached the point where a discussion of the evidence required was necessary. *See, eg., Alexander v. Washington Mut., Inc.,* 2008 WL 2600323 (E.D. Pa. 2008) (denying a motion to dismiss class action concerning alleged unlawful captive reinsurance arrangement pursuant to filed rate doctrine, safe harbor of Section 8(c), burford abstention doctrine, and plaintiffs' lack of standing); *Gerhart v. Beazer Homes Holding Corp.,* 2009 WL 799256 (E.D. Cal. 2009) (dismissing captive reinsurance RESPA claim as barred by one-year statute of limitations); *Riddle v. Bank of America Corp.,* 2013 WL 1482668 (E.D. Pa. 2013) (denying motion to dismiss captive reinsurance class action based on statute of limitations); *Alston v. Countrywide Financial Corp.,* 585 F.3d 753 (3rd Cir. 2009) (reversing district court's decision dismissing captive reinsurance class action, concluding that plaintiffs need not allege an overcharge to have standing); *Barlee v.*

12

1    standard of liability.

2    **B.**     **Rule 23 Certification Analysis**[9]

3          **1.**     **Legal Standard**

4          A class may be certified only if: (1) the class is so numerous that joinder of all members is

5    impracticable (numerosity); (2) there are questions of law or fact common to the class

6    (commonality); (3) the claims or defenses of the representative parties are typical of the claims or

7    defenses of the class (typicality); and (4) the representative parties will fairly and adequately protect

8    the interests of the class. Fed. R. Civ. P. 23(a).  In addition to the requirements imposed by Rule

9    23(a), Plaintiff bears the burden of demonstrating that the class is maintainable pursuant to Rule

10   23(b).  *Narouz v. Charter Commc'ns, LLC,* 591 F.3d 1261, 1266 (9th Cir. 2010).  In this case,

11   Plaintiff seeks certification of the Class under Rule 23(b)(3). To certify a class under Rule 23(b)(3),

12   Plaintiff must also demonstrate: (1) "questions of law or fact common to the members of the class

13   predominate over any questions affecting only individual members" ("Predominance") and (2) a

14   class action is "superior to other available methods for the fair and efficient adjudication of the

15   _____

16   *First Horizon Nat'l. Corp.,* 2013 WL 706091 (E.D. Pa. 2013) (granting in part and denying in part a motion to
     dismiss in a captive reinsurance class action on standing and tolling grounds); *McNeary-Calloway v. JP Morgan*

17   *Chase Bank, N.A.,* 863 F. Supp. 2d 928 (N.D. Cal. 2012) (dismissing captive reinsurance claims because a
     subsequent purchase of hazard insurance was not a "settlement service" under RESPA); *Galiano v. Fidelity Nat.*

18   *Title Ins., Co.,* 2010 WL 9447505 (E.D. N.Y. 2010) (dismissing captive reinsurance claims under RESPA because
     the Plaintiffs challenged the actual price of the settlement service, thus, the claims were not covered by Section 8

19   and, additionally, were held to be foreclosed by the filed rate doctrine).  The Court has located only two cases
     arguably touching on the evidence required to substantiate a captive reinsurance claim under Section 8.  In *Kay v.*

20   *Wells Fargo & Co.*, 247 F.R.D. 572, 576 (N.D. Cal. 2007), the Court accepted the parties' argument that the
     "substantiality of risk transfer" was a predominate issue involved in the litigation. *Id* at 575-76.  While this indicates

21   some acceptance of the standards of the Countrywide Letter, the Letter is not referenced, nor does the court discuss
     other considerations referenced in the Countrywide Letter.  In *McCarn v. HSBA USA, Inc.,* 2012 WL 5499433 (E.D.

22   Cal. 2012), the court referenced the Countrywide Letter and listed the factors discussed therein. *Id* at *1.  However,
     this discussion from *McCarn* appears in the factual background section and is cited to the plaintiffs' complaint.

23   Moreover, the reference to the Countrywide Letter was unnecessary to the Court's decision and the plaintiffs' claims
     were dismissed for lack of standing and outside the statute of limitations. *Id.* at *3-4.

24

25          [9] Defendants' Opposition is not structured in a useful fashion.  Rather than arguing the specific
     requirements of Rule 23(a) and (b), e.g., commonality, predominance, etc., Defendants have presented all of their

26   arguments under the heading "The Named Plaintiffs Are Not Similarly Situated To The Class They Seek To
     Represent."  Def.'s Opp., 24, Doc. 129.  Defendants then present several arguments in opposition to class

27   certification, however, it is unclear if Defendants suggest these arguments defeat commonality, typicality,
     predominance, the adequacy of the representative Plaintiffs, or some other Rule 23 requirement. Defendants merely

28   use Rule 23 buzz words such as "typicality" and "adequacy." The Court will nonetheless attempt to address
     Defendants' various arguments under the proper Rule 23 inquiry.

controversy" ("Superiority"). Fed. R. Civ. P. 23(b)(3).

Rule 23 is more than a pleading standard. "A party seeking class certification must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes,* - - U.S. - -, 131 S. Ct. 2541 at 2552 (2011) ("*Dukes"*) (emphasis in original). "[A]ctual, not presumed, conformance with Rule 23(a) remains . . . indispensable." *General Telephone Co. Of Southwest v. Falcon*, 457 U.S. 147, 160 (1982).

When considering a motion for class certification, the Court must conduct a "rigorous analysis" to determine "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Dukes,* 131 S.Ct. at 2551-2; *Ellis v. Costco Wholesale Corp.,* 657 F.3d 970, 980 (9th Cir. 2011). Frequently "that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." *Ellis,* 657 F.3d at 980 (citing *Dukes,* 131 S. Ct. at 2551). While the court is generally required to accept a Plaintiff's allegations as true, *Blackie v. Barrack*, 524 F.2d 891, 901, n.17 (9th Cir. 1975), a court is not required to "unquestioningly accept a plaintiff's arguments as to the necessary Rule 23 determinations." *Campion v. Old Republic Home Protection Co., Inc.*, 272 F.R.D. 517, 525 (S.D. Cal. 2011) (internal citation omitted). In fact, the Court *must* probe behind the pleadings if doing so is necessary to make findings on the Rule 23 certification decision. *Ellis,* 657 F.3d at 981.

## 2.    Numerosity

Rule 23(a)(1) requires the members of a proposed class to be so numerous that joinder of all of the class members would be impracticable. Fed. R. Civ. P. 23(a). "Impracticability does not mean 'impossibility,' but only the difficulty or inconvenience in joining all members of the class." *Harris v. Palm Springs Alpine Estates, Inc.,* 329 F.2d 909, 913–14 (9th Cir.1964) (quoting *Advertising Specialty Nat. Ass'n v. FTC*, 238 F.2d 108, 119 (1st Cir.1956)). Additionally, the exact size of the class need not be known so long as "general knowledge and common sense indicate that it is large." *Perez-Funez v. Dist. Dir.,* 611 F. Supp. 990, 995 (C.D. Cal. 1984). This Court has held that the numerosity requirement "imposes no absolute limitations" but that "Plaintiffs must show some evidence of or reasonably estimate the number of class members." *Kincaid v. City of Fresno*, 244

F.R.D. 597, 602 (E.D. Cal. 2007) (citations and quotations omitted).

Defendants do not dispute Plaintiffs have met the numerosity requirement, and the Court finds this requirement is met. Based upon a document provided in discovery listing the total number of borrowers reinsured through Atrium on a yearly basis, the total number of borrowers falling within the proposed class definition exceeds 83,623. *See* Ciolko Decl., Ex. 5 at 217:19-218:18 and Ciolko Decl., Ex. 43 (listing of the number of policy holders subject to reinsurance contracts with Atrium for book years 2000 through 2009). Accordingly, the proposed Class satisfies the numerosity requirement of Rule 23(a)(1).

### 3.    Commonality

Rule 23(a)(2) requires "questions of law or fact common to the class." Historically, the requirements of Rule 23(a)(2) have "been construed permissively," and "[a]ll questions of fact and law need not be common to satisfy the rule." *Hanlon,* 150 F.3d at 1019. Indeed, "[e]ven a single [common] question" will satisfy the Rule 23(a)(2) inquiry. *Dukes,* 131 S.Ct at 2556 (internal citation omitted).

The Supreme Court's recent decision in *Dukes,* however, has undoubtedly increased the burden on class representatives by requiring that they identify *how* common points of facts and law will drive or resolve the litigation. *Dukes,* 131 S. Ct at 2552 ("What matters to class certification ... is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.") (internal citations omitted.) Under this standard, it is insufficient to merely allege any common question, for example, "did Defendant's conduct violate the UCL or CLRA?" *See Ellis v. Costco,* 657 F.3d at 981*; Dukes,* 131 S.Ct. at 2551-52 ("[a]ny competently class complaint literally raises common 'questions.'")

Plaintiffs argue there are numerous common questions of law and fact because Plaintiffs, on behalf of themselves and the proposed Class, challenge Defendants' uniform conduct. For example, Plaintiffs argue the following issues are central to Defendants' liability and subject to common proof: (1) whether Defendants' captive reinsurance arrangements involved sufficient transfer of risk; (2) whether payments to Atrium were bona fide compensation for services actually performed; and (3)

whether payments to Atrium exceeded the value of the reinsurance. Defendants' primarily offer two arguments in opposition to the commonality requirement: (1) the risk transfer analysis requires individualized inquiries; and (2) determining whether borrowers were "referred" to a Primary Insurer requires individual inquiries. Explained in greater detail below, Plaintiffs' claims present numerous common questions that are capable of generating common answers apt to drive the resolution of this litigation.

### i.      The Standard of Decision Is a Common Question to the Class

To resolve Plaintiffs' Section 8 claims on the merits, the Court must eventually determine a proper standard of decision to evaluate Defendants' captive reinsurance arrangement under Section 8. While the Court need not definitively opine on this standard at the class certification stage, it is notable that the question concerning the proper standard of decision is itself a question common to the Class which will drive resolution of the case. In other words, whether the Court should apply Defendants' case law approach or Plaintiffs' Countrywide Letter approach is a question common to the Class as a whole.

### ii.     Defendants' "Case Law" Standard of Decision Is Compromised Entirely of Common Questions

Defendants make no Rule 23 arguments concerning its "case law" approach to Section 8 liability. Indeed, Defendants did not raise this approach until its supplemental brief. While some of Defendants' arguments in opposition to class certification would apply equally under either standard of decision, Defendants do not discuss how its case law approach affects class certification.

Regardless, the questions specifically raised under Defendants' theory can be answered on a classwide basis. For example, Defendants argue they "actually perform" reinsurance services if they contractually are obligated to provide reinsurance upon the occurrence of a specified contingency. Whether Atrium has such contractual obligations is a common question for all class members.

Similarly, Defendants' argument that Atrium "actually performs" reinsurance services if it has ever made a reinsurance payment is an inquiry common to the Class as a whole. Atrium's reinsurance agreements do not apply to individual Class members. Rather, Atrium's reinsurance

agreements cover annual pools of loans which are aggregated into one trust account for each Primary Insurer.  Moreover, while Atrium may place new books of loans in the trust account on an annual basis, the terms of the reinsurance agreement apply for all book years in the aggregate.  Thus, under Defendants' theory, if Atrium made one payment to CMG in 2008, Atrium would be deemed to "actually provide" reinsurance services with respect to the CMG agreement as a whole.  Whether a reinsurance payment was ever made throughout the life of the four reinsurance agreements is a question that is common to the Class as a whole.

### iii.    The Risk Transfer Analysis Can Be Determined Through Class-wide Proof

Plaintiffs argue the primary consideration in determining Defendants' liability under Section 8 is whether Atrium assumed sufficient risk from the Primary Insurers.  Defendants argue the risk transfer analysis is not subject to common proof because risk assessment would entail a separate inquiry for each reinsurance agreement with a particular primary insurance provider, as well as for each book year among the four primary insurance providers.  Defendants argue the bands of coverage, as well as premium cedes, varied not only among the different reinsurance agreements, but even for different book years within a single reinsurance agreement.  Accordingly, Defendants argue, the Court would be required to inquire individually into the risk transfer for each book year on each reinsurance agreement.

Plaintiffs counter that a book year approach to the risk transfer analysis is at odds with the structure of Atrium's reinsurance business.  Specifically, coverage under Atrium's reinsurance agreements is provided for pools of loans originated during a given book year, which are then added to the same trust account and cross-collateralized with previous and subsequent books of loans for each of the Primary Insurers. Accordingly, Plaintiffs argue, the reinsurance agreements should be viewed over the life of the agreement, rather than in isolated slices of time.  Plaintiffs additionally argue that the core of their claims concerns contractual provisions contained in all of Atrium's agreements that limit Atrium's liability beyond what is stated in the contractual bands of loss.  These liability limiting features, Plaintiffs argue, demonstrate Atrium never assumed any real risk.

**a.      Contractual Liability-Limiting Considerations of Risk**

**Transfer Are Common to the Class**

The risk transfer analysis does not entail individualized inquiries.  The core contention of Plaintiffs' Motion for Class Certification is that Atrium's agreements with the Primary Insurers contained liability-limiting provisions precluding the transfer of any real risk.  This allegation is highly probative in the context of the Countrywide Letter, which states that a real transfer of risk takes place in an excess-of-loss arrangement if the reinsurer's band of loss is such that a reasonable business justification would motivate a private mortgage insurer to reinsure that band.  Assuming Plaintiffs' allegations are true, even if the band of loss superficially appeared to transfer risk, contractual clauses limiting Atrium's liability for that band may alter an otherwise reasonable business justification to reinsure that band.[10]

Defendants attempt to distinguish the contracts based on differing bands of loss and premium cedes, however, none of these differences concern liability-limiting features.   Additionally, Defendants vigorously dispute the merits of Plaintiffs' argument by referring to other contractual provisions purportedly exposing Atrium to liability.  This argument, too, misses the point.  The Court is not required to determine whether the language of the reinsurance agreements actually precluded a genuine transfer of risk.  At the class certification stage, Plaintiffs are required to show a common theory of liability can be asserted on behalf of the class as a whole; Plaintiffs do not need to prove that theory. A determination of whether Atrium's agreements with the Primary Insurers limited Atrium's liability is a common issue.

Moreover, even if Atrium's agreements with the Primary Insurers needed to be separately evaluated, the risk transfer analysis is still a common issue to the Class.  Defendants do not contend

---

[10]  For example, Section 13.4 of the UGI agreement contains the following provision: "Notwithstanding any other provision of this Agreement, the only consequence of Reinsurer's failure to deposit any required amounts into the Trust Agreement will be the termination of the Agreement pursuant to Section 5.4."  Ciolko Decl., Ex. 31. Similarly, Section 12.02 of the Genworth agreement states that "any assets not included in the Trust are not available to support or secure this Agreement." Ciolko Decl., Ex. 31. Reports issued by Defendants' actuary, Milliman, Inc, ("Milliman"), a national actuarial consulting firm, apparently confirm that the reinsurance contracts limit Atrium's liability: "If trust funds are depleted such that Atrium's capital is below the required capital, Atrium *can* infuse additional funds in order to continue reinsuring business. *However, Atrium has no liability beyond the funds available in the trust.*" Ciolko Decl., Ex. 30 (emphasis added).

individual class members' loans would need to be reviewed.  Rather, it is undisputed that the reinsurance agreements concern pools of loans aggregated into one multi-year trust account.  Thus, at most, the Court would need to evaluate four reinsurance agreements to determine whether the liability-limiting features of the agreements precluded a real transfer of risk.  These inquiries are common to Class.

**b.** **Band Loss and Premium Cede Considerations Are Common to the Class**

Differences in bands of loss and premium cedes do not preclude class certification.  The Northern District of California was presented with this precise issue in *Kay v. Wells Fargo & Co.*, 247 F.R.D. 572, 576 (N.D. Cal. 2007).  In *Kay,* the plaintiff alleged a captive reinsurance arrangement violated Section 8 of RESPA.  The lender and affiliated reinsurer utilized the services of seven different private mortgage insurers.  At class certification, the defendants argued the substantiality of risk transfer presented individualized inquiries, because this analysis would vary among the seven different reinsurance agreements.  *Kay* rejected this argument, stating that:

> In the present action, North Star's reinsurance agreements were not entered into for each individual borrower. Rather, they covered pools of loans for each private mortgage insurer. Accordingly, this order finds that at most it will have to consider the seven reinsurance agreements entered into by North Star with each private mortgage insurer. Such an investigation will not be so particularized that it will overshadow the common issues of the class.

*Id.* at 576.

This Court agrees with *Kay's* reasoning on this issue.  Atrium's reinsurance arrangements covered pools of loans for each of the four Primary Insurers.  Inquiries into individual loans would not be necessary to evaluate the sufficiency of risk transfer for these reinsurance agreements.  The required investigation "will not be so particularized that it will overshadow the common issues of the class."  *Kay,* 247 F.R.D. at 576.

Defendants suggest that because the bands of loss and premium cedes within the individual reinsurance agreements have changed over the years, the risk transfer analysis would need to be performed for each book year.  The Court is not persuaded by Defendants' book year approach to risk transfer.

First, the structure of Atrium's reinsurance arrangement does not lend itself to a book year approach. It is undisputed that all book years within a given reinsurance agreement are pooled into one trust account and cross-collateralized with all other book years. Because all book years are pooled and cross-collateralized, Atrium utilized capital and retained earnings from profitable book years to satisfy losses of unprofitable book years. Cross-collateralization increases the likelihood that all or a greater portion of reinsurance obligations could be satisfied from the trust account because the performance of a given book year affects the ability of the trust to meet reinsured obligations for other book years. *See,* Milliman's Analysis of Atrium's Excess-of-Loss Reinsurance Program, Doc. 117, Attach. 7, 9-12. Thus, cross-collateralization of all book years reduces the overall risk associated with continuing a reinsurance arrangement with a given insurer. *Id.* Cross-collateralization of all book years supports Plaintiffs' risk transfer analysis which is targeted at the captive reinsurance arrangement as a whole.[11]

Second, even if the Court accepted Defendants' position that changes in bands of loss and premium cedes should be independently evaluated, the evidence shows that any such fluctuations are minimal. Indeed, CMG's and Radian's bands of loss and premium cedes never varied throughout the life of the agreements. Def.s' Opp., Appendix. 1, Doc. 129. Thus, for at least two of the four reinsurance agreements, there is no basis for Defendants' book year approach.

Looking to the UGI agreement, only two of these fluctuations appear to have any bearing on the proposed class period (2004 - present). Def.s' Opp., p. Appendix 1, Doc. 129 (Showing an attachment point of 4%, detachment point of 14%, with a premium cede of 45% for the class period between 2004-2009. The agreement was amended to provide for a detachment point of 10% and a premium cede of 25% for the class period between 2009-present). The same is true for the Genworth agreement, where every book year from 2004-2008 had the same bands of loss and premium cede,

---

[11] Notably, Defendants' own arguments in opposition to class certification belie their assertion that the reinsurance at issue is appropriately viewed at the book year level. In support of their contention that risk was actually transferred, Defendants cite to *all* of the payments to be made from *all* of the trusts supporting the four reinsurance agreements that make up their captive reinsurance arrangement over the life span of the entire captive venture in the aggregate. Def.'s Opp., Doc. 129, 1: 9-12 ("Indeed, as a result of the collapse of the housing market . . . [Atrium's] entire reinsurance payments obligations will reach $224 million.") Thus, Defendants do not assess risk on a book year basis.

1  and was amended in 2008 to provide for a different band of loss and premium cede covering the

2  class period from 2008-present. Def.s' Opp., p. Appendix 1, Doc. 129.

3        Thus, even if the Court were to determine the UGI and Genworth agreements should be

4  evaluated with respect to changing bands of loss and premium cedes (and given Atrium's cross-

5  collateralization of all book years, such an analysis may not be of significant utility to the overall risk

6  transfer analysis), the Court would, at most, have to conduct an additional two analyses to account

7  for these changes. As the Court in *Kay* observed when acknowledging the need to consider seven

8  different reinsurance agreements, this investigation "will not be so particularized that it will

9  overshadow the common issues of the class." *Kay,* 247 F.R.D. at 576.

10        For class certification purposes, the most important consideration of Atrium's reinsurance

11  agreements is that they were not entered into with individual borrowers. Rather, the agreements

12  covered pools of loans for each Primary Insurer. Plaintiffs' allegations of contractual liability-

13  limiting features, alone, permits the Court to evaluate the sufficiency of risk transfer on a class-wide

14  basis. Furthermore, a more substantive approach risk transfer, i.e., bands of loss contrasted with

15  premium cedes, can be done on an aggregated basis for the entire Class. The sufficiency of risk

16  transfer is a common issue under Rule 23(a)(2).

17        **iv.**    **Whether a Referral Occurred Under Section 8(a)**

18        Section 8(a) prohibits a lender from receiving a thing of value for "referring" borrowers to

19  a private mortgage insurer. 12 U.S.C. § 2607(a). A "referral" under Section 8 is defined as "any oral

20  or written action directed to a person which has the effect of affirmatively influencing the selection

21  by any person of a provider of" private mortgage insurance. 24 C.F.R. § 3500.14(f)(1).

22        Defendants argue the question of whether and how each putative class member was referred

23  to a Primary Insurer will require individual inquiries. Defendants argue this individual inquiry will

24  arise in three contexts: (1) Plaintiffs have not provided evidence indicating that PHH directs the use

25  of a specific mortgage insurer when PHH originates the loan; (2) For brokered loans, PHH would

26  have no direct interaction with the borrower prior to closing and the selection of the insurance

27  provider is made by the broker and borrower, rather than PHH; and (3) For loans purchased by PHH

28  on the secondary market from correspondent lenders, the correspondent lender chooses the mortgage

1   insurer and sells the loan to PHH after closing.  For all these reasons, Defendants argue Plaintiffs can

2   not demonstrate that they or the Class members were "referred" to a particular insurance provider

3   as required by Section 8. Plaintiffs respond the evidence demonstrates that, whether borrowers dealt

4   directly with PHH or indirectly through a broker or correspondent lender, all PHH borrowers were

5   referred to mortgage insurance companies who had reinsurance agreements with Atrium.

6       Plaintiffs can litigate their theory that Defendants, whether directly or through brokers and

7   correspondent lenders, systematically referred borrowers to one of the Primary Insurers.[12]  Notably,

8   Defendants' briefing concedes this issue.  Defendants' opposition states that "PHH Mortgage does

9   provide brokers with a list of [private mortgage insurance] providers that can be selected by the

10  borrower if the broker decides to use PHH Mortgage as the lender for his or her customer." Def.s'

11  Opp., 24, Doc. 129.  Defendants' supplemental opposition states that "[w]hile it is true that, as with

12  brokered loans, PHH Mortgage provides its correspondent lenders with a list of preferred [private

13  mortgage insurance] providers, it does not direct the use of a specific [private mortgage insurance]

14  provider in connection with such loans, and it does not have any interaction with the borrowers prior

15  to closing."  Def.s' Sup. Opp., 27, Doc. 185.

16      Much of Defendants' argument asserts that PHH did not "direct" or "require" Plaintiffs to

17  use a particular insurer, however, this argument misses the point.  Plaintiffs do not need to establish

18  PHH "required" the use of a insurer.  Rather, all Plaintiffs must show is that they were "referred" to

19  an insurer.  By providing correspondent lenders and brokers with a list of PHH's Primary Insurers,

20  an issue common to the Class is whether this referral constitutes an "oral or written action directed

21  to a person which has the effect of affirmatively influencing the selection by any person of a provider

22  of" private mortgage insurance.

23      Additionally, Plaintiffs have offered significant evidence to support a classwide theory of

24  referral.  For example, the evidence shows that Defendants provided its brokers and correspondent

25  lenders  with  documents  describing  the  Primary  Insurers  as  "approved  providers  in  the  PHH

26

27

28      [12] The Court does not opine on whether Plaintiffs *have* made such a showing.  Rather, the Court acknowledges the evidence shows Plaintiffs can litigate their referral theories through common proof.

program." *See* Ciolko Decl., Ex. 11, Doc. 117 Attach. 4. These documents also show that borrowers would be assessed a .75% penalty if the "[mortgage insurance] commitment is not ordered through one of PHH's preferred [mortgage insurance providers]." *Id.* Moreover, PHH utilized a computer program that randomly assigned borrowers to one of the Primary Insurers. Ciolko Decl., Ex. 9, Doc. 117, Attach. 4 (the computer program "will enable automatic [mortgage insurance] company selection (GE v. UGI) based on parameters determined by Cendent Mortgage's business team. It will also provide a 'plug-and-play' infrastructure for future [mortgage insurance] vendors.")

Internal memorandums and correspondence from PHH personnel further demonstrate PHH's affirmative influence, if not outright control, over the private mortgage insurance selection process. For example, an email chain between various PHH personnel contains the following exchanges:

> "PHH offers our brokers and correspondents the choice of allowing PHH to order the Private Mortgage Insurance (PMI) commitment for your loans or you can order the PMI commitment yourself from a PHH-approved [mortgage insurance] provider ... If the PMI is not ordered through one of PHH's preferred providers, PHH will collect an additional fee in the amount of ¾ point ... If the PMI is ordered through United Guaranty, Genworth, Radian, or CMG, no additional adjustments to loan price or fees will be applied ... [w]e penalize all tiers if they do not use our preferred MI provider."

Doc. 224, Ex. A; *See also, Id.* at Exhibit B ("PHH will only accept – (4) Mortgage Insurance Companies. When any other M.I. Company is used – PHH hits your SRP with .75%"). Moreover, PHH personnel have specifically stated that they "completely control" mortgage insurance for retail loans. *See, Id.* at Ex. C (PHH's Sam Rosenthal stated that PHH "completely control[led]" mortgage insurance for "retail" loans and that for loans originated through "wholesale" or "correspondent" channels," PHH would select the insurance provider. For loans originated through credit unions, Mr. Rosenthal stated that PHH would insure such loans by selecting CMG, or "they can choose the [insurance] provider from our preferred [insurance] provider list, which we control.")

Defendants maintain that some Class members (including three of the named Plaintiffs) received specific disclosures regarding the reinsurance arrangement between Primary Insurers and Atrium. These disclosures state that the borrowers were "NOT required to use United, Genworth, Radian or CMG and therefore Atrium, as a condition for the settlement of [their] loan on the subject property." Defendants argue this disclosure demonstrates that Class members were not, in fact,

required to use the Primary Insurers.

The Court is not persuaded that this disclosure negates common issues. As the Court has already noted, *requiring* a borrower to use a certain insurance provider is not the same as *referring* a borrower to a preferred insurance provider. Section 8 requires a referral. If anything, this disclosure memorializes the fact that PHH refers (while apparently not "requiring") borrowers to use Primary Insurers. Moreover, this single statement in a disclosure does not override the substantial evidence to the contrary.

Defendants' citation to *Edwards v. First American Corp.,* 2012 WL 6963359 (C.D. Cal. 2012) does not alter this conclusion. In *Edwards*, a RESPA Section 8 case involving title insurance referral agreements, plaintiffs sought to certify a class of all consumers who used "one of [thirty eight] title agencies or similar entities that were partially-owned" by the defendants. *Edwards*, *Id*. at *4. The defendants argued that the plaintiffs could not satisfy Rule 23(b)(3)'s predominance requirement because, among other things, the referral of business at issue involved the practices of thirty-eight different companies. *Id*. at *17. The Central District denied class certification because the Court could not determine, on a classwide basis, the existence of a referral:

> [I]t was quite common for third parties such as lenders, mortgage brokers, Realtors, builders, and attorneys to affirmatively influence the selection of [the defendant] as the title insurance underwriter. Thus, asking the question "Did the referral agreements result in class members choosing [the defendant] as their insurance underwriter" would not yield a common answer with respect to the proposed nationwide class.

In reaching this conclusion, *Edwards* noted that the defendants "provided declarations from title agents, closing attorneys, and others at many of the title agencies at issue, all of which state that persons other than the title agencies influenced putative class members' choice of title insurance provider." *Id*. at *17-18. Based upon the record before it, the court in *Edwards* observed that defendants had "introduced significant evidence demonstrating that, for many of the putative class members, parties other than defendants or title agents with defendants had a referral agreement in place 'affirmatively influenc[ed] the selection' of the class member's title insurance provider." *Id*. at *17. Given this evidence, the *Edwards* court concluded that individualized issues would predominate the inquiry into each class member's "selection" of his or her respective title insurance

1    underwriter. *Id*. at *18.

2    Here, unlike *Edwards,* Defendants have not offered any evidence demonstrating that

3    individualized issues pertain to the manner in which Class members' loans were referred to private

4    mortgage insurers. Instead, Defendants contend that because certain Class members "may" not have

5    had direct contact with PHH, the referral mechanism pertaining to such Class members' loans was

6    somehow different. *See e.g.,* Defs. Opp. 24-25 ("PHH would have no direct interaction with the

7    borrower prior to closing and, therefore, the selection of a pmi provider *may* be made by the broker

8    and the customer")(emphasis added); Defs. Supp. 13 (same). With respect to the correspondent

9    loans, Defendants only offer the unsupported statement that PHH "does not direct the use of a

10   specific mortgage insurer in connection with such loans and it does not have any interaction with the

11   borrowers prior to closing." *Id*. This is not the "significant evidence" as was before the court in

12   *Edwards*.

13   Plaintiffs cite substantial evidence demonstrating that every Class member was referred to

14   a Primary Insurer by PHH's in-house protocols and procedures. In sum, the captive reinsurance

15   arrangement established and implemented by PHH at issue here is far different from the sprawling

16   and unwieldy scheme involving the thirty-eight different title insurance companies that the court

17   addressed in *Edwards*.  Whether Plaintiffs' referral theory will prevail at trial is currently not at

18   issue.  At the class certification stage, Plaintiffs only are required to offer a theory that can be

19   asserted on a classwide basis. Plaintiffs' referral theories can be litigated on a classwide basis.

20                   **v.    All the Countrywide Factors Are Susceptible to Classwide Proof**

21   The Countrywide Letter puts forth numerous considerations to determine whether a captive

22   reinsurance arrangement is valid, i.e, whether reinsurance is "actually provided" within the meaning

23   of Section 8.  This Court finds that every one of these considerations are susceptible to class-wide

24   proof.

25   For example, the first Countrywide inquiry asks whether the payments to the reinsurer are

26   "for reinsurance services 'actually furnished for services performed.'"  To satisfy this inquiry, it must

27   be shown that (1) there is a legally binding contract for reinsurance with terms and conditions

28   conforming to industry standards; (2) The reinsurer must post capital and reserves satisfying the laws

of the state in which it is chartered and the reinsurance contract between the primary insurer and the reinsurer must provide for the establishment of adequate reserves to ensure that, when a claim the reinsurer is made, funds will exist to satisfy the claim; and (3) there must be a real transfer of risk.

Each of these requirements can be analyzed on a class-wide basis.  For instance, the first requirement can be analyzed on a class-wide basis by comparing the terms and conditions of Atrium's four reinsurance contracts with expert testimony concerning the industry standards for reinsurance contracts.  The second requirement can be determined on a class-wide basis because Atrium pools all book years into one trust account.  This cross-collateralization allows the Court to compare the trust account capital and reserves with Atrium's potential liability over the aggregated life of the reinsurance agreement.  Lastly, as discussed above, the substantiality of risk transfer can be determined on a class-wide basis.

Turning to the second requirement that Atrium's compensation does not exceed the value of its reinsurance services, the six considerations[13] offered by the HUD can be determined on a class-wide basis as well. For the reinsurance agreements with CMG and Radian, the band coverage and premium cedes for all book years are constant, and all book years are cross-collateralized.  This circumstance permits straightforward application of these factors.  As for the UGI and Genworth agreements, the infrequency with which the band coverage and premium cedes fluctuate permits analysis of these considerations for multiple book years at once and, in all likelihood, would not entail more than two analyses for these agreements.

The requirements outlined by HUD are not exclusive, and numerous other actuarial and mathematical models may prove probative in determining whether Atrium "actually performs" reinsurance services.  The overarching point, however, is that consideration of individual class

---

[13] This inquiry may consider the following factors: (1) a comparison, "using relevant mathematical models, the risk borne by the captive reinsurer with payment provided by the primary insurer; (2) "Analyze the likelihood of losses occurring, the magnitude and volatility of possible losses, the amount of payments received, the timing of payments and potential losses, current market discount rates;" (3) take into account the relative risk exposure of the primary lender and the captive reinsurer; (4) consider the extent to which the lender or the firm controlling the captive reinsurer is shielded from potential losses by inadequate reserves and a corporate structure that segregates risks; (5) examine other transactions between the lender, primary insurer and captive reinsurer to determine whether they are related to the reinsurance agreement; and (6) examine whether the ceding commission is commensurate with the administrative costs assumed by the primary insurer.

members' agreements are not required to establish liability.  As all book years are pooled together and cross-collateralized, a broader analysis of the legitimacy of Atrium's reinsurance operation can be conducted on a class-wide basis.  The Court does not find any meaningful individual issues would need to be litigated to determine whether Defendants captive reinsurance arrangement violates Section 8.

**4.     Typicality**

Rule 23(a)(3) requires the claims or defenses of the representative parties be typical of the claims or defenses of the class.  The purpose of Rule 23(a)(3) is "to assure that the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir.1992).  Claims are "typical if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Id*.  The requirement is satisfied where the named plaintiff has the same or similar injury as the unnamed class members, the action is based on conduct which is not unique to the named plaintiffs, and other class members have been injured by the same course of conduct.  *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir.1992).

Defendants present two arguments that are properly considered under Rule 23(a)(3):[14]   (1) None of the named Plaintiffs received insurance from CMG, thus, the named Plaintiffs do not have "standing" to challenge those captive reinsurance agreements; and (2) Second, Defendants argue that because the reinsurance agreements with Radian and CMG have been commuted, the named Plaintiffs and putative Class members affiliated with these two insurers have no claim.[15]  The Court

---

[14] Defendants offer other "typicality" arguments that are more appropriately discussed as part of the commonality analysis.  For example, Defendants argue that "[t]o the extent the named plaintiffs' claims are not in the same book as other named plaintiffs, or there are other books where there are no named plaintiffs, the claims of the six named plaintiffs are not typical."  Def.s' Opp., 27: 17-20, Doc. 129. This argument ignores the basic concept of Rule 23(a)(3). The typicality requirement is satisfied where the named plaintiff has the same or similar injury as the unnamed class members, the action is based on conduct which is not unique to the named plaintiffs or relies upon a unique theory, and other class members have been injured by the same course of conduct.  Defendants' "book year" arguments do not suggest a different theory of recovery or fundamentally different course of conduct. Notably, Defendants "typicality" argument goes into a discussion of the validity of Atrium's risk transfer, and proceeds to argue that "the proposed class cannot make the required liability showing on the basis of common evidence."  Def.s' Opp., 28, Doc. 129.  Defendants' "book year" argument appears better suited for discussion under commonality, which the Court has done. *See, infra,* Section III.B.3.iii.b.

[15] When one of Atrium's reinsurance contracts were "commuted," the reinsurance agreement is terminated. Def.s' Opp. 34: 7-20. Upon commutation of the agreement, the Primary Insurer assumes the entire risk of loss with

1  addresses each argument in turn.

2          I.      "Standing" to Challenge the CMG Agreements

3          Defendants argue that none of the named Plaintiffs have "standing" to challenge the captive

4  reinsurance agreements with CMG.  Specifically, Defendants note that while the named Plaintiffs

5  challenge the captive reinsurance agreements with all four primary insurers, none of them received

6  insurance from CMG.  "Accordingly, the named plaintiffs do not have standing to represent a class

7  of individuals who obtained pmi from CMG."  Def.s' Opp., 22-23, Doc. 129.

8          Defendants' "standing" argument is misguided.  Neither CMG, nor any other insurer, is a

9  defendant in this action.  Standing concerns the relationship between the plaintiff and defendant;

10  not the relationship between a plaintiff and a third party that is not before the Court.  *Lujan* , 504

11  U.S. at 560-61 ("the injury has to be fairly traceable to the challenged action of the *defendant*.")

12  (emphasis added.)

13         The Court interprets this "standing" argument as one that asserts the named Plaintiffs' claims

14  are not typical of Class members who received insurance from CMG.  Under a typicality analysis,

15  each named Plaintiff must "possess the same interest" and have suffered "the same injury" as "all

16  the members of the class" they seek to represent, regardless of the Primary Insurer used. *Epstein v.*

17  *MCA, Inc*., 179 F.3d 641, 652 (9th Cir. 1999).  Each named Plaintiff was subject to Defendants'

18  captive reinsurance arrangement and suffered the same alleged harm as putative Class members

19  whose loans were insured by CMG.  Defendants do not suggest Class members whose loans were

20  insured by CMG are predicated on different factual or legal premises than Class members whose

21  loans were insured by any of the other three Primary Insurers.

22         The Northern District's decision in *Kay* lends support to the Court's analysis.  In *Kay,* a

23  single named Plaintiff proposed to represent a class of individuals in a Section 8 captive reinsurance

24  class action involving seven different insurers.  *Kay* found the claims relating to all seven of the

25  primary reinsurers were typical of *Kay's* claims. *Kay,* 247 F.R.D. at 576 ("Kay's claim is typical as

26  the rest of the class because it arises out of the same business practices. As the private insurance

27  ───────────────

28  respect to all of the underlying loans, and all remaining premium cedes and capital contributions remaining in that
particular reinsurance trust are forfeited to the insurer.  *Id.*

agreements cover pools of mortgage agreements, no individualized inquiry will be needed to examine either Kay's mortgage agreement or any other class member's mortgage agreement.")

The Court agrees with *Kay's* analysis on this issue and finds that the named Plaintiffs' claims are typical of the putative class members who received insurance from CMG.  The named Plaintiffs' claims derive from the same factual predicates and rely upon the same legal theory as the putative Class members whose loans were insured by CMG.

### ii.    Reinsurance Agreements that Have Been Commuted

Defendants argue that named Plaintiffs and putative Class members who received insurance from Radian or CMG are not typical of the other Plaintiffs' and class members claims because those two reinsurance agreements have been commuted.  As a result, Defendants have forfeited the funds remaining in those trusts.  Defendants argue this circumstance moots the claim of any named or putative plaintiff whose loans were insured by Radian or CMG.

Plaintiffs respond that commutation of the Radian and CMG agreements does not erase the Section 8 violations that took place from the time the mortgage transactions were finalized until those reinsurance agreements  were commuted.  At most, Plaintiffs argue, the commutations of the Radian and CMG agreements would limit damages.

Plaintiffs' and Class members' claims whose loans were insured by Radian or CMG are not "mooted" by Atrium's subsequent commutation of those agreements. The Radian and CMG agreements were in existence between 2004 and 2009, and during that time, Plaintiffs allege Defendants unlawfully received kickbacks from these insurers.  Prior Section 8 violations are not mooted merely because a party is no longer violating Section 8.

As Plaintiffs correctly observe, the only effect of Atrium's commutation of these agreements relates to damages.  Subsequent to the termination of these agreements, it could no longer be alleged Defendants were receiving kickbacks from the Primary Insurers.  Courts, however, consistently hold that the need for individual "damage calculations alone cannot defeat certification." *Yokoyama v. Midland Nat'l Life Ins. Co*., 594 F.3d 1087, 1094 (9th Cir. 2010); *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975) ("[t]he amount of damages is invariably an individual question and does not defeat class action treatment.")

1   Accordingly, commutation of these reinsurance agreements does not make Plaintiffs' claims
2   atypical to those of the Class.

3   **iii.    Plaintiffs' Claims Are Not Typical of Class Members From January 1,**
4   **2004 to June 1, 2007**

5   Section 8 of RESPA is subject to a one-year statute of limitations. *See,* 12 U.S.C. § 2607.
6   Plaintiffs filed their original Complaint on June 2, 2008; thus, the class period extends back to June
7   2, 2007. The named Plaintiffs seek to represent a class dating back to January 1, 2004.[16] Plaintiffs
8   contend that putative class members from January 1, 2004 to June 1, 2007 are entitled to equitable
9   tolling and/or equitable estoppel. The parties have dedicated significant briefing on the merits of
10  tolling.  Additionally, Plaintiffs argue the tolling determination is a merits inquiry not suited for
11  determination at class certification, and the Court should certify the proposed class, leaving the
12  merits of tolling for resolution post-certification.

13  The Court need not determine the merits of tolling because Plaintiffs' claims are not typical
14  of the Class period from January 1, 2004 to June 1, 2007.  "The certification of a class is
15  questionable where it is predictable that a major focus of the litigation will be on an arguable defense
16  unique to the named plaintiff *or to a subclass*." *Hanon,* 976 F.2d at 508, quoting *Rolex Employees*

17

18
19  [16] This lawsuit is a "piggyback" of other lawsuits that have been previously resolved. There were seven
    suits filed against private mortgage insurers, challenging, among other practices involving settlement fees and
20  services, the captive reinsurance arrangements that these companies had with the lenders that referred them business.
    *See Pedraza v. United Guar. Corp.*, No. 1:99-cv- 00239-AAA (S.D. Ga.).; *Moore v. Radian Group Inc.*, No.
21  2:01-cv-00023-TJW (E.D. Tex.); *Mullinax v. Radian Guar. Inc.*, No. 1:00-cv-01247-JAB (M.D.N.C.); *Patton v.
    Triad Guar. Ins. Corp.*, No. 1:00-cv-00132-AAA (S.D. Ga.); *Downey v. Mortgage Guar. Ins. Corp.*, No. 1:00-cv-
22  00108-AAA (S.D. Ga.); *Baynham v. PMI Mortgage Ins. Co.*, No. 1:99-cv-00241-AAA (S.D. Ga.); Three of these,
    *Pedraza, Downey, and Baynham* were settled together. *See* Ciolko Decl., Ex. 39 at ¶ 12 (*Baynham* Injunction); Ex.
23  40. The others were dismissed. The injunctions entered by the United States District Court for the Southern District
    of Georgia resolved various claims asserted under RESPA, including claims, like those asserted here, that challenged
24  the *bona fides* of captive reinsurance arrangements between the private mortgage insurers and the lenders who
    referred business to them. The settlements of the litigation against private mortgage insurers also enjoined all class
25  members, who were defined as borrowers who had obtained a "Covered Loan" (as defined in the settlement) by the
    private mortgage insurers that were party to the settlement including UGI (and PMI Mortgage Ins. Co) from bringing
26  suit asserting specified claims, including RESPA claims of the type at issue in this suit.  The injunction on class
    members applied to claims arising out of loan transactions "consummated on or before December 31, 2003." *See*
27  Ciolko Decl., Ex. 40 Baynham Settlement at ¶ 12. The start date of the class proposed for certification here is the
    first date after the dissolution of the injunction imposed by the settlements in the earlier litigation against the private
28  mortgage insurers—January 1, 2004.  (Pl.s' Mot. Class Cert., 44-46, Doc. 117.)  Essentially, Plaintiffs seek to pick
    up the litigation where these lawsuits left off.

*Retirement Trust v. Mentor Graphics Corp.*, 136 F.R.D. 658, 664 (D. Or.1991) (emphasis added); *See also, Perez v. First American Title Ins. Co.* 2010 WL 1507012 (D. Ariz. Apr. 14, 2010), citing *Duprey v. Conn. Dep't of Motor Vehicles*, 191 F.R.D. 329, 340–41 (D. Conn. 2000) ("class action cannot proceed on behalf of class members whose claims are time-barred"); *Daniels v. Fed. Reserve Bank of Chicago*, 194 F.R.D. 609, 618 (N.D. Ill. 2000) ("individuals with time-barred claims may not be included within a proposed class") (citation omitted); *Roberts v. Source for Public Data*, No. 2:08–cv–04167–NKL, 2009 WL 3837502, at *7 (W.D. Mo. Nov.17, 2009) (it would be "improper for the class definition to contain class members whose suits may be barred by the statute of limitation"); *Lopez v. G.A.T. Airline Ground Support, Inc.*, 2010 WL 3633177 (S.D. Cal., 2010) (Granting motion for class certification, but limiting the class to those class members whose claims were not time-barred); *Domingo v. New England Fish Co.*, 727 F.2d 1429 (9th Cir.1982) ("Domingo may represent all class members whose claims were not already time-barred").

All of the representative Plaintiffs' claims fall within RESPA's one-year statute of limitations.   These Plaintiffs may proceed to the merits of their claims without the need overcome statute of limitations hurdles.  Thus, claim tolling does not touch the merits of the named Plaintiffs' claims.  Rather, Plaintiffs' seek to  expand the scope of their proposed Class by invoking a tolling doctrine that does not have any applicability to their own claims. Necessarily, this raises potentially dispositive differences between class members whose claims arose within the statute of limitations (including every named Plaintiff) and those whose claims arose outside of it.[17]

If the Court were to follow Plaintiffs' suggestion and certify the Class as proposed, the interests of tolling class members would be represented by individuals who have no interest in claim tolling.  Further, if the Court were to later determine, post-certification, tolling was not available to these class members, tolling class members would forever be deprived of a potential RESPA claim because individuals who never had any concrete interest in claim tolling were unable to successfully

---

[17] This circumstance is distinguishable from the Ninth Circuit's long standing principle that potential individual defenses to class members or "individualized issues of compliance with the statute of limitations" do not generally defeat typicality or predominance. *Cameron v. E.M. Adams, & Co.*, 547 F.2d 473, 478 (9th Cir.1976); *Hanon,* 976 F.2d at 508–09.  In those instances, the Defendants *may* have been able to assert unique defenses against class members sprinkled throughout the Class.  Here, however, Defendants' statute of limitations defense has wholesale application to each class member from January 1, 2004 to June 1, 2007.

litigate the tolling issue.  Binding these absent Class members to an outcome in which none of the named representatives have a personal stake would be patently unfair.

The decision in *Minter v. Wells Fargo Bank, N.A.,* 274 F.R.D. 525 (D. Md. 2011) ("*Minter I"*) supports the Court's conclusion that Plaintiffs' claims are atypical of Class members from January 1, 2004 to June 1, 2007.[18]  In *Minter I,* Consumers filed actions alleging that a mortgage lender and real estate company created a sham entity to circumvent legislation designed to prevent market-distorting business practices within real estate settlement services industry, in violation of RESPA and other laws.  *Id.* at 529-31.  When the plaintiffs moved for class certification, the court was concerned in two respects.  First, the proposed class contained both timely and untimely claims.  Second, the court noted that the defendants' business operations "somewhat" changed right about the same time as the statute of limitation cutoff for the proposed class.[19]  *Id.* at 547-48.  Resolving these two concerns, the court determined the class should be bifurcated between timely and untimely claims and independently evaluated under Rule 23.  *Id.*

After observing that every named plaintiffs' claim was within the statute of limitations, *Minter I* determined that:

> The Named Minter Plaintiffs also fail under typicality with respect to the Tolling Class. First, Tolling Class claims must, as a threshold matter, satisfy certain requirements to be equitably tolled, whereas the claims of the Named Minter Plaintiffs suffer no such burden. Defendants, therefore, are entitled to attack the Tolling Class members' claims as unqualified for equitable tolling, and the Named

---

[18] Plaintiffs cite to subsequent *Minter* decisions that provide support for the Court's decision.  Plaintiffs cite to *Minter v. Wells Fargo Bank, N.A.,* 279 F.R.D. 320 (D. Md. 2012) ("*Minter II"*) and *Minter v. Wells Fargo Bank, N.A.*, 2013 WL 593963 (D. Md. Feb. 14, 2013) (*Minter III"*) in support of their argument that this Court should not reach the merits of tolling at the class certification stage.  Pls.' Supp. 15: 11-25, Doc. 208.  Both of these decisions, however, specifically concerned a tolling class where the named plaintiff's claims, as well as the claims of the proposed class, were all beyond the statute of limitations.  *Minter II,* 279 F. Supp. at 322. Indeed, the *Minter II and III* decisions were only required because *Minter I* specifically found that timely claims are not typical of untimely claims for certification purposes, and permitted the plaintiffs to seek a representative whose claims were typical of untimely claims, i.e., a representative whose claims required tolling.  *Minter I,* 274 F.R.D. at 548. That is not the case here.  The named Plaintiffs' claims, and indeed, the majority of the class's claims, are timely and do not concern the tolling issue in any way.

[19]  The court downplayed these differences, noting that, much like the minimal differences in Defendants' reinsurance arrangements, "the changes in [defendants'] operations over time are, without more, likely insufficient to justify splitting the class." *Id* at 547.

32

Minter Plaintiffs' claims are not typical for this purpose. Second, as discussed above, the facts of Prosperity's business operations as they relate to the Tolling Class are somewhat distinct from those as they relate to the Timely Class. This distinction alone is insufficient to defeat typicality, but when coupled with the need for a tolling analysis the Court is persuaded the Named Minter Plaintiffs' claims cannot represent members of the Tolling Class. Because the Tolling Class lacks a representative member with claims sufficiently typical and adequate, the Court will not certify the Tolling Class as such.

*Id*. at 449; *See also, Tait v. BSH Home Appliances Corp.,* 2012 WL 6699247 (C.D. Cal. 2012) (finding a named plaintiff whose claims were outside the statute of limitations typical of those class members who claims were similarly outside the statute of limitations, but atypical of those class members whose claims were inside the statute of limitations); *Alexander v. JBC Legal Group,* P.C., 237 F.R.D. 628, 631 (D. Mont. 2006) (holding that typicality requirement was met where "at least some of the other class members may also have received the letter outside of the statute of limitations").

This Court applies the same analysis as *Minter I.* Tolling Class members must satisfy certain requirements to assert their RESPA claims, whereas the claims of the named Plaintiffs suffer no such burden.  Defendants, therefore, are entitled to attack tolling Class members' claims on grounds inapplicable to the named Plaintiffs.  Accordingly, Plaintiffs claims are not typical of class members from January 1, 2004 to June 1, 2007.

## 5.    Adequacy of Representation

Rule 23 requires that a class be certified only if "representative parties will fairly and adequately protect the interests of the class." This factor requires that (1) the proposed representatives do not have conflicts of interest with the proposed class, and (2) that the representatives and their counsel will vigorously prosecute the action on behalf of the class. *Hanlon,* 159 F.3d at 120.

Defendants do not argue that Plaintiffs' counsel is inadequate or has any conflicts of interests with the proposed Class.[20] Defendants do not dispute that Plaintiffs' counsel would vigorously prosecute the this case on behalf of the Class.  Indeed, there is nothing in the record to suggest

---

[20] Plaintiffs and the proposed Class are represented by Barroway Topaz Kessler Meltzer & Check, LLP, Bramson, Plutzik, Mahler & Birkhaeuser, LLP, Berke, Berke & Berke and Travis & Calhoun, P.C.

1  Plaintiffs' counsel would not fairly and adequately protect the interests of the Class. The Court finds

2  Plaintiffs' counsel are experienced counsel and will represent the Class adequately.

3         Defendants argue that Plaintiff Munoz is not an adequate class representative because he is

4  delinquent on his loan.[21]  Defendants argue this circumstance subjects Mr. Munoz to affirmative

5  defenses not otherwise applicable to the putative class members. Plaintiffs respond that Mr. Munoz's

6  delinquency on his loan is irrelevant to a liability determination under Section 8.

7         Mr. Munoz's delinquency is irrelevant to Section 8 liability. If Defendants' conduct violated

8  Section 8, Defendants would be liable to Mr. Munoz for damages in an amount equal to three times

9  the amount Mr. Munoz paid for PHH's settlement service. Mr. Munoz's failure to stay current on

10  his loan is not a defense to Section 8 liability, and Defendants do not cite any authority to the

11  contrary. The only relevance of Mr. Munoz's delinquency relates to the amount of Mr. Munoz's

12  damages. As the Court just explained, individual damage inquiries do not defeat class certification.

13  *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010); *See also, Comcast*

14  *Corp. v. Behrend*, – U.S. –, 133 S. Ct. 1426 (2013) (the relevant damage inquiry requires damages

15  be capable of determination on a classwide basis, and that those damages be traceable to the

16  plaintiff's "liability case").

17  **B.      Rule 23(b)(3) Analysis**

18         Having satisfied the requirements of Rule 23(a), a plaintiff must next demonstrate that the

19  action can be appropriately certified under Rule 23(b)(1), (b)(1) or (b)(3). Plaintiff seeks to certify

20  the class under Rule 23(b)(3). To do so, Plaintiff must establish that  (1) "questions of law or fact

21  common to the members of the class predominate over any questions affecting only individual

22

23         [21]  Defendants argue that Plaintiffs Melani and Lovette are not adequate class representatives because

24  Atrium's agreements with Radian (the primary insurer of Plaintiffs Melani and Lovette) were commuted. According
to Defendants, "to the extent Melani and Lovette had a claim arising out of the reinsurance that Radian obtained

25  from Atrium, those claims have now been mooted by the commutation of the reinsurance agreement between Atrium
and Radian" Def.'s Opp., 35, Doc. 129. This argument is not proper under Rule 23(a)(4), as it does not argue these

26  plaintiffs would not fairly and adequately protect the interests of the Class, nor does it suggest these plaintiffs have a
conflict of interest with putative Class members. Thus, while Defendants make this argument under the "adequacy"

27  heading, the arguments that follow concern whether claims associated with commuted captive reinsurance
arrangements are typical of those that were not commuted. The Court has fully addressed this issue under Rule

28  23(a)(3), *infra,* Section III.B.4.ii and does not readdress it here.

members" ("Predominance") and (2) a class action is "superior to other available methods for the fair and efficient adjudication of the controversy." ("Superiority"); Fed. R. Civ. P. 23(b)(3).

### 1.   Predominance

Mere commonality pursuant to Rule 23(a)(2) is insufficient to meet Rule 23(b)(3)'s predominance requirement. *See Hanlon*, 150 F.3d at 1022.  Rule 23(b)(3) instead concerns "the relationship between the common and individual issues." 'When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than an individual basis.' " *Hanlon*, 150 F.3d at 1022 (citing Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1778 (2d ed.1986)). "Because no precise test can determine whether common issues predominate, the Court must pragmatically assess the entire action and the issues involved." *Romero v. Producers Dairy Foods, Inc*., 235 F.R.D. 474, 489 (E.D. Cal. 2006). "[T]he main concern in the predominance inquiry . . . [is] the balance between individual and common issues.*" Kelly v. Microsoft Corp*., 395 Fed. Appx. 431, 433 (9th Cir. 2010) (internal citation omitted.)

Defendants assert three individualized inquiries will predominate over common issues to determine whether Defendant' captive reinsurance arrangement violates Section 8: (1) the adequacy of risk transfer; (2) the referral mechanism; and (3) whether Class members are delinquent on their loans.  The Court has already determined the first two inquiries are common to the Class. *See, infra,* Sections III.B.3.iii-iv. The common issues discussed above, i.e., the proper standard of decision, adequacy of risk transfer, the referral mechanism and application of the Countrywide considerations, *see, infra,* Sections III.B.3.i-v, are the predominant issues relevant to Defendants' liability under Section 8. Indeed, these common issues are the driving force of this litigation.  Thus, these issues predominate.

This Court has already determined that the status of Class members' loans, e.g., current or delinquent, is irrelevant to Section 8 liability. *See, infra* Section III.B.5.  Rather, the status of Class members' loans is relevant only to individual Class members' damages, which generally does not defeat class certification. *Yokoyama v. Midland Nat'l Life Ins. Co*., 594 F.3d 1087, 1094 (9th Cir.

2010).

However, a recent Supreme Court decision has found a class action should not be certified when the damages traceable to the actionable conduct can not be determined on a classwide basis. *See, Comcast Corp. v. Behrend*, – U.S. –, 133 S. Ct. 1426 (2013). *Comcast* employed language that arguably detracted from the "black letter rule" that a class may obtain certification under Rule 23(b)(3) when liability questions common to the class predominate over damage questions unique to class members. *See, Id.* at 1433 ("respondents' model falls far short of establishing that damages are capable of measurement on a classwide basis. Without presenting another methodology, respondents cannot show Rule 23(b)(3) predominance: Questions of individual damage calculations will inevitably overwhelm questions common to the class.")

The *Comcast* ruling reiterated a well-established liability focus of the Rule 23 analysis: The damages must be capable of determination on a classwide basis, and those damages must be traceable to a plaintiff's "liability case." *Id.* In *Comcast*, the plaintiffs failed to link the asserted damages to the liability case, because the measure of damages flowed from four different antitrust theories; however, only one of those theories was viable at trial. In other words, the damage methodology did not measure the damages attributable to plaintiffs' theory of liability. Thus, it could not be determined that the plaintiffs' classwide determination of damages was attributable to plaintiffs' theory of liability.

The *Comcast* decision does not infringe on the long-standing principle that individual class member damage calculations are permissible in a certified class under Rule 23(b)(3). As the *Comcast* dissent noted, the majority opinion "breaks no new ground on the standard of certifying a class action under Federal Rule of Civil Procedure 23(b)(3)." *Id.* at 1436 (Ginsburg, J. Dissenting) ("[r]ecognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal. . . . In the mine run of cases, it remains the "black letter rule" that a class may obtain certification under Rule 23(b)(3) when liability questions common to the class predominate over damages questions unique to class members"); *See also,* Rubenstein, Newberg on Class Actions § 4:54, p. 205 (5th ed. 2012) (ordinarily, "individual damage[s] calculations should not scuttle class certification under Rule 23(b)(3)").

Other courts concur that the *Comcast* ruling does not break any new grounds under the Rule 23 analysis. *See, e.g., In re High Tech Employment Litigation,* 2013 WL 1352016 (N.D. Cal. Apr. 5, 2013) ("Because the *Comcast* plaintiffs' methodology for proving damages was not tied to their theory of impact, plaintiffs had failed to satisfy Rule 23(b)(3)'s predominance requirement."); *Forrand v. Federal Express Corp.,* 2013 WL 1793951 (C.D. Cal. Apr. 25, 2013) ("As the Supreme Court reemphasized in *Comcast,* in order for Rule 23(b)(3)'s predominance requirement to be satisfied, a plaintiff must bring forth a measurement method that can be applied classwide and that ties the plaintiff's legal theory to the impact of the defendant's allegedly illegal conduct."); *Boach v. T.L. Cannon Corp.,* 2013 WL 1316452 (N.D. N.Y. Mar. 29, 2013) ("The failure of the proponent of the class to offer a damages model that was "susceptible of measurement across the entire class for purposes of Rule 23(b)(3)" was fatal to the certification question."); *Martins v. 3PD, Inc* 2013 WL 1320454 (D. Mass. Mar. 28, 2013) ("I interpret [*Comcast*] not to foreclose the possibility of class certification where some individual issues of the calculation of damages might remain, as in the current case, but those determinations will neither be particularly complicated nor overwhelmingly numerous.")

Here, Plaintiffs can ascertain classwide damages directly attributable to their liability case. Plaintiffs' liability case is predicated on the theory that Defendants' captive reinsurance arrangement violated section 8 of RESPA.  If liability is proven, the damages for this violation are provided by statute, and call for three times the amounts paid for Defendants' settlement service.  12 U.S.C. § 2607(d)(2).

The parties dispute whether the appropriate measure of damages is the entire amount of the private mortgage insurance, or a percentage of the private mortgage insurance that parallels the premium cede.  The Court need not resolve this disagreement at the class certification stage.  In either case, the damages are measurable on a classwide basis.  For instance, if the measure of damages is the entire amounts paid for the private mortgage insurance, damages could be ascertained on a classwide basis, perhaps, by looking to Defendants' records for all payments received for private mortgage insurance during the Class period.  On the other hand, if the damages are for a prorated portion of the private mortgage insurance payments that parallels the premium cede, those

damages likely could be ascertained by some common methodology such as looking to Defendants' records for the total amount of private mortgage insurance payments in each reinsurance agreement and multiplying those amounts by the relevant premium cede.  In either instance, the damages are attributable to Plaintiffs' liability case on a class-wide basis.

Differing amounts of individual class members' damages does not defeat certification. Defendants' argument that delinquent class members would require individual damage determinations is wrong for two reasons: First, Section 8 does not suggest that statutory damages would be offset by any reinsurance payments made by Atrium.  Defendants suggest this is the only "fair" result, however, there is no authority in Section 8, case law, or HUD guidance for "offset." Second, even if damage offset would be appropriate, such an analysis would be conducted on a classwide basis because Atrium's reinsurance arrangement is not maintained on an individualized loan basis.  Reinsurance payments are made from a cross-collateralized trust account covering all book years in the aggregate, and therefore, any offset would be on per-reinsurance-agreement-basis; not by individual loan.  Accordingly, the individual and classwide damage determinations involved in this case are properly certified under Rule 23.

### 2. Superiority

The superiority requirement tests whether "class litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino v. Carter-Wallace, Inc.,* 97 F.3d 1227, 1234 (9th Cir. 1996).  "If each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually a class action is not superior." *Zinser,* 253 F.3d at 1192.  Rule 23(b)(3) specifies four nonexclusive factors that are "pertinent" to a determination of whether class certification is the superior method: (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action.  Fed. R. Civ. P. 23(b)(3)(A)-(D).

Class adjudication would be the superior method for resolving the claims at issue here.  First, there is no evidence that Class members have any interest in controlling prosecution of their claims

separately nor would they likely have the resources to do so.  Although the potential recovery is not insubstantial, given the costs of litigation and the superior resources and sophistication of the Defendants, no individual plaintiff is likely to have the means or incentive to pursue this litigation on his or her own.  Second, the Court is not aware of any other litigation raising the claims at issue here which have been commenced elsewhere on behalf of Class Members.  Third, concentrating the litigation in California is efficient and desirable because a substantial part of the events giving rise to the claims in this action occurred in this district.  Lastly, there will not be any undue difficulty in managing this litigation as a class action.  Indeed, because Class members can be identified from Defendants' records, individual notice can be readily accomplished.  This consumer action is well suited for class treatment, and litigation on a class basis is a superior method for adjudicating Plaintiffs' claims.

## CONCLUSION AND RECOMMENDATIONS

Having carefully considered the parties' submissions and the entire record in this case, the Court recommends Plaintiffs' Motion for Class Certification be GRANTED IN PART AND DENIED IN PART.

The Court RECOMMENDS the following class be certified:

All persons who obtained residential mortgage loans originated and/or acquired by PHH and/or its affiliates on or after June 2, 2007, and, in connection therewith, purchased private mortgage insurance and whose loans were included within PHH's captive mortgage reinsurance arrangements (the "Class").

The Court FURTHER RECOMMENDS that Efrain Munoz, Leona Lovette, Stephanie Melani, Iris Grant, John Hoffman, and Daniel Maga, II, be appointed as Class representatives.

The Court FURTHER RECOMMENDS the law firm of Barroway Topaz Kessler Meltzer & Check, LLP be appointed as Lead Class Counsel and the law firms of Bramson, Plutzik, Mahler & Birkhaeuser, LLP, Berke, Berke & Berke and Travis & Calhoun, P.C., be appointed as Class Counsel.

These findings and recommendations are submitted to the district judge assigned to this action, pursuant to Title 28 of the United States Code section 636(b)(1)(B) and this Court's Local Rule 304.  Within fifteen (15) days of service of this recommendation, any party may file written

1  objections to these findings and recommendations with the Court and serve a copy on all parties.

2  Such a document should be captioned "Objections to Magistrate Judge's Findings and

3  Recommendations."    The district judge will review the magistrate judge's findings and

4  recommendations pursuant to Title 28 of the United States Code section 636(b)(1)(C).

5       The parties are advised that failure to file objections within the specified time may waive the

6  right to appeal the district judge's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

7

8       IT IS SO ORDERED.

9  **Dated:   May 14, 2013**          **/s/ Barbara A. McAuliffe**

10                          UNITED STATES MAGISTRATE JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28