**KESSLER TOPAZ
MELTZER & CHECK, LLP**
Edward W. Ciolko
Terence S. Ziegler
Johnston de F. Whitman, Jr.
Joshua A. Materese
280 King of Prussia Road
Radnor, PA  19087
Telephone:  (610) 667-7706
Facsimile:  (610) 667-7056

*Counsel for Plaintiffs*
[Additional Counsel listed on signature page]

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| EFRAIN MUNOZ, LEONA LOVETTE, STEPHANIE MELANI, IRIS GRANT, JOHN HOFFMAN, DANIEL MAGA, II, and MARCELLA VILLALON, individually and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>          v.<br><br>PHH CORP., PHH MORTGAGE CORP., PHH HOME LOANS, LLC, ATRIUM INSURANCE CORP.<br><br>          Defendants. | **CASE NO.:  1:08-CV-759 AWI-BAM**<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br><br>JURY TRIAL DEMANDED |

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

JURISDICTION AND VENUE ................................................................................................3

PARTIES ..................................................................................................................................3

    A.    Plaintiffs ..................................................................................................................3

    B.    Defendants ..............................................................................................................7

FACTUAL ALLEGATIONS .....................................................................................................8

    A.    PHH's Operations ...................................................................................................8

    B.    PMI Industry ...........................................................................................................9

    C.    RESPA Prohibits Kickbacks For Referrals And Fee-Splitting To PMI Policies ................................................................................................................10

    D.    Mortgage Reinsurance Industry ...........................................................................12

    E.    Captive Mortgage Reinsurance Arrangements And HUD's Concern About RESPA Anti-Kickback Violations Under Such Arrangements ...........................13

    F.    PHH's CRAs .........................................................................................................16

CLAIM TOLLING ALLEGATIONS .....................................................................................18

    A.    Ms. Villalon Relied Upon Defendants' Disclosure At Her Loan Transaction .............19

    B.    Defendants Affirmatively Misled Ms. Villalon And The Other TSMs ........................21

    C.    The Disclosure Did Not Convey Information Sufficient To Alert Reasonable Borrowers Of Facts Vital To Their RESPA Claims....................................23

    D.    Following Her Loan Transaction, Ms. Villalon Was Neither On Notice Of Her Claims Nor Could She Have Reasonably Discovered The Facts Underlying Those Claims ..............................................................................28

CLASS ACTION ALLEGATIONS .........................................................................................31

CLAIM FOR RELIEF .............................................................................................................34

PRAYER FOR RELIEF ..........................................................................................................36

DEMAND FOR JURY TRIAL ...............................................................................................37

Plaintiffs Efrain Munoz ("Mr. Munoz"), Leona Lovette ("Ms. Lovette"), Stephanie Melani ("Ms. Melani"), Iris Grant ("Ms. Grant"), John Hoffman ("Mr. Hoffman"), Daniel Maga, II ("Mr. Maga") and Marcella Villalon ("Ms. Villalon") (collectively "Plaintiffs"), on behalf of themselves and a class of all others similarly situated, allege as follows:[1]

## INTRODUCTION

1.      PHH Corporation, one of the nation's largest financial services companies, together with certain participating subsidiaries and/or affiliates, including PHH Mortgage Corporation ("PHH Mortgage") and PHH Home Loans, LLC ("PHH Home Loans"), operating under various trade names (collectively referred to herein as "PHH" or the "Company") has acted in concert with its wholly-owned reinsurer, Atrium Reinsurance Corporation ("Atrium"), previously known as Atrium Insurance Corporation, to effectuate captive reinsurance arrangements ("CRAs") whereby, in violation of the Real Estate Settlement Procedures Act of 1974 ("RESPA"):  (a) illegal referral payments in the form of purported reinsurance premiums are paid by private mortgage insurers ("MIs") to Atrium; and (b) through Atrium, PHH receives an unlawful split of private mortgage insurance ("PMI") premiums paid by its borrowers.

2.      This is a proposed national class action brought by Plaintiffs on behalf of themselves and a class consisting of the following persons who obtained residential mortgage loans from PHH

---

[1] Plaintiffs file this Second Amended Class Action Complaint ("SAC") pursuant to the Court's August 11, 2014 Order Granting Defendants' Motion For Partial Judgment On The Pleadings And Granting Leave To Amend (ECF No. 266) ("August 11 Order") to address the perceived deficiencies in the First Amended Class Action Complaint ("FAC").  In accordance with the August 11 Order, the SAC amends only the allegations in the FAC (ECF No. 96):  (i) addressing why equitable tolling and equitable estoppel tolled the statute of limitations applicable to the claims of Ms. Villalon and all other members of the Tolling Subclass, as defined below in ¶2; and (ii) addressing the definition and scope of the class on behalf of which the SAC alleges claims.  *See* August 11 Order at 17 (Ms. Villalon "may not amend any section of the complaint outside the scope of equitable tolling and equitable estoppel pleadings.").  All other changes reflected herein are ministerial.  A redlined version of the SAC, reflecting the aforementioned changes, is attached hereto as Exhibit ("Ex.") A.

1

and/or its affiliates during the period from January 1, 2004 through January 1, 2010 (the "Class Period"):

    (i)    All persons who obtained residential mortgage loans originated and/or acquired by PHH and/or its affiliates on or after June 2, 2007, and, in connection therewith, purchased PMI that was putatively reinsured by Atrium pursuant to PHH's CRAs (the "Class").

    (ii)    All persons, like Ms. Villalon, who obtained residential mortgage loans originated and/or acquired by PHH and/or its affiliates on or between January 1, 2004 and June 1, 2007, and, in connection therewith, purchased PMI that was putatively reinsured by Atrium pursuant to PHH's CRAs (the "Tolling Subclass" or "Tolling Subclass Members" ("TSMs")).

3.    In this action, Plaintiffs challenge a secretive conspiracy to circumvent RESPA's prohibition against kickbacks and unearned fees.  Members of the conspiracy included PHH Corporation, PHH Home Loans, PHH Mortgage, Atrium and unnamed co-conspirator MIs.

4.    Homeowners who buy a home with less than a 20% down payment are typically required to pay for PMI.  PMI protects the lender in the event of a default by the borrower.  The premium is paid by the borrower and is usually collected by the lender with the borrower's monthly payments.  Borrowers typically have no opportunity to comparison-shop or select the MI.

5.    Section 2607 of RESPA prohibits lenders from:  (a) accepting kickbacks or referral fees from any person providing a real estate settlement service, including providers of PMI; and (b) accepting any portion of a settlement service fee—including amounts paid by borrowers for PMI—other than for services actually performed.  Thus, a lender cannot legally accept a kickback or any unearned portion of a premium from the insurer issuing the PMI policy on the borrower's home.

6.    Nonetheless, in defiance of RESPA's unambiguous mandate, PHH attempted to circumvent the statute's prohibition against accepting kickbacks and unearned fees by arranging for MIs to pay an excessive portion of borrowers' PMI premiums to Atrium in the form of purported reinsurance premiums.

7. While these payments to PHH's wholly-owned subsidiary were purportedly for "reinsurance" services, Atrium received these payments while assuming no actual, little, or incommensurate risk vis-à-vis the premium ceded to the reinsurer. For instance, during the period beginning in the year 2000 through the end of 2007, PHH's captive reinsurer received over $327,000,000 from leading primary mortgage insurers as its "split" of borrowers' PMI premiums— over $32,000,000 in 2007 alone. In stark contrast, during such time period, its actual insurance losses as reflected in the total amount of claims paid were zero. In other words, the hundreds of millions of dollars collected by PHH through its CRAs far exceeded the value of any services rendered.

8. This scheme constitutes disguised, unlawful referral fees in violation of RESPA's anti-kickback provisions, as well as a violation of RESPA's ban on accepting a percentage of settlement-service fees other than for services actually performed.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367 and 12 U.S.C. § 2614.

10. Venue is proper in this district under 28 U.S.C. § 1391(b) and 12 U.S.C. § 2614 because the real property involved in one or more of Plaintiffs' mortgage loan transactions is located in this district. Further, Defendants reside in this district and a substantial part of the events giving rise to the claims occurred in this district.

## PARTIES

A. **Plaintiffs**

11. Mr. Munoz resides in Shafter, CA. On or about June 2, 2007, Mr. Munoz obtained a residential mortgage loan from PHH for the purchase of a home, with a down payment of less than

20%.  Mr. Munoz was required to pay for PMI from a provider with whom PHH had a CRA.  Mr. Munoz was given no opportunity to select his MI; rather, the insurer was selected by PHH.

12.    Ms. Lovette resides in Sharon Hill, PA.  On June 11, 2007, Ms. Lovette obtained a residential mortgage loan from PHH for the purchase of a home, with a down payment of less than 20%.  Ms. Lovette was required to pay for PMI from a provider with whom PHH had a CRA.  Ms. Lovette was given no opportunity to select her MI; rather, the insurer was selected by PHH.

13.    Ms. Melani resides in Erie, PA.  On or about June 7, 2007, Ms. Melani obtained a residential mortgage loan from PHH for the purchase of a home, with a down payment of less than 20%.  Ms. Melani was required to pay for PMI from a provider with whom PHH had a CRA.  Ms. Melani was given no opportunity to select her MI; rather, the insurer was selected by PHH.

14.    Ms. Grant resides in Thousand Oaks, CA.  On or about December 31, 2007, Ms. Grant obtained a residential mortgage loan from PHH for the purchase of a home, with a down payment of less than 20%.  Ms. Grant was required to pay for PMI from a provider with whom PHH had a CRA.  Plaintiff Grant was given no opportunity to select her MI; rather, the insurer was selected by PHH.

15.    Mr. Hoffman resides in Chicago, IL.  On or about October 1, 2008, Mr. Hoffman obtained a residential mortgage loan from PHH for the purchase of a home, with a down payment of less than 20%.  Mr. Hoffman was required to pay for PMI from a provider with whom PHH had a CRA.  Mr. Hoffman was not given an opportunity to select his MI; rather, the insurer was selected by PHH.

16.    Mr. Maga resides in Chicago, IL.  On or about June 27, 2008, Mr. Maga obtained a residential mortgage loan from PHH for the purchase of a home, with a down payment of less than 20%.  Mr. Maga was required to pay for PMI from a provider with whom PHH had a CRA.  Mr. Maga was not given an opportunity to select his MI; rather, the insurer was selected by PHH.

17.     Ms. Villalon resides in Pueblo, Colorado.  On March 1, 2007, Ms. Villalon obtained a residential mortgage loan (REDACTED   from PHH Mortgage Corp. in connection with the purchase of a property located at 19 Aberdeen Bluffs, Pueblo, Colorado 81004 (the "Property").  Because her down payment on the Property constituted less than 20% of the Property's purchase price, Ms. Villalon was required to purchase PMI for PHH's benefit.   PHH selected CMG Mortgage Insurance Company ("CMG") (now known as Arch Mortgage Insurance Company) to provide the PMI on Ms. Villalon's loan, and Ms. Villalon pays and has paid $REDACTED per month for such coverage.  Ms. Villalon's loan was putatively reinsured through PHH's CRA with CMG.

18.     From the commencement of this action on June 2, 2008 (ECF Nos. 1-2), Plaintiffs have pursued claims on behalf of members of the Tolling Subclass, such as Ms. Villalon, whose claims accrued outside the one-year statute of limitations ("SOL") applicable to Sections 8(a) and 8(b) of RESPA—*i.e.*, borrowers who obtained a mortgage loan from PHH on or between January 1, 2004 and June 1, 2007—based upon the principles of equitable tolling and equitable estoppel (together, "Claim Tolling").[2]

19.     Prior to May 15, 2013, the interests of Ms. Villalon and other TSMs were represented by Plaintiffs Munoz, Lovette, Melani, Grant, Hoffman, and Maga.  On May 15, 2013, Magistrate Judge Barbara A. McAuliffe issued her Findings and Recommendations on Plaintiffs' Motion for Class Certification ("Findings and Recommendations"), within which Judge McAuliffe recommended that the Court certify a class in this action consisting of all "persons who obtained mortgage loans

---

[2] Under the *American Pipe* tolling doctrine, the filing of the CAC on June 2, 2008 tolled the statute of limitations as to all similarly situated absent Class members, such as Ms. Villalon.  *See Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974) ("[T]he commencement of a class action suspends the statute of limitations as to all asserted members of the class who could have been parties to the action had the suit been permitted to continue as a class action."); *see also Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 352-53 (1983) ("Rule 23 both permits and encourages class members to rely upon the named plaintiffs to press their claims.").

originated and/or acquired by PHH Corp. and/or its affiliates on or after June 2, 2007"—excluding from the then-proposed Class the more than 50,000 TSMs, such as Ms. Villalon, who obtained PMI coverage, that was putatively reinsured by Atrium, in connection with mortgage loans obtained from PHH and/or its affiliates between January 1, 2004 and June 2, 2007.  *See* ECF No. 230 at 30-33; *see also* Ex. 43 to the February 11, 2011 Declaration of Edward W. Ciolko in Support of Plaintiffs' Motion for Class Certification (ECF No. 115) (filed under seal) (reflecting that:  (i) 25,253 PMI policies on loans issued in 2004 by PHH were putatively reinsured by Atrium; (ii) 14,847 PMI policies on loans issued by PHH in 2005 were putatively reinsured by Atrium; (iii) 10,765 PMI policies on loans issued by PHH in 2006 were putatively reinsured by Atrium; and (iv) 14,455 PMI policies on loans issued by PHH in 2007 were putatively reinsured by Atrium).

20.     Judge McAuliffe did not recommend certifying the Tolling Subclass on the grounds that none of the then-existing proposed Class representatives' (*i.e.*, Plaintiffs Munoz, Lovette, Melani, Grant, Hoffman, and Maga) claims were typical of the claims of the TSMs because, unlike the TSMs, the proposed Class representatives did not need Claim Tolling to support their RESPA claims.  *See* ECF No. 230 at 30-33.

21.     Accordingly, on May 30, 2013, Ms. Villalon moved to intervene in this action (*see* ECF No. 231) as a proposed Class representative for the TSMs pursuant to Federal Rules of Civil Procedure ("Rule") 24(a) and 24(b).  In her submissions made in support of her motion to intervene, Ms. Villalon agreed to adopt the allegations in the FAC (including those underlying Claim Tolling).  *See* ECF No. 231-2 at 8.  Judge McAuliffe granted the motion to intervene on July 29, 2013 (*see* ECF No. 242 at 1-2) (the "July 29 Order"), and this Court denied Defendants' request for reconsideration of that decision on October 29, 2013 (ECF No. 247).

22.     Judge McAuliffe's July 29 Order further ordered the parties to engage in limited fact discovery concerning certain aspects of Claim Tolling and its susceptibility to class certification ("Limited Discovery") and to thereafter submit supplemental briefing regarding the same.  *See* ECF No. 242 at 19-20; *see also* August 14, 2013 Scheduling Order Re: Class Discovery and Supplemental Briefing on Class Certification (ECF No. 245) (same).  During Limited Discovery, the parties served and/or responded to document requests, interrogatories, and requests for admissions.   Defendants deposed Ms. Villalon on October 23, 2013.

**B.**     <u>**Defendants**</u>

23.     Defendant PHH Corporation is a Maryland corporation, with its corporate headquarters located at 3000 Leadenhall Rd., Mt. Laurel, New Jersey.   PHH does business in all fifty states. Defendant PHH Corp., the parent company of the other Defendants in this case, is a proper party to this action, as it: (a) participated in the unlawful scheme described herein; and (b) was and is a beneficiary of the unlawful kickbacks and unearned fees described herein.  *See, e.g.*, *2007 Form 10-K Submission to the Securities and Exchange Commission, filed February 29, 2008 ("2007 10-K")* ("We also generate revenue from reinsurance activities from our wholly owned subsidiary, Atrium Insurance Corporation").   Further, upon information and belief, Atrium funnels reinsurance premiums to PHH Corporation.   At any rate, regardless of whether Atrium paid dividends to PHH Corporation, PHH Corporation received substantial pecuniary benefit from its unlawfully-orchestrated CRAs.    Under RESPA Section 8(b), 12 U.S.C. 2607(b), it is unlawful for any person to accept any portion of an unearned fee.  Section 8(d) of RESPA, 12 U.S.C. § 2607(d), provides that a violator is jointly and severally liable for three times the amount paid for the settlement service.

24.     Defendant PHH Mortgage is a New Jersey corporation and a subsidiary of Defendant PHH Corporation.  PHH Mortgage was formerly known as "Cendant Mortgage."

25.     Defendant PHH Home Loans is a Delaware limited liability company and a subsidiary of Defendants PHH Corporation and Defendant PHH Mortgage.

26.     Defendant Atrium Insurance Corporation was a subsidiary of PHH and incorporated in New York.   On November 12, 2009, Atrium incorporated in the State of Vermont as Atrium Reinsurance Corporation, and assumed all premiums and liabilities of Atrium Insurance Corporation.

## FACTUAL ALLEGATIONS

**A.    PHH's Operations**

27.     PHH is one of the nation's largest originators of residential mortgage loans, as well as one of the country's biggest outsource providers of mortgage origination services.  Prior to February 1, 2005, PHH was a subsidiary of Cendant Corp. (renamed Avis Budget Group, Inc.).  Effective February 1, 2005, PHH was spun off as an independent, publicly traded company.  *See* 2007 10-K.

28.     The Company originates and services mortgage loans primarily through PHH Mortgage and its subsidiaries, one of which is PHH Home Loans.  PHH Home Loans has also conducted business under various assumed names, including Sunbelt Lending Services, Hamera Home Loans, ERA Home Loans, Burnett Home Loans, Coldwell Banker Home Loans, Cartus Home Loans, First Capital and Coastal Funding.  *See id.*; *see also* Exhibit 21 to 2007 10-K.

29.     Through its subsidiary Atrium, PHH enters into agreements to provide purported reinsurance services to primary PMI providers with respect to mortgage loans originated, funded and/or serviced by PHH.

30.     Atrium, a monoline mortgage guaranty insurance company, receives premiums from certain third-party PMI companies that insure loans originated by PHH's mortgage production division. *See* 2007 10-K.

8

**B.**     **PMI Industry**

31.     In order to lessen risk of default, lenders typically prefer to finance no more than eighty percent of the value of a home, with the remaining twenty percent being paid as a down payment by the borrower.  In the event of a default, the lender is then more likely to completely recover its investment.

32.     Many potential homebuyers cannot afford to pay 20% of the purchase price as a down payment on a home.  PMI allows the lender to make loans in excess of 80% of the home's value by providing a guarantee from a dependable third party—the MI—to protect the lender in the event of a default by the borrower.

33.     MIs are typically unaffiliated third-party companies who agree to cover the first twenty to thirty percent of the amount of the potential claim, including unpaid principal, interest and certain expenses.

34.     The amount of PMI coverage required varies according to the perceived risk of default. The lower the percentage of the borrower's down payment, the more PMI required.  For example, more PMI is required with a five percent down payment than with a fifteen percent down payment. Additionally, more PMI may be required for adjustable-rate mortgages than for fixed-rate mortgages.

35.     While the lender is the beneficiary of the PMI, the borrower pays the premiums, usually through an addition to the borrower's monthly mortgage payment.

36.     Borrowers generally have no opportunity to comparison-shop for PMI.  The MI is selected by the lender.  The terms and conditions of the insurance policy, as well as the cost of the policy, is determined by the lender and the MI, rather than negotiated between the borrower and the MI.

37.     The PMI industry began with the founding of Mortgage Guaranty Insurance Corp. ("MGIC") in 1957 and is dominated by MGIC and other companies, including, without limitation: PMI Mortgage Insurance Company, Genworth Mortgage Insurance Corporation ("Genworth"), Radian

Guaranty Inc. ("Radian"), AIG United Guaranty ("UGI"), Triad Guaranty Insurance Corporation and Republic Mortgage Insurance Company. Generally, the industry is represented by a trade association known as Mortgage Insurance Companies of America ("MICA"). According to its website, MICA's members include each of the foregoing insurers, with the exception of Radian Guaranty.

38. According to MICA, new PMI contracts for its member firms have consistently exceeded $200 billion per year since 1998. MICA member-firms issued over 1.4 billion new certificates of mortgage insurance in 2006, representing over $226 billion in new insurance written. MICA 2007-2008 Fact Book & Membership Directory, available at www.PrivateMi.com.

39. PMI is limited to the conventional home loan market. Mortgage loans directly insured by the federal government via mortgage guaranty programs, such as those maintained by the Federal Housing Administration and the Veterans Administration, maintain their own form of mortgage default insurance.

**C.** **RESPA Prohibits Kickbacks For Referrals And Fee-Splitting Related To PMI Policies**

40. RESPA is the primary federal law regulating residential mortgage settlement services. The United States Department of Housing and Urban Development ("HUD") is charged with enforcing RESPA. HUD has promulgated the implementing rules for RESPA. See Regulation X, 24 C.F.R. § 3500.

41. RESPA was enacted, in part, to curb the problem of kickbacks between real estate agents, lenders and other real estate settlement service providers. "It is the purpose of this chapter to effect certain changes in the settlement process for residential real estate that will result...(2) in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services." 12 U.S.C. § 2601(b).

42.     A key component of RESPA is its dual prohibition of referral fees and fee-splitting between persons involved in real estate settlement services.

43.     In 12 U.S.C. 2607(a) RESPA provides:

> No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

44.     In 12 U.S.C. 2607(b) RESPA provides:

> No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

45.     Regulation X further explains, "A charge by a person for which no or nominal services are performed or for which duplicative fees are charged is an unearned fee and violates this section." 24 C.F.R. § 3500.14(c).

46.     The term "thing of value" is broadly defined in RESPA and further described in Regulation X as including:

> without limitation, monies, things, discounts, salaries, commissions, fees, duplicate payments of a charge, stock, dividends, distributions of partnership profits, franchise royalties, credits representing monies that may be paid at a future date, the opportunity to participate in a money-making program, retained or increased earnings, increased equity in a parent or subsidiary entity…The term payment is used as synonymous with the giving or receiving any "thing of value" and does not require transfer of money.

24. C.F.R. § 3500.14(d).

47.     Regulation X further explains, "A charge by a person for which no or nominal services are performed or for which duplicative fees are charged is an unearned fee and violates this section." 24 C.F.R. § 3500.14(c).

48.     PMI business referred to MIs by a lender constitutes "business incident to or a part of a real estate settlement service" within the meaning of RESPA, 12 U.S.C. § 2607(a).   The term "settlement service" is liberally defined in RESPA and Regulation X and includes the "provision of services involving mortgage insurance." 24 C.F.R. § 3500.2(b).

49.     Under RESPA, therefore, a lender is prohibited from accepting referral fees from a MI or from splitting PMI premiums with the insurer other than for services actually performed.

**D.     Mortgage Reinsurance Industry**

50.     MIs may enter into contracts with reinsurers, whereby the reinsurer typically agrees to assume a portion of the MI's risk with respect to a given pool of loans.   In return, the MI pays to the reinsurer a portion of the premiums it receives from borrowers with respect to the loans involved.

51.     Mortgage reinsurance arrangements can generally take two forms:   (a) "quota share" and (b) "excess of loss."

52.     In a quota share reinsurance arrangement, the reinsurer agrees to assume a fixed percentage of all the MI's insured losses.   Thus, if the MI experiences losses, the reinsurer is certain to experience losses in the percentage agreed upon in the reinsurance coverage.

53.     In an excess of loss reinsurance arrangement, however, the reinsurer is liable only for claims, or a percentage thereof, above a particular level (the "entry point").   Unlike the quota share arrangement, the excess of loss method does not necessarily result in any risk of loss being shifted to the reinsurer, and, further, can unscrupulously be manipulated to, essentially, ensure that the reinsurer will never incur actual losses.

54.     The likelihood of the reinsurer experiencing any losses under this arrangement depends not only on the amount of losses by the PMI, but also on whether the reinsurance agreement between

the reinsurer and the MI sets the entry point for the reinsurer at a level where the reinsurer bears actual risk of loss.

**E.** **Captive Mortgage Reinsurance Arrangements And HUD's Concern About RESPA Anti-Kickback Violations Under Such Arrangements**

55.    MIs collect billions of dollars in premiums from customers produced by home mortgage lenders.  Certain lenders, seeking to capitalize on the billions of dollars their borrowers pay to these insurers in premiums each year, have established their own affiliated or "captive" reinsurers.  These captive reinsurers provide reinsurance primarily or exclusively for loans the lender originates that require the borrower to pay for PMI.

56.    Under the "CRA," the lender refers its borrowers to a MI who agrees to reinsure with the lender's captive reinsurer.  These arrangements require the MI to cede a percentage of the borrowers' premiums to the lender's captive reinsurer.

57.    Captive mortgage reinsurance arrangements raise obvious RESPA kickback problems. MIs are dependent on the lender to obtain business, while the lender is collaborating with the insurer to obtain a share of the borrower's premium revenue through its captive reinsurer.  The insurer stimulates its business by providing a lucrative stream of revenue for the lender via the lender's captive reinsurer.

58.    Simply put, as opposed to receiving direct payments for referring its customers to a certain MI, an unscrupulous lender can use a CRA to funnel such unlawful kickbacks through its subsidiary reinsurance company.

59.    Concerned that these transactions would be designed to disguise a funneling of referral fees back to the lender who arranged for the MI to obtain the business, HUD issued a letter dated August 6, 1997 ("HUD letter") addressing the problem of captive reinsurers and RESPA's anti-kickback violations.  *See* HUD letter, attached as Ex. B.

60.     The HUD letter concluded that CRAs were permissible under RESPA only "if the payments to the affiliated reinsurer:  (1) are for reinsurance services 'actually furnished or for services performed' and (2) are bona fide compensation that does not exceed the value of such services" (emphasis in original).

61.     The HUD letter focuses the RESPA anti-kickback analysis on whether the arrangement between the lender's captive reinsurer and the MI represents "a real transfer of risk."  HUD warned that "The reinsurance transaction cannot be a sham under which premium payments . . . are given to the reinsurer even though there is no reasonable expectation that the reinsurer will ever have to pay claims."

62.     The HUD letter states "This requirement for a real transfer of risk would clearly be satisfied by a quota share arrangement, under which the reinsurer is bound to participate pro rata in every claim" (emphasis in original).

63.     The HUD letter contrasts the excess loss method of reinsurance.  HUD states that excess loss reinsurance contracts can escape characterization as a referral fee or fee-split only:

> …if the band of the reinsurer's potential exposure is such that a reasonable business justification would motivate a decision to reinsure that band.  Unless there is a real transfer of risk, no real reinsurance services are actually being provided. In either case, the premiums paid…must be commensurate with the risk.

64.     Notably, state insurance commissioners and federal regulators have investigated and uniformly condemned similar CRAs in the title insurance industry as sham transactions designed to funnel unlawful kickbacks for business referrals.  As a result, a number of offenders paid fines, reimbursed customers and abandoned such arrangements altogether.  *See, e.g.*, http://www.fntg.com/captive_reinsurance.asp; *see also* Lori Lesko, *Stewart Faces Renewed Charges of RESPA Reinsurance Violations*, $42 Million Fine, RESPANews.com, *available at:* http://RESPANews.com, Archived News Headlines (last accessed June 2, 2008) (noting the California

14

Department of Insurance's accusation that Stewart Title reported anticipated recoveries from the captive reinsurers on reported claims from 1998-2006 of zero dollars, thereby indicating no real transfer of risk or expectation of transfer of risk"); *Insurance Commissioner of the State of California v. Stewart Title Guaranty Co.*, File No. DISP05048942 (Insurance Commissioner of the State of California June 27, 2007); Janis Mara, *Wells Fargo, Citibank Under Investigation in Alleged Kickback Schemes, Inman News, available at:* http://alta.org/indynews/news.cfm?newsID=2571 (last accessed June 2, 2008); Steve Zurrier, *Kickbacks Probed*, AllBusiness.com, *available at:* http://www.allbusiness.com/personal-finance/real-estate/941921-1.html (last accessed June 2, 2008) (noting, "The problem is that these particular reinsurance companies have yet to pay out any claims, which is why state insurance officials allege the money sent to the reinsurance companies is a flat-out kickback"); HUD Reaches RESPA Settlements With Major Lender And Builders For $1.6 Million, Press Release dated July 18, 2006, *available at:* http://www.hud.gov/news/release.cfm?content=pr06-086.cfm.

65.     The National Association of Insurance Commissioners ("NAIC") also addressed the accounting treatment of premiums ceded to captive mortgage reinsurers.  Under the annual statement requirements of the NAIC, MIs should not treat as authorized reinsurance amounts ceded to lender-captive reinsurers where adequate risk is not transferred.  Rather, such amounts should be accounted for under the less beneficial deposit accounting guidelines and identified as though unauthorized accounting was being utilized.

66.     Finally, HUD also stated that consumers should be provided with adequate disclosure concerning their lenders' CRAs, finding that "consumers would be well served by a meaningful disclosure and a meaningful choice for consumers having their loans included in a captive reinsurance program."  HUD defined a "meaningful disclosure" as one that "would reveal that the CRA exists, that

the lender stands to gain financially under the arrangement, and that the consumer may choose not to have his or her insurance provided by an insurer in such an arrangement.  HUD defined a "meaningful choice" as one that "would provide the consumer an easy, non-burdensome opportunity to opt out by, for example, indicating a preference one way or the other on a form."

**F.      PHH's CRAs**

67.      In connection with the billions of dollars in home loans originated by PHH, many of its borrowers pay for PMI.

68.      PHH enters into "CRAs," whereby it refers its borrowers to MIs, who agree to reinsure with Atrium.  These insurers include at least:  UGI; Genworth; Radian; and CMG.

69.      PHH has a strong financial interest in steering business to MIs who, in turn, agree to reinsure with Atrium on terms that will produce significant kickbacks to PHH.

70.      Atrium enters into reinsurance agreements solely with respect to loans originated by PHH.

71.      Under PHH's CRAs, the MI pays Atrium a percentage of the premiums paid by borrowers on a particular pool of loans; in return, Atrium purportedly agrees to assume a portion of the MI's risk with respect to the loans involved.

72.      In fact, no actual, little or incommensurate risk is actually transferred from the primary insurer to Atrium in exchange for the significant reinsurance payments to Atrium.  The actual risk, if any, transferred to Atrium is not commensurate with the premiums it extracts from the MI.

73.      The numbers speak for themselves.  For instance, during the time frame beginning in 2000 and extending through 2007, PHH's captive reinsurer has collected from MIs over $327,000,000 as its "share" of borrower's PMI premiums.  In contrast, its "share" of paid insured losses was zero:

| YEAR | PREMIUMS RECEIVED BY REINSURER | LOSSES PAID BY REINSURER |
|---|---|---|
| 2007 | $32,559,000 | $0 |
| 2006 | $35,740,000 | $0 |
| 2005 | $45,718,000 | $0 |
| 2004 | $41,868,000 | $0 |
| 2003 | $46,198,000 | $0 |
| 2002 | $49,785,000 | $0 |
| 2001 | $42,943,000 | $0 |
| 2000 | $32,749,000 | $0 |
| TOTAL: | $327,560,000 | $0 |

74.     As HUD noted during its testimony by Assistant Secretary for Regulatory Affairs and Manufactured Housing Gary M. Cunningham before the United States Congress (referring to analogous CRAs in the title insurance industry):

> [W]hen there is a history of little or no claims being paid, or the premium payments to the captive reinsurer far exceed the risk borne by the reinsurer, there is strong evidence that there is an arrangement constructed for the purpose of payment of referral fees or other things of value in violation of Section 8 of RESPA.

75.     The millions of dollars collected by PHH through its captive reinsurer have clearly not been commensurate to its actual risk exposure.  The Company has received millions of dollars in payments, while bearing little or no risk of loss.

76.     In reality, PHH's CRAs were and are sham transactions for collecting illegal kickbacks in return for referring PMI business to certain insurers.

77.     The money PHH collected through its captive reinsurer far exceeded the value of the services, if any, it performed.   There was no real transfer of risk or, at least, not a commensurate transfer of risk.   The amounts paid were simply disguised kickbacks to PHH for the referral of borrowers to MIs.

78.     These arrangements keep premiums for PMI artificially inflated because a percentage of borrowers' premiums are not actually being paid to cover actual risk, but are simply funding illegal kickbacks to lenders.   In other words, because the money collected by a lender through its captive reinsurer comes from borrowers' PMI premiums, borrowers are essentially required to pay for both actual PMI coverage and MIs' unlawful kickbacks to lenders.

79.     Amounts paid to lenders as unlawful kickbacks have become a part of the cost of doing business for MIs.   As a result, PMI premiums incorporate the payment of such kickbacks—to the detriment of consumers.

## CLAIM TOLLING ALLEGATIONS

80.     Prior to and throughout the Class Period, Defendants participated in and were parties to an agreement or understanding that was, by its very nature and purposeful design, a "pay-to-play" scheme.   Through this agreement or understanding, PHH continually violated RESPA through CRAs pursuant to which PHH's "preferred" MIs funneled kickbacks to Atrium.   The kickback payments that the MIs provided were made in exchange for PHH's referral of its borrowers' PMI business, rather than for actual reinsurance services (as defined by applicable regulatory, actuarial, and accounting guidelines) that Atrium was to perform or actually performed.

81.     The statutes of limitations applicable to the claims asserted herein should be tolled based upon the principles of Claim Tolling.  Ms. Villalon and the other members of the Tolling Subclass were not (nor should they have been) on notice of their claims against Defendants before June 2, 2007, one

year prior to the filing of the CAC, after which the *American Pipe* tolling doctrine applied to their claims,[3] and they each exercised objectively reasonable due diligence under the circumstances. This is particularly true here based upon Defendants' affirmative acts of concealment.

82.     Any delay in the TSMs' commencement of this litigation is excusable and, accordingly, it would be inequitable for the Court to apply the one-year limitation period set forth in RESPA Section 16, 12 U.S.C. § 2614 to preclude the claim of any TSM. For Ms. Villalon and the other TSMs, Claim Tolling is available and should apply.

### A.     Ms. Villalon Relied Upon Defendants' Disclosure At Her Loan Transaction

83.     Ms. Villalon's loan transaction took place on March 1, 2007. At her closing, Ms. Villalon received a uniform "Mortgage Insurance" disclosure (the "Disclosure") set forth at paragraph ten (10) within her mortgage "Deed of Trust," which purported to describe Defendants' CRAs. *See* Ex. C (Ms. Villalon's Deed of Trust). Defendants similarly provided or caused to be provided the information within this uniform Disclosure to each of the more than 50,000 other TSMs who obtained a mortgage from PHH that required them to purchase PMI for PHH's benefit that was putatively reinsured under Defendants' CRAs. *See* ¶19, *supra*; *see also* Ex. D (Defendants' Objections and Responses to Plaintiffs' First Set of Interrogatories Directed to All Defendants Pursuant to the Court's July 29, 2013 and August 15, 2013 Orders) at Response No. 7 ("REDACTED

").

---

[3] *See* ¶18, *supra* (discussing *American Pipe* tolling and its application to Ms. Villalon's claims).

84.     Like other TSMs, in order to obtain her mortgage loan from PHH, at her loan transaction, Ms. Villalon:  (i) reviewed each page of the mortgage Deed of Trust (including the Disclosure); and (ii) signed or initialed each page.

85.     The uniform Disclosure presented to Ms. Villalon and to other TSMs stated:

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

[MIs] evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses.  These agreements are on terms and conditions that are satisfactory to the [MIs] and the other party (or parties) to these agreements.  These agreements may require the [MI] to make payments using any source of funds that the [MI] may have available (which may include funds obtained from [PMI] premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for [PMI], in exchange for sharing or modifying the [MI's] risk, or reducing losses.  If such agreement provides that an affiliate of Lender takes a share of the [MI's] risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance."  Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for [PMI], or any other terms of the Loan.  Such agreements will not increase the amount Borrower will owe for [PMI], and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights borrower has – if any – with respect to the [PMI] under Homeowners Protection Act of 1998 or any other law. . . .**

*See* Ex. C at ¶10 (bold emphasis in original).

86.     Neither prior to nor after their respective closings, did Ms. Villalon or any other TSM receive *any* communication from Defendants concerning the actual or potential putative reinsurance of PMI.  Depending upon the date that a particular TSM received a mortgage loan from PHH, and which

of PHH's "preferred" MI providers insured their loan, a TSM may have also received an "Affiliated Business Arrangement Disclosure Statement" ("ABD") at his or her closing.  *See* Ex. E (the ABD produced by Defendants in Limited Discovery).

87.     While Ms. Villalon did not receive an ABD, there are no material differences between the representations concerning the CRAs in the Disclosure and those in the ABD (together, the Disclosure and the ABD are referred to herein as the "Mortgage Documents").  Instead, the ABD repeated and reinforced in substantial form the representations in the Disclosure concerning the CRAs, which all TSMs received.  For instance, the ABDs that PHH distributed during the Class Period stated that:  (i) any CRA "may provide…a financial or other benefit" to PHH; (ii) the MI providing the PMI on a particular borrower's loan would "pay a reinsurance fee to Atrium [the reinsurer] for its assumption of [the MI's] risk"; and (iii) a borrower could purportedly "opt out" of using a PMI provider that had a reinsurance agreement with PHH.  As alleged below, the language of the Disclosure and the ABDs did not place TSMs on notice of their claims.  In fact, ***only one of the more than 24,000 TSMs who obtained their PMI from Genworth acted to exclude his or her loan from PHH's CRA with Genworth during period from January 1, 2004 through December 31, 2008***.

**B.     Defendants Affirmatively Misled Ms. Villalon And The Other TSMs**

88.     Upon information and belief, PHH intentionally utilized the Disclosure it provided to its borrowers to misrepresent and conceal information that would put those same borrowers on notice of vital information bearing upon their respective RESPA claims.  Although undetectable by Ms. Villalon within the limitations period, Defendants' affirmative acts of concealment that cloaked Defendants' RESPA violations are straightforward.  Specifically, Defendants made affirmative misrepresentations and false assurances within the Disclosure regarding the CRAs':  (i) purported lack of any impact upon Ms. Villalon's rights, interests, or costs; and (ii) putative legitimacy.

89.     Starting with the former, the express bold-faced false assurances within the Disclosure affirmatively misrepresented to reasonable borrowers that the CRAs would "not affect the amounts [borrower] ha[d] agreed to pay for [PMI]" or "the rights [borrower] ha[d]."  Upon information and belief, Defendants intentionally designed this language to lull Ms. Villalon and other TSMs into believing that the CRAs described in the Disclosure *would have no practical impact on their costs, rights, or interests*.  In short, the Disclosure portrayed the potential reinsurance of the TSMs' PMI as an insurance business transaction concerning which a borrower, such as Ms. Villalon—"not a party to the Mortgage Insurance"—had no practical reason to be concerned.

90.     Though not necessary for Plaintiffs' to prove their RESPA claims, these representations were false and misleading because Defendants' unlawful kickback and fee-splitting arrangement had the direct and broad effect of "increas[ing] unnecessarily the cost of" the settlement service—PMI—on a market-wide basis.  *See* 12 U.S.C. § 2601(b).

91.     Further, the Disclosure affirmatively misrepresented, and thus concealed, the true nature and purpose of the CRsA by misrepresenting to borrowers that any payments made or ceded to PHH of portions of its borrowers' PMI premiums would be in exchange for actual reinsurance—*i.e.,* the transfer of actual or commensurate risk to the reinsurer.  Defendants' representations and assurances are false and misleading not for what they omitted, *but for what they affirmatively stated*.  In this regard, Defendants misrepresented to Ms. Villalon and every other TSM that the purpose of the CRAs were to "*shar[e] or modif[y] the [MI's] risk*" and/or "*reduc[e] losses*" associated with each TSM's mortgage, which portrayed the arrangement as providing *bona fide* reinsurance.  In reality, however, the MIs' purported "reinsurance" payments to Atrium were prohibited kickbacks made in exchange for PHH's referrals of its borrowers to the MIs to purchase PMI.

92.     Defendants' use of the misleading form Mortgage Documents constitutes an affirmative act of concealment that is separate and distinct from Defendants' conduct that violated RESPA. Defendants' disclosure or nondisclosure of their alleged unlawful conduct is not an element of Plaintiffs' RESPA claims—Defendants' unlawful receipt of kickbacks and splitting of fees would violate RESPA even if these wrongful acts had been fully disclosed.  Moreover, Defendants' affirmative misrepresentations have no bearing upon Defendants' liability.  Instead, these affirmative misrepresentations bear directly upon the TSMs' ability to learn of the facts underlying their claims. While the kickbacks that PHH's "preferred" MIs paid PHH for referrals of PHH's borrowers violated RESPA regardless of Defendants' misrepresentations, these misrepresentations precluded Ms. Villalon and the other TSMs from detecting Defendants' RESPA violations and commencing litigation within the limitations period.  Upon information and belief, Defendants used the misleading Disclosure for the purpose of concealing those violations and preventing Ms. Villalon and the other TSMs from discovering the underlying bases for their claims, despite exercising reasonable due diligence both within and outside the limitations period.

C.      **The Disclosure Did Not Convey Information Sufficient To Alert Reasonable Borrowers Of Facts Vital To Their RESPA Claims**

93.     The uniform Disclosure, which purports to explain the reinsurance of PMI—*i.e.*, that the reinsurance company receives a part of the MIs' premiums in exchange for assuming a portion of the risk of a borrower defaulting—specifically assured Ms. Villalon and all other TSMs that they were "*not a party to the mortgage insurance*" (*see* Ex. C at ¶10) and that PHH's CRAs would not have, or were not having, ***any practical impact*** on the TSM's respective costs, loan terms, or PMI or settlement rights or obligations.

94.     Regardless of whether the CRAs were, in fact, having a practical impact on Ms. Villalon's rights, costs, and interests—as she alleges that they were—the false assurances within the

Disclosure quelled any concern that an objectively reasonable borrower, such as Ms. Villalon, may have regarding the potential reinsurance of the PMI that they were required to purchase for the benefit of PHH.

95.     Here, as a direct result of these assurances, it was irrelevant to Ms. Villalon and other TSMs that the Disclosure (or any other document):  (i) mentioned "captive reinsurance;" (ii) explained the general purpose of PMI; (iii) noted the possibility that Defendants may receive a financial benefit from the CRAs; or (iv) purportedly permitted borrowers to "opt out" of using a particular PMI provider with which PHH had a CRA—to which they were assured they "were not a party."  To an objectively reasonable borrower, such as Ms. Villalon, this generic information neither raised a specter of impropriety nor conveyed any other facts that would excite inquiry.  Simply being told the PMI that a borrower was required to purchase for the benefit of his or her lender (and as to which the borrower is not a party) may be reinsured is insufficient to put an objectively reasonable borrower on notice that anything improper or actionable may have occurred (or may occur in the future), or that his or her rights under RESPA may have been violated.  The mere appearance of the words "captive reinsurance" within the Disclosure is insufficient to excite the inquiry of a reasonable borrower.

96.     Indeed, in defending themselves against identical RESPA claims in litigation that the Consumer Financial Protection Bureau ("CFPB") commenced on January 29, 2014 (*In the Matter of PHH Corp.*, Administrative Proceeding No. 2014-CFPB-0002 (the "Administrative Proceeding")), PHH has contended, among other things, that:

- "The most common form of reinsurance in the mortgage insurance industry is a captive arrangement";

- Captive reinsurance "is not only a common risk-spreading device, but it provides many benefits, such as surplus relief, catastrophic exposures, utilization of a reinsurer's expertise, risk sharing/transfer, and smoothing of financial results"; and

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 1:08-CV-759 AWI-BAM

- "[T]he captive reinsurance structure ensures that lenders have 'skin in the game,' which results in the origination of better quality loans."

Ex. F (January 31, 2014 Brief in Support of the Motion of PHH Corporation, PHH Mortgage Corporation, PHH Home Loans, LLC, Atrium Insurance Corporation, and Atrium Reinsurance Corporation to Dismiss The Notice of Charges or, In the Alternative, for Summary Disposition, at 4-5, Document No. 18 filed in the Administrative Proceeding).

97.     Plaintiffs, of course, do not agree with PHH's characterizations of "captive reinsurance" as applied to the CRAs at issue in this litigation.   Nevertheless, PHH's descriptions of "captive reinsurance" demonstrate Defendants' concessions that:  (i) "captive reinsurance" cannot be presumed to be inherently unfair to consumers; and (ii) Defendants' borrowers, therefore, had no basis to commence an investigation into their potential RESPA claims merely because the words "captive reinsurance" appeared in their respective Mortgage Documents.

98.     In fact, on August 13, 2013, shortly before the CFPB commenced the Administrative Proceeding, the CFPB took the sworn deposition of Samuel Rosenthal, PHH's Vice President of Risk Management-Secondary Marketing.  In "Respondents' Disclosure of Witnesses" that Defendants filed in the Administrative Proceeding on March 11, 2014 (Ex. G), Defendants represented that Mr. Rosenthal possessed knowledge that would permit him to testify at the Administrative Proceeding "concerning Atrium's reinsurance agreements, including negotiations, decision-making, and business dealings with private mortgage insurance ('pmi') providers."   During his deposition, Mr. Rosenthal gave the following testimony:

> Q.     Are you familiar with third party or non-captive reinsurance in the mortgage space?
>
> A.     No, sir.
>
> Q.     So you couldn't name anybody who provides that?

**A.**    **Can you describe what third party or non-captive reinsurance is?**

**Q.**    **Well if a mortgage guaranty company were to go out in the market and say well I don't want to get captive or I don't want to just get captive, I want to find a reinsurance company that will reinsure some of my mortgage guaranty risk, are you familiar with that market?**

**A.**    **Not really, but I see what you're saying, is if another entity was out there willing to purchase mortgage reinsurance from an MI and they could lay off some of the risk, I'm not familiar with that.**

(Ex. H, Transcript of the August 13, 2013 Deposition of Samuel Rosenthal in *In re Captive Reinsurance*, an investigational hearing conducted by the CFPB, at 44:21-45:12)

99.      The fact that an experienced reinsurance industry member, such as Mr. Rosenthal, *could not identify any* circumstance in which an MI obtained reinsurance from a non-captive reinsurer demonstrates that the words "captive reinsurance" appearing in a mortgage refer to an industry standard.  As such, these words would not and did not excite the inquiry of an objectively reasonable borrower.

100.     A home purchase is a significant life event, full of anxiety and stress.  Home buyers spend considerable time ensuring that they have undertaken the requisite inspections, filled out the appropriate paperwork, and read the voluminous documents presented to them.  They understandably and justifiably rely upon the uniform written representations made to them to facilitate this important transaction.

101.     Based upon the generic and unsuspicious language within the Disclosure concerning the CRAs, as well as Ms. Villalon's reliance upon Defendants' affirmatively false and misleading representations therein, Ms. Villalon lacked any basis to investigate further the term "captive reinsurance" at the time she read it in the Disclosure.  Indeed, she believed that Defendants correctly presented to her everything within the Disclosure concerning the CRAs, including the putative legitimacy of any financial benefit to either the MI or reinsurer, and thus she had no cause for concern.

Only after Ms. Villalon received the assistance of counsel did she become aware of the possibility that the Disclosure had misled her.

102.     Reflecting the reality that Defendants' Mortgage Documents did not raise any suspicions among TSMs, neither Ms. Villalon nor more than 99.99% of the other TSMs saw any reason to "opt out" of the possibility that their PMI would be reinsured by an MI participating in Defendants' CRAs and therefore would be included within Defendants' CRAs.  Tellingly, the documents that PHH has produced to date, including those that Judge McAuliffe ordered Defendants to produce pursuant to the Court's February 22, 2013 Order granting Plaintiffs' Motion to Compel (ECF No. 210), demonstrate that, from January 2004 through December 31, 2008, there were approximately 24,200 PMI policies putatively reinsured under PHH's CRA with Genworth—one of PHH's "preferred" PMI providers that had a CRA with PHH.  ***Of those approximately 24,200 PMI policies, only one borrower (or approximately 4 out of every 100,000 borrowers) elected to opt out of the CRA, with not a single borrower choosing to do so throughout the entire calendar years of 2005 through 2008***.  The absence of any borrower action in response to the language within the Disclosure and the substantially similar ABD confirms that the representations concerning Defendants' CRAs in those documents ***did not raise any concern of impropriety for an objectively reasonable borrower***.

103.     Likewise, during the same time period from January 2004 through December 31, 2008, there were approximately 50,000 PMI policies putatively reinsured under PHH's CRA with UGI— another one of PHH's "preferred" PMI providers with which PHH had a CRA.  ***Of those approximately 50,000 PMI policies, only five borrowers (or approximately 10 out of every 100,000 borrowers) elected to opt out of the CRA, with not a single borrower choosing to do so throughout the entire calendar years of 2005 through 2008***.  Again, the appearance of the words "captive reinsurance" in PHH's Mortgage Documents did not raise any suspicions among reasonable borrowers.

### D.  Following Her Loan Transaction, Ms. Villalon Was Neither On Notice Of Her Claims Nor Could She Have Reasonably Discovered The Facts Underlying Those Claims

104.    Mr. Villalon was only put on actual notice of the possibility of her claims when she received a notice of investigation ("Notice") from Kessler Topaz Meltzer and Check LLP ("KTMC") in or around October 2012.   *See* Ex. I (the Notice received by Ms. Villalon).    This particular communication informed borrowers who were required to purchase PMI, such as Ms. Villalon, and whose loans may have been part of a CRA, that:  (i) KTMC was conducting an ongoing investigation into reinsurance schemes like Defendants' CRAs; (ii) their rights under RESPA may have been violated; and (iii) they could learn more about potential remedies by contacting counsel.   Until that time, Ms. Villalon had no basis to conduct any further investigation of Defendants' CRAs.

105.    Shortly thereafter, on or around November 13, 2012, Ms. Villalon first spoke with counsel from KTMC concerning the subject matter of the Notice and to discuss the basis of any possible claims.

106.    Ms. Villalon signed a written agreement regarding KTMC's legal representation on or around February 7, 2013.

107.    Prior to communicating with counsel, and despite actively participating in her loan transaction by, *inter alia*, reading and reviewing each of the documents presented to her at closing, including the Disclosure, nothing Ms. Villalon was aware of or *received at or following her closing*, by mail or otherwise provided her with any notice of facts bearing upon her RESPA claims.   The same is true for each TSM.   Specifically, none of the TSMs received any document or communication indicating that PHH's purportedly legitimate CRAs could have, would have, or were having, ***any practical impact*** on the TSMs' costs or loan terms, or on their PMI or settlement rights or obligations.   These documents and communications include, but are not limited to:  (i) the Disclosure (as set forth

above); (ii) monthly billing statements pertaining to TSMs' respective mortgages and/or PMI; and (iii) correspondence from Defendants or from any MI.

108.    In fact, neither prior to or after her March 1, 2007 loan transaction, did Ms. Villalon receive anything from Defendants containing any information whatsoever concerning any putative reinsurance of the PMI that she was required to purchase for PHH's benefit.  Nor was any information concerning Defendants' CRAs discoverable by reasonable, timely, and diligent inquiry.

109.    Indeed, after Ms. Villalon discovered information bearing upon the claims alleged herein upon receipt of the Notice, she contacted PHH on or about January 31, 2013 in an effort to investigate certain facts concerning her PMI and whether her PMI was reinsured.  PHH's representative was unable to answer Ms. Villalon's question, and PHH's representative did not understand the term "captive reinsurance."

110.    Shockingly, although Defendants reaped *more than $327 million in ceded premiums* from their CRAs during the time period from 2000 through 2007 (and *more than $493 million* in ceded premiums during the time period that Defendants maintained CRAs with their "preferred" MIs, as set forth above in ¶73), PHH confirmed during the Limited Discovery that it "REDACTED

" *See* Ex. D at Response No. 5. REDACTED

111.   Further reflecting the real-world impediments to Ms. Villalon and the other TSMs becoming aware of material facts concerning their RESPA claims is Defendants' exclusive possession and concealment of all essential facts relating to Defendants' unlawful CRAs.

112.   Prior to June 2, 2007, there were no public documents or lawsuits filed against any Defendant concerning Defendants' CRAs.  It was *not until January 2012*—nearly four years after Plaintiffs filed the initial complaint in this action—that the CFPB (*the governmental unit tasked with enforcing RESPA*) first publicly announced an investigation into CRAs like those at issue here.  On January 29, 2014, the CFPB filed its "Notice of Charges" initiating the Administrative Proceeding.

113.   Other than the instant lawsuit, the first public revelation regarding ***PHH's*** potential RESPA violations occurred when the CFPB launched its investigation into PHH in ***May 2012***.  As CFPB Director Richard Cordray recently remarked in announcing the assessment of monetary penalties upon certain MIs based upon their participation in CRAs:  "Homeownership is difficult and expensive enough for most people without extra costs imposed by ***financial kickbacks that are kept hidden from them***."

114.   It is unreasonable and unrealistic to require Ms. Villalon and other reasonable borrowers to second-guess the information that they have received from persons upon whom they are entitled to justifiably rely in connection with their respective mortgage closings and to undertake their own futile investigation into the legality of every part of their loan transaction based upon the mere possibility that any aspect of the transaction may give rise to a claim.

115.   Given the unavailability of any information concerning Defendants' CRAs, and the practical effect of Defendants' false assurances and acts of concealment on the TSMs' due diligence, Ms. Villalon and the other TSMs were as diligent as could reasonably be expected.  Any delay by the absent putative Tolling Class members is excusable, and it would be inequitable for the Court to apply

the one-year limitation period set forth in RESPA § 16, 12 U.S.C. § 2614 in a way that would preclude the claim of any TSM.

## CLASS ACTION ALLEGATIONS

116.    Amounts paid to lenders as unlawful kickbacks have become a part of the cost of doing business for MIs.   As a result, PMI premiums incorporate the payment of such kickbacks—to the detriment of consumers.

117.    Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2) and/or (b)(3) on behalf of the Class and the Tolling Subclass as defined above  in ¶2.

118.    The Class and the Tolling Subclass exclude Defendants and any entity in which any Defendant has or had a controlling interest, as well as their respective officers, directors, legal representatives, successors, and assigns.

119.    The members of the Class and the Tolling Subclass are so numerous that joinder of all members is impracticable.

120.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

121.    The claims of Plaintiffs Munoz, Lovette, Melani, Grant, Hoffman, and Maga are typical of the claims of the Class, and the claims of Plaintiff Villalon are typical of the claims of Tolling Subclass.

122.    There are questions of law and fact common to the Class and the Tolling Subclass, including but not limited to:

a.    Whether Defendants' CRAs involved sufficient transfer of risk;

b.    Whether payments to PHH's captive reinsurer were bona fide compensation and solely for services actually performed;

c.   Whether payments to PHH's captive reinsurer exceeded the value of any services actually performed;

d.   Whether PHH accepted a portion, split, or percentage of borrowers' PMI premiums other than for services actually performed; and

e.   Whether Defendants are liable to Plaintiffs, the Class, and the Tolling Subclass for statutory damages pursuant to RESPA § 2607(d)(2).

123.   Further, the members of the Tolling Subclass share numerous common questions of law and fact, including, but not limited to:

a.   Whether TSMs were on actual or constructive notice of their claims more than a year prior to June 2, 2008;

b.   Whether the words "captive reinsurance" appearing within TSMs' Mortgage Documents would lead an objectively reasonable borrower to conduct further investigation;

c.   Whether the TSMs may justifiably rely upon the written representations of their lender, rather than distrust such representations; and

d.   Whether Defendants actively misled TSMs concerning Defendants' CRAs.

124.   These and other questions of law and/or fact common to the Class and the Tolling Subclass predominate over any questions affecting only individual Class or TSMs.   Indeed, this is the quintessential case for class action treatment.   Defendants' CRAs were not entered into for each individual borrower, but, rather, for pools of loans.

125.   The same common issues predominate with respect to all members of the Class and the Tolling Subclass, regardless of whether their loans were originated by PHH or acquired from third-party lenders.   Plaintiffs' sole claim is for violation of Section 8 of RESPA, 12 U.S.C. § 2607.   Section 8(b) of RESPA, 12 U.S.C. § 2607(b), does not require a referral, but, as described herein, contains a

general prohibition against the acceptance of any unearned settlement services charges.  Therefore, regardless of whether PHH or a third-party lender made the initial referral to the MI, Defendants' acceptance of any unearned portion of the PMI premiums paid by such borrowers violates RESPA, as described herein.

126.    Plaintiffs Munoz, Lovette, Melani, Grant, Hoffman, and Maga will fairly and adequately represent and protect the interests of the members of the Class, and Plaintiff Villalon will adequately represent and protect the interests of the Tolling Subclass.  Plaintiffs Munoz, Lovette, Melani, Grant, Hoffman, and Maga have no claims antagonistic to those of the Class, and Plaintiff Villalon has no interests that are antagonistic to those of the Tolling Subclass.  Plaintiffs have retained counsel competent and experienced in complex nationwide class action litigation.  Plaintiffs' counsel will fairly, adequately, and vigorously protect the interests of the Class and the Tolling Subclass.

127.    Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class and/or the Tolling Subclass, which would establish incompatible standards of conduct for Defendants.

128.    Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Class and/or the Tolling Subclass would create a risk of adjudications with respect to individual members of the Class and/or the Tolling Subclass which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

129.    Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final

injunctive relief or corresponding declaratory relief with respect to the Class and the Tolling Subclass as a whole.

130.    Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class and the Tolling Subclass predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**CLAIM FOR RELIEF**
**Violation of RESPA Section 8, 12 U.S.C. § 2607**

131.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

132.    Throughout the Class Period, PHH provided "settlement services" in respect of "federally-related mortgage loans," as such terms are defined by RESPA §§ 2602(1) and (3).

133.    The amounts received by PHH through its CRAs constituted "things of value" within the meaning of RESPA § 2602(2).

134.    Plaintiffs, the Class, and the Tolling Subclass obtained federally-related residential mortgage loans through PHH and paid millions of dollars for PMI premiums in connection with their real estate closings.  Defendants arranged for an unlawfully excessive split of borrowers' premiums to be paid to Atrium.

135.    The millions of dollars in premiums accepted from MIs: (a) were not for services actually furnished or performed; and/or (b) exceeded the value of such services.

136.    The millions of dollars accepted by PHH through its CRAs constituted fees, kickbacks or things of value pursuant to agreements with MIs that business incident to real estate settlement services involving federally-related mortgage loans would be referred to such insurers.  Such practice violated RESPA, 12 U.S.C. 2607(a).  Atrium—PHH's subsidiary—participated in the scheme and

34

served as the direct conduit by which the kickbacks were funneled.  Atrium agreed to provide purported "reinsurance" services involving mortgage insurance paid by Plaintiffs and the Class.

137.   In connection with transactions involving federally-related mortgage loans, PHH accepted a portion, split or percentage of charges received by MIs for the rendering of real estate settlement services other than for services actually performed, in violation of RESPA, 12 U.S.C. 2607(b).  The money paid by MIs to PHH and accepted by PHH through its captive reinsurer was a portion, split or percentage of the PMI premiums paid by PHH's customers.  Atrium—PHH's subsidiary—participated in the scheme and served as the direct party to which the split was paid.  Atrium agreed to provide purported "reinsurance" services involving mortgage insurance paid by Plaintiffs, the Class, and the Tolling Subclass.

138.   Plaintiffs, the Class, and the Tolling Subclass were harmed by Defendants' unlawful kickback scheme.

139.   First, Plaintiffs, the Class, and the Tolling Subclass were overcharged for PMI. Kickbacks and unearned fees unnecessarily and artificially inflate settlement service charges.  Under PHH's scheme, the PMI premiums paid by Plaintiffs and the Class and Tolling Subclass necessarily and wrongly included payments for both: (a) actual mortgage insurance services; and (b) payments unlawfully kicked back to PHH's captive reinsurer that far exceeded the value of any services performed and, were, in fact, illegal referral fees.

140.   Second, *regardless* of whether Plaintiffs, the Class, and the Tolling Subclass were overcharged for PMI, and *regardless* of the reasonableness or unreasonableness of the rates Plaintiffs paid for PMI, under RESPA, Plaintiffs, the Class, and the Tolling Subclass were, as a matter of law, entitled to purchase settlement services from providers that did not participate in unlawful kickback and/or fee-splitting schemes.  Congress has expressly provided for private enforcement of this protected

right by empowering consumers to recover statutory damages from offending parties.  *See Edwards v. The First American Corp., et al.*, 517 F. Supp. 2d 1199, 1204 (C.D. Cal. 2007).

141.    Plaintiffs allege that Defendants accepted unlawful kickback payments and/or an unearned portion of settlement service charges in violation of RESPA—allegations and claims completely distinct and separate from whether the price he paid for settlement services was "unfair."

142.    Defendants therefore violated RESPA, 12 U.S.C. § 2607.  Accordingly, pursuant to the clear and unambiguous language of 12 U.S.C. § 2607(d), Plaintiffs, the Class, and the Tolling Subclass are entitled to recover from Defendants an amount equal to three times the amounts they have paid or will have paid for PMI as of the date of judgment.  *See Edwards*, 517 F. Supp. 2d at 1203-1204.

143.    In accordance with RESPA, 12 U.S.C. § 2607(d), Plaintiffs also seek attorneys' fees and costs of suit.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendants and in favor of Plaintiffs, the Class, and the Tolling Subclass and award the following relief:

A.    This action be certified as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring:  (i) Plaintiffs Munoz, Lovette, Melani, Grant, Hoffman, and Maga as representatives of the Class; (ii) Plaintiff Villalon as representative of the Tolling Subclass; and (iii) Plaintiffs' counsel as counsel for the Class and the Tolling Subclass;

B.    The conduct alleged herein be declared, adjudged and decreed to be unlawful;

C.    Plaintiffs, the Class, and the Tolling Subclass be awarded statutory damages pursuant to RESPA § 8(d)(2), 12 U.S.C. § 2607(d)(2);

D.    An order granting Plaintiffs, the Class, and the Tolling Subclass costs of suit, including reasonable attorneys' fees and expenses; and

E.      An order granting Plaintiffs, the Class, and the Tolling Subclass such other, further and different relief as the nature of the case may require or as may be determined to be just, equitable and proper by this Court.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all claims in this action.

Dated: October 7, 2014                    Respectfully submitted,

**KESSLER TOPAZ
MELTZER & CHECK, LLP**

*/s/ Edward W. Ciolko*
Edward W. Ciolko
Terence S. Ziegler
Johnston de F. Whitman
Joshua A. Materese
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**BRAMSON, PLUTZIK, MAHLER &
BIRKHAEUSER, LLP**
Alan R. Plutzik (SBN 077785)
2125 Oak Grove Blvd., Suite 120
Walnut Creek, CA 94598
Telephone: (925) 945-0770
Facsimile: (925) 945-8792

**BERKE, BERKE & BERKE**
Ronald J. Berke
420 Frazier Avenue
Chattanooga, TN 37402
Telephone: (423) 266-5171
Facsimile: (423) 265-5307

**TRAVIS & CALHOUN, P.C.**
Eric G. Calhoun
1000 Providence Towers East
5001 Spring Valley Road
Dallas, Texas 75244
Telephone: (972) 934-4100
Facsimile: (972) 934-4101

*Counsel for Plaintiffs*

## <u>CERTIFICATION</u>

I hereby certify that, on October 7, 2014, a true and correct copy of the foregoing document was filed under seal with the Clerk of the Court by electronic mail, and will also be served by electronic mail upon all counsel of record.


Dated: October 7, 2014                                 */s/ Edward W. Ciolko*
                                                         Edward W. Ciolko