**LARSON O'BRIEN LLP**
Stephen G. Larson (State Bar No. 145225)
Paul A. Rigali (State Bar No. 262948)
Steven E. Bledsoe (State Bar No. 157811)
555 South Flower Street, Suite 4400
Los Angeles, CA 90071
Telephone: (213) 436-4888

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Joseph H. Meltzer, Esq.
Terence S. Ziegler, Esq.
Donna Siegel Moffa, Esq.
Lisa Lamb Port, Esq.
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Attorneys for Plaintiffs and the Class*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

EFRAIN MUNOZ, *et al.*,

        Plaintiffs,

    v.

PHH CORP., *et al.*,

        Defendants.

No. 1:08-cv-00759-MMB-BAM

**PLAINTIFFS' SECOND THROUGH SIXTH MOTIONS FOR ORDERS IN LIMINE AND INCORPORATED MEMORANDUM OF LAW**

    Dept:    Ctrm 10 (13th fl.)
    Judge:  Hon. M. Miller Baker

1

## TABLE OF CONTENTS

2   I.      INTRODUCTION................................................................................. 1

3   II.     COMMON LEGAL STANDARDS ................................................... 2

4   III.    ARGUMENT ....................................................................................... 3

5           Plaintiffs' Motion in Limine No. 2 ..................................................... 4

6           Plaintiffs' Motion in Limine No. 3 ..................................................... 8

7           Plaintiffs' Motion in Limine No. 4 ..................................................... 9

8           Plaintiffs' Motion in Limine No. 5 ................................................... 12

9           Plaintiffs' Motion in Limine No. 6 ................................................... 15

10  IV.     CONCLUSION................................................................................. 17

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

i

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

4

**Federal Cases**

5

*Amgen Inc. v. F. Hoffman-La Roche Ltd.,*
  2007 WL 6335374 (D. Mass. Aug. 10, 2007) ..................................... 17

6

7

*Asia Vital Components Co., Ltd. v. Asetek Danmark A/S,*
  377 F. Supp. 3d 990 (N.D. Cal. 2019)..................................................... 4

8

9

*Brodit v. Cambra,*
  350 F.3d 985 (9th Cir. 2003).................................................................. 2

10

11

*Buchwald v. Renco Grp., Inc.,*
  2014 WL 4207113 (S.D.N.Y. Aug. 22, 2014) ..................................... 17

12

13

*In re C.R. Bard, Inc., Pelvic Repair Sys. Prods. Liab. Litig.,*
  2013 WL 3367715 (S.D. W. Va. July 5, 2013) ................................... 17

14

15

*In re ConAgra Foods, Inc.,*
  90 F. Supp. 3d 919 (C.D. Cal. 2015) ................................................ 4, 8

16

17

*Daubert v. Merrell Dow Pharm., Inc.,*
  509 U.S. 579 (1993)................................................................................ 3

18

19

*Elliott v. Versa CIC, L.P.,*
  349 F. Supp. 3d 1004 (S.D. Cal. 2018).................................................. 3

20

21

*Eolas Techs., Inc. v. Microsoft Corp.,*
  270 F. Supp. 2d 997 (N.D. Ill. 2003)................................................... 17

22

23

*Garcia v. Praxair, Inc.,*
  2021 WL 38183 (E.D. Cal. Jan. 5, 2021) .............................................. 8

24

25

*Geddes v. United Fin. Grp.,*
  559 F.2d 557 (9th Cir. 1977).............................................................. 8, 9

26

*Gianni Versace S.r.l. v. Fashion Nova, Inc.,*
  2021 WL 3260608 (C.D. Cal. May 10, 2021) ....................................... 4

27

28

*In re Homestore.com, Inc.*,
  2011 WL 291176 (C.D. Cal. Jan. 25, 2011) .......................................... 9

*Lust v. Merrell Dow Pharms., Inc.*,
  89 F.3d 594 (9th Cir. 1996) .................................................................. 3

*Mixed Chicks LLC v. Sally Beauty Supply LLC*,
  879 F. Supp. 2d 1093 (C.D. Cal. 2012) ................................................ 2

*Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*,
  523 F.3d 1051 (9th Cir. 2008) .......................................................... 4, 5

*Niebur v. Cicero*,
  212 F. Supp. 2d 790 (N.D. Ill. 2002) .................................................. 17

*In the Matter of PHH Corp.*,
  No. 2014-CFPB-0002 (C.F.P.B. Nov. 25, 2014) ................................... 12

*PHH Corp. v. CFPB*,
  839 F.3d 1 (D.C. Cir. 2016), *reinstated in relevant part and
  rev'd in part on other grounds*, 881 F.3d 75 (D.C. Cir. 2018) ............. 5

*In re Roundup Prod. Liab. Litg.*,
  2019 WL 1371806 (N.D. Cal. Feb. 18, 2019) ..................................... 12

*United States v. Hankey*,
  203 F.3d 1160 (9th Cir. 2000) ........................................................... 15

*United States v. Heller*,
  551 F.3d 1108 (9th Cir. 2009) ............................................................. 2

*United States v. Hitt*,
  981 F.2d 422 (9th Cir. 1992) ............................................................. 15

*Zuegel v. Mountain View Police Dept.*,
  2020 WL 6205079 (N.D. Cal. Oct. 22, 2020) ........................................ 9

**Federal Statutes**

12 U.S.C. § 2607(d) ................................................................................ 9

# Rules

Fed. R. Civ. P. 26(a)(2)(B)(i) ................................................................. 4, 8

Fed. R. Evid. 104(a) ................................................................................. 2

Fed. R. Evid. 401 ................................................................... 3, 9, 11, 12

Fed. R. Evid. 402 ................................................................... 2, 8, 9, 12

Fed. R. Evid. 403 ........................................................................... *passim*

Fed. R. Evid. 611(a)(1) ................................................................ 2, 16, 17

Fed. R. Evid. 702 ................................................................................... 3

# I.      INTRODUCTION

Plaintiffs Efrain Munoz, Leona Lovette, Stephanie Melani, John Hoffman, and Daniel Maga, II (collectively, "Plaintiffs) respectfully move this Court for an Order granting five additional motions *in limine*,[1] which seek to exclude various arguments, evidence, and testimony, including expert or opinion testimony, that Plaintiffs anticipate PHH Corporation, PHH Mortgage Corporation, PHH Home Loans, LLC, and Atrium Reinsurance Corporation (collectively, "Defendants") may seek to offer at. The matters set forth herein should be excluded as a matter of law in order to avoid prejudice to Plaintiffs and avoid confusing the jury with irrelevant and inadmissible evidence.

Plaintiffs seek to preclude Defendants and their counsel, experts, and any and all of their corporate representatives and witnesses from presenting to the jury any of these precluded arguments or evidence in any manner, whether in voir dire, opening statements, questions to witnesses, objections, closing arguments, or otherwise. Plaintiffs further move the Court to order attorneys for Defendants to inform counsel and their experts, clients, and witnesses not to volunteer, inject, disclose, state, or mention to the jury any of the precluded information until specifically questioned thereon after a prior ruling by the Court. Permitting interrogation of witnesses, comments to jurors or prospective jurors, or offers of evidence concerning any of the precluded matters would impermissibly prejudice the jury.

Additionally, Plaintiffs ask in the final motion in limine (#6) that the Court enter an Order pursuant to its substantial jurisdiction over

---

[1] Plaintiffs separately filed their Motion *in Limine* No. 1 on November 17, 2021. (ECF 466).

1  the presentation of evidence at trial under Federal Rule of Evidence

2  611(a), requiring, as a matter of fairness, that Defendants produce

3  witnesses for Plaintiffs' case-in-chief that they themselves will bring to

4  trial to testify live.

5  **II.   COMMON LEGAL STANDARDS**

6      "A motion in limine is a procedural mechanism to limit in advance

7  testimony or evidence in a particular area." *United States v. Heller*, 551

8  F.3d 1108, 1111 (9th Cir. 2009). Motions *in limine* serve "to avoid the

9  futile attempt of unringing the bell when jurors have seen or heard

10  inadmissible evidence, even when stricken from the record." *Brodit v.*

11  *Cambra*, 350 F.3d 985, 1004–05 (9th Cir. 2003) (internal quotations

12  omitted). Other proper reasons for granting motions *in limine* include,

13  among other things, to "help the Court perform its proper 'gatekeeping'

14  duty, including for proposed experts subject to attack" under the

15  Federal Rules of Evidence, to "help trial planning and save expense by

16  eliminating a major issue at trial," and to "help the Court thoroughly

17  research and review a significant and complicated evidentiary issue

18  outside the pressure and parameters of a trial in session." *Mixed Chicks*

19  *LLC v. Sally Beauty Supply LLC*, 879 F. Supp. 2d 1093, 1094 (C.D. Cal.

20  2012).

21      Certain of the Federal Rules of Evidence are particularly relevant

22  to the instant motions. Under Rule 104, the Court "must decide any

23  preliminary question[s]" about the admissibility of evidence. Fed. R.

24  Evid. 104(a). "In so deciding, the [C]ourt is not bound by evidence rules,

25  except those on privilege." *Id.* It is axiomatic that "[i]rrelevant evidence

26  is not admissible and must be excluded. Fed. R. Evid. 402. Evidence is

27  relevant only if it has "any tendency to make a fact … of consequence in

28  determining the action … more or less probable than it would be

2

without the evidence[.]" Fed. R. Evid. 401. However, even relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of … of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. A matter is particularly suited for an order *in limine* when a limiting instruction would likely prove ineffective at trial. *See* Fed. R. Evid. 403, advisory committee's note on proposed rules.

A motion *in limine* may also be used to exclude or limit an expert's testimony. *Elliott v. Versa CIC, L.P.*, 349 F. Supp. 3d 1004, 1005-06 (S.D. Cal. 2018). Under Federal Rule of Evidence 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise..." To be admissible, the expert's knowledge must "help the trier of fact to understand the evidence or to determine a fact in issue." *Id.* at 702(a). The admission of an expert witnesses requires that the witness's testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993) (emphasis added). "[I]t is the proponent of the expert who has the burden of proving admissibility." *Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

## III.   ARGUMENT

Under the above standards and those cited below, Plaintiffs respectfully request the Court grant the following motions *in limine*, each of which can and should be granted without reference to any particular evidence to be introduced at trial. The issues and categories of evidence set forth below should be excluded as a matter of law, in

1    order to, among other things, avoid prejudice to Plaintiffs and avoid

2    confusing the jury with irrelevant and inadmissible matters.

3        **Plaintiffs' Motion in Limine No. 2**: Plaintiffs move to preclude

4    Defendants from offering at trial any expert testimony on issues that

5    were not previously included or otherwise disclosed in their expert's

6    reports. Specifically, Defendants must be precluded from offering expert

7    testimony: (1) quantifying the value of the reinsurance services, i.e.,

8    risk transfer, or any other service purportedly provided by Atrium, for

9    purposes of determining whether the amounts paid by the mortgage

10   insurers to Atrium in connection with the CRAs were commensurate

11   with that risk or (2) comparing the captive reinsurance agreements

12   ("CRAs") at issue with industry standards or norms.

13       Rule 26 of the Federal Rules requires an expert witness to disclose

14   an expert report that contains "a complete statement of all opinions the

15   witness will express and the basis and reasons for them." Fed. R. Civ. P.

16   26(a)(2)(B)(i). "The purpose of the disclosure requirements of Rule 26 is

17   to avoid surprise and allow each party to prepare to cross-examine

18   those experts the opponent has indicated will be called at trial." *In re*

19   *ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 958 (C.D. Cal. 2015) (citation

20   omitted). "[W]here an expert fails to provide a theory in the report, a

21   court may 'preclud[e] him from testifying on this issue.'" *Asia Vital*

22   *Components Co., Ltd. v. Asetek Danmark A/S*, 377 F. Supp. 3d 990,

23   1002 (N.D. Cal. 2019) (quoting *Nationwide Transp. Fin. v. Cass Info.*

24   *Sys., Inc.*, 523 F.3d 1051, 1062 (9th Cir. 2008)). Indeed, "[a]lthough an

25   expert is not strictly limited to the precise words contained within an

26   expert report, it is axiomatic that an expert may not present new

27   opinions on topics not timely included or otherwise disclosed in the

28   expert's report." *Gianni Versace S.r.l. v. Fashion Nova, Inc.*, 2021 WL

4

1   3260608, at *3 (C.D. Cal. May 10, 2021) (noting that this is "black letter

2   law") (quotations and citation omitted); *see also Nationwide Transp.*

3   *Fin. v. Cass Info. Sys., Inc.,* 523 F.3d 1051, 1062 (9th Cir. 2008) (district

4   court did not abuse its discretion in precluding expert who failed to

5   discuss certain issue in his expert report from testifying on this issue at

6   trial).

7   *Price commensurability*

8         To determine whether a captive reinsurance arrangement passes

9   muster under RESPA, a two part test is applied that assesses if the

10  payments to the reinsurer: (1) are for reinsurance services 'actually

11  furnished or for services performed', and (2) are bona fide compensation

12  that does not 'exceed the value of such services.' ECF No. 417 at 35

13  (citing the 1997 HUD Letter at 3[2]). The first part of this test, addressing

14  whether reinsurance services are actually furnished, requires, *inter*

15  *alia*, that there "be a real transfer of risk." 1997 HUD Letter at 6. *See*

16  *also* ECF No. 417 at 35-36. The second part of the test considers

17  whether the compensation paid for the reinsurance exceeds the value of

18  the reinsurance, i.e., whether the premium paid for the reinsurance is

19  "commensurate with the risk."[3] *Id. Accord PHH Corp.,* 839 F.3d at 41

20

21

22  [2] The Court's reference to the "1997 HUD Letter" refers to a U.S. Dep't of
    Hous. & Urban Dev., Opinion Letter on Captive Reinsurance Programs to

23  Countrywide Funding Corporation (Aug. 6, 1997) ("1997 HUD Letter"). As
    explained by the D.C. Circuit in *PHH Corp. v. CFPB*, 839 F.3d 1, 41-46 (D.C.

24  Cir. 2016), *reinstated in relevant part and rev'd in part on other grounds*, 881

25  F.3d 75 (D.C. Cir. 2018) (en banc), the "1997 HUD Letter was widely
    disseminated and relied on" in the mortgage lending industry and that the

26  letter harmonizes with [RESPA's implementing regulation]. *See* ECF No. 417

27  at 35.

28  [3] The 1997 HUD Letter further states:

1  (explaining that "[i]f the payment to the lender-affiliated reinsurer is

2  more than the reasonable market value of the reinsurance, then we may

3  presume that the excess payment above reasonable market value was

4  not a bona fide payment for the reinsurance but was a disguised

5  payment for a referral").

6        Unlike Plaintiffs,[4] Defendants have failed to proffer any expert

7  economic, market or other analysis addressing whether the amounts of

8  premiums paid were commensurate with and/or exceeded the value of

9  the risks transferred (if any). Defendants have likewise failed to

10  quantify or ascribe any value to the purportedly transferred risks for

11  purposes of determining if the premiums paid for the purported

12  reinsurance are commensurate with the amounts paid by the mortgage

13  insurers to Atrium in connection with the CRAs.

14        In fact, Defendants' expert, Timothy Riddiough, testified in his

15  deposition that he was not asked to so opine and therefore did not base

16  his opinions on price commensurability:

17  _____

18        The reinsurance transaction cannot be a sham under which
        premium payments (minus a ceding commission, if applicable)

19        are given to the reinsurer even though there is no reasonable
        expectation that the reinsurer will ever have to pay claims. . . .

20        The requirement [that there be a real transfer of risk] could [] be
        met by excess loss arrangements, if the band of the reinsurer's

21        potential exposure is such that a reasonable business justification
        would motivate a decision to reinsure that band. Unless there is a

22        real transfer of risk, no real reinsurance services are actually
        being provided. *In either case, the premiums paid (minus a*

23        being provided. *In either case, the premiums paid (minus a*

24        *ceding commission, if applicable) must be commensurate to the*

25        *risk.*

26  1997 HUD Letter at 6 (emphasis added).

27  [4] *See, e.g.*, ECF 362-5 at 245-416.), Expert Report of Kent E. Barrett, dated
   June 24, 2016; ECF 362- 5 at 417-81 Expert Report of Allan Schwartz, dated

28  June 24, 2016.

1      Q. Were you asked to provide – in your initial report, were

2      you asked to provide an opinion on whether the

3      compensation that was paid under the reinsurance

4      agreements at issue was commensurate with the services

5      that were provided?

6      A. No.

7      Q. Okay. And did you do an analysis of that?

8      A. Did I sit down and do an analysis of one versus the other,

9      no, I did not.

10     Q. Okay. Why not?

11     A. I wasn't asked to.

12     Q. Okay. Did you actually do any calculation of whether the

13     value of the services that you found existed was

14     commensurate with the cede for the price for the

15     reinsurance?

16     A. I did not.

17 (Riddiough Tr. (ECF 350-2, Ex. 15) at 204:21-205:9, 218:1-5).

18     Accordingly, Defendants should be precluded from offering expert

19 testimony on this topic at trial.

20 *Industry standards or norms*

21     Defendants have not proffered any expert opinion comparing the

22 CRAs at issue with industry standards or norms, and such comparison

23 does not appear in any expert report submitted on behalf of Defendants.

24 In fact, Defendants' expert admitted to ***not*** making any such

25 comparisons during his deposition:

26     Q. You interpreted the HUD letter without reference to any

27     commonly accepted industry standards regarding analysis of

28     risk transfer, is that correct?

1   A. Yes. This definition is a – I'm focusing on the HUD letter

2   as it – as it attempts to address RESPA. The other

3   definitions that you're talking about are, you know, most

4   likely, *if not definitely, written outside of any considerations*

5   *of RESPA issues*[.]

6   (Riddiough Tr. at 69:1-10) (emphasis added). Needless to say, allowing

7   Defendants to present expert testimony on this topic when they have

8   not proffered an expert opinion on it at all will not only significantly

9   prejudice Plaintiffs, who will not have had the opportunity to prepare a

10  rebuttal, but directly violates Rule 26's express purpose to avoid

11  "surprises" at trial. *See In re ConAgra Foods, Inc.*, 90 F. Supp. 3d at

12  958.

13      Accordingly, Defendants should be precluded from offering expert

14  testimony on this topic at trial.

15      **Plaintiffs' Motion in Limine No. 3**: Plaintiffs move to preclude

16  Defendants from presenting any argument, testimony, or evidence

17  regarding or referencing Defendants' financial conditions. Such

18  reference is irrelevant, or if relevant, any such relevance would be

19  outweighed by the prejudice and confusion it could cause the jury. Fed.

20  R. Evid. 402, 403.

21      It is well-settled that "it is improper to present information

22  regarding a party's relative size, wealth, or financial condition to a

23  jury." *See Garcia v. Praxair, Inc.*, 2021 WL 38183, at *36 (E.D. Cal. Jan.

24  5, 2021); *see also Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th

25  Cir. 1977) ("It has been widely held by the courts that have considered

26  the problem that the financial standing of the defendant is inadmissible

27  as evidence in determining the amount of compensatory damages to be

28  awarded."). The rationale for this rule is simple: "[e]vidence of a

1  defendant's wealth is ordinarily irrelevant to any issue of liability or

2  compensatory damages," *see Zuegel v. Mountain View Police Dept.*,

3  2020 WL 6205079, at *6 (N.D. Cal. Oct. 22, 2020), and "can be

4  prejudicial, as it can distract the jury from the real issues in the case,"

5  *see In re Homestore.com, Inc.*, 2011 WL 291176, at *1 (C.D. Cal. Jan.

6  25, 2011). Indeed, the Ninth Circuit has made clear that evidence of

7  "the ability of a defendant to pay the necessary damages injects into the

8  damage determination a foreign, diverting, and distracting issue which

9  may effectuate a prejudicial result." *Geddes*, 559 F.2d at 560.

10     Here, Defendants' financial conditions (and ability or inability to

11  pay damages owed to Plaintiffs) is wholly irrelevant to whether

12  Defendants are liable to Plaintiffs for violating RESPA, whether

13  RESPA's safe harbor provision applies, and what amount of damages to

14  Plaintiffs are owed, particularly given that the amount of damages are

15  specifically prescribed by statute. 12 U.S.C. § 2607(d); Fed. R. Evid. 401,

16  402. None of the elements required to prove liability or damages under

17  RESPA depend upon or relate to Defendants' financial conditions or

18  ability to pay damages. And even if Defendants' financial status and

19  ability to pay damages were relevant (it is not), such argument,

20  evidence, or testimony would be highly prejudicial to Plaintiffs and only

21  serve to confuse the issues, mislead the jury, and waste time. *See*

22  *Geddes*, 559 F.2d at 560; Fed. R. Evid. 402, 403. Accordingly,

23  Defendants should be precluded from offering any evidence or

24  testimony regarding Defendants' financial conditions or ability or

25  inability to pay damages owed to Plaintiffs.

26     **Plaintiffs' Motion in Limine No. 4**: Plaintiffs move to exclude

27  Defendants, under Rules 402 and 403, from presenting any argument,

28  evidence, or testimony, including expert testimony, that (i) Atrium was

1   not out of compliance with any state insurance regulations at any time

2   during the Class Period and (ii) no examination or audit of any

3   Defendant by any state insurance regulator or examiner resulted in a

4   finding of noncompliance with state insurance regulations.[5] Such

5   evidence has no relevance to the issues to be decided at trial, and, even

6   if it did, would be unduly prejudicial and confusing to the jury.

7        That PHH and Atrium (like all other insurance and reinsurance

8   companies) may have been subject to regulation by state insurance

9   departments during the Class Period, including those in New York and

10  Vermont, is irrelevant to the issues in this action. Most importantly,

11  state insurance regulators and examiners did not review the CRAs for

12  compliance with RESPA, including most significantly with respect to

13  whether they passed risk transfer or price commensurability under the

14  statute's safe harbor provision. For example, New York state regulators'

15  review of Atrium was of the company as a whole and entailed inspecting

16  the company's financial statements, considering whether the captive

17  reinsurance agreements contained the state required clauses, and

18  considering whether the company was meeting reserve requirements

19  (which in certain instances, it was not). *See, e.g.*, PHH-Munoz 02859

20  (NY Report on Examination from January 1, 2002 through December

21  31, 2007) (attached as Exhibit 14 to Plaintiffs' Response to Def.

22  Statement of Undisputed Facts, ECF No. 355-4 at 460-80). Similarly,

23  Vermont regulators' review examined the financial condition of the

24

25  ─────────────────────────
    [5] In Defendants" section of the Joint Pretrial Statement concerning disputed
26  facts relating to "Plaintiffs' RESPA Claim," Defendants included 11
    paragraphs concerning "The State Insurance Regulations Governing Atrium,"
27  which suggests that they are intending to present evidence on this matter at
    trial. ECF No. 431, at Section IV.B, ¶¶ 7-18.
28

10

1   company and considered whether Atrium Re complied with similar

2   Vermont regulatory requirements. *See* AIMS-CIMS-00005779 (VT

3   Report on Examination as of December 31, 2013) (attached as Exhibit

4   15 to Plaintiffs' Response to Def. Statement of Undisputed Facts, ECF

5   No. 355-5 at 1).[6] Even Defendants' own expert, Timothy Riddiough,

6   agrees that the focus of such regulatory review is distinct from

7   reviewing for compliance under RESPA: "I understand the HUD letter

8   was written with the intent of interpreting RESPA, while the insurance

9   regulation … requirements were not." Rebuttal Report of Timothy

10   Riddiough. ECF No. 352-2, Ex. F at ¶13.

11         Therefore, information relating to any state regulatory

12   examination or audit of Atrium's financial condition or compliance with

13   other state insurance regulations is irrelevant to the issues to be

14   decided at trial, or, at most have *de minimis* relevance, to facts of

15   consequence. Fed. R. Evid. 401. For similar reasons, that state

16   insurance departments may not have taken action challenging the

17   CRAs despite their audits of PHH and Atrium is irrelevant to the

18   analysis of whether those CRAs complied with RESPA–compliance with

19   RESPA was instead within the purview of HUD and later the CFPB,

20   not any state insurance department.[7] Any argument, evidence or

21

22   [6] Moreover, state insurance departments did not even have the information
     necessary to perform a RESPA analysis, including, for instance, capital
23   deficiency information, and, therefore, such an analysis, even if it was
     performed (which it was not), would have been incomplete.
24

25   [7] In fact, the CFPB, which was the actual federal agency in charge of
     enforcing compliance with RESPA, *filed* an enforcement action against
26   Defendants that addressed the CRAs at issue here and that concluded with
     the ALJ finding that Defendants had in fact violated the statute. In fact, in
27   his Recommended Decision, the ALJ found as follows: "[S]tate regulation is
28   largely beside the point because the evidence shows that state regulators did

11

1   testimony on this matter must therefore be excluded under Fed. R.

2   Evid. 401 and 402.

3       In addition, because any state regulatory examinations or audits

4   that found Atrium to be in compliance with state insurance regulations

5   did not cover or even consider risk transfer or price commensurability

6   under RESPA – the core issues in this litigation – any such evidence or

7   argument on the matter would be confusing and misleading to the jury.

8   Fed. R. Evid. 403. Indeed, jurors could easily be misled into believing

9   that state insurance regulators that examined or audited Atrium for

10  purposes of state insurance requirements also found that the CRAs at

11  issue complied with RESPA – which they certainly did not. *Cf. In re*

12  *Roundup Prod. Liab. Litg.*, 2019 WL 1371806, at *4 (N.D. Cal. Feb. 18,

13  2019) (discussion of EPA approval in products liability litigation

14  restricted under Rule 403 to avoid wasting time and misleading the jury

15  because the primary inquiry was what the scientific studies show, not

16  what the EPA concluded they show).

17      **Plaintiffs' Motion in Limine No. 5:** Plaintiffs move to exclude

18  Defendants, under Fed. R. Evid. 402 and 403, from presenting any

19  argument, evidence, or testimony, including expert testimony, that

20  Atrium provided valuable services to the mortgage insurers other than

21  or unrelated to actual *reinsurance* services. Such evidence has no

22  relevance to the issues to be decided at trial, and, even if it did, would

23  be unduly prejudicial and confusing to the jury.

24

25

26

27  not examine Atrium for risk transfer or price commensurability, or RESPA
    compliance in general." *In the Matter of PHH Corp.*, No. 2014-CFPB-0002,

28  Doc. 205 at 72 (C.F.P.B. Nov. 25, 2014).

1    Defendants have argued more than once during this litigation that

2  the mortgage insurance companies that were party to the CRAs at issue

3  received certain benefits from the CRAs separate and apart from

4  reinsurance and, as such, Atrium provided other "services" under the

5  CRAs that somehow satisfy RESPA Section 8(c). For instance,

6  Defendants' proffered expert, Dr. Riddiough, has opined that the CRAs

7  provided "additional benefits to the MIs, including risk diversification,

8  risk sharing, reduced capital requirements, the incentive on the part of

9  the affiliated lender to originate higher quality loans to fill the

10  reinsurance books, aka 'skin-in- the-game,' and reduced earnings

11  volatility, in addition to the claims paying services provided by Atrium's

12  reinsurance agreements." *See* ECF No. 409, at 7.[8]

13    But any such "benefits" that the mortgage insurers may have

14  secured as a result of the CRAs have no relevance to the issues to be

15  decided at trial, namely whether the CRAs violated RESPA, as

16  determined pursuant to the test set out in the 1997 HUD Letter. As the

17  Court explained at summary judgment, the "first step of the HUD test

18  asks whether Atrium actually provided ***reinsurance***." (ECF No. 417 at

19  35) (emphasis added). *See also id.* at 9 (stating that the 1997 HUD

20  Letter explains that "captive mortgage reinsurance arrangements are

21  permissible under RESPA's safe harbor if the payments to the

22  reinsurer: (1) are for ***reinsurance services*** actually furnished or for

23  services performed—i.e., there is, among other things, a real transfer of

24  ─────────────────────

25  [8] In the Joint Pretrial Statement, Defendants also included the following
   purportedly disputed fact: "In addition to the insurance coverage that Atrium
26  provided to the mortgage insurers, the mortgage insurers received other
   valuable financial and other benefits from the reinsurance agreements … ",
27  again suggesting that Defendants are intending to present evidence on this
28  issue at trial. ECF No. 431, at Section IV.B ¶2.

risk—and (2) are bona fide compensation that does not exceed the value of such services") (internal quotations omitted and emphasis added). Indeed, the 1997 HUD Letter clearly states that part one of the test to determine whether a captive reinsurance agreement violates RESPA considers whether "***reinsurance is actually being provided in return for the compensation***." 1997 HUD Letter at 6 (emphasis added). There is no mention of these amorphous other benefits to the mortgage insurers that Defendants continue to allude to.

In fact, Defendants themselves acknowledged in their motion for summary judgment that the proper inquiry under the 1997 HUD Letter looks to whether *reinsurance* services, not other generic services, are being performed for purposes of determining whether captive reinsurance arrangements violate RESPA:

> The HUD Letter detailed how its two-part test should be applied. First, ***for "a real service – reinsurance – [to be] performed by the reinsurer,"*** the following criteria must be satisfied: (a) there must be an industry-standard "legally binding contract for reinsurance"; (b) "the reinsurer must post capital and reserves satisfying [relevant state law] and the reinsurance contract must provide for the establishment of adequate reserves"; and (c) "there must be a real transfer of risk."

ECF 342-1 at 7 (emphasis added).

The Court similarly recognized at summary judgment that these "ancillary benefits [to the MIs] … depended on the provision of reinsurance services. If the CRAs were in fact a 'sham,' then these 'additional benefits' were merely illusory in nature." ECF 417 at 39 n.21. Accordingly, evidence regarding other benefits that the mortgage

14

insurers may have purportedly received as a party to the CRAs are irrelevant to whether the RESPA 8(c) safe harbor applies to the captive *reinsurance* arrangements here.

In addition, even if evidence regarding these other purported "services" could have some slight probative value (which it does not), any such value would be substantially outweighed by the danger of unfair prejudicial, misleading the jury, and confusing the issues, and should be excluded on that basis alone. For instance, the jury may be confused or mislead into thinking, incorrectly, that these purported "benefits" should be taken into consideration when applying the HUD test to determine whether the RESPA safe harbor applies here. But they simply have no bearing on the relevant inquiry for the jury. Moreover, such evidence would be prejudicial in that it could suggest that the mortgage insurers received benefits to which Atrium is entitled compensation, notwithstanding Atrium's failure to provide any actual reinsurance services under RESPA and the HUD letter. Therefore, in addition to being irrelevant, such argument, evidence, or testimony must be excluded under Fed. R. Evid. 403, as any potential probative value is substantially outweighed by these other significant concerns. *See, e.g., United States v. Hitt*, 981 F.2d 422, 424 (9th Cir. 1992) ("Where the evidence is of very slight (if any) probative value," evidence should be excluded under Rule 403 "if there's even a modest likelihood of unfair prejudice or a small risk of misleading the jury."); *United States v. Hankey*, 203 F.3d 1160, 1172 (9th Cir. 2000) (evidence should be excluded as unfairly prejudicial if it has an "undue tendency to suggest decision on an improper basis").

**Plaintiffs' Motion in Limine No. 6**: Plaintiffs move for an Order requiring Defendants to produce witnesses for Plaintiffs' case-in-chief

15

1  that they themselves will bring to trial. As a matter of fairness,

2  Plaintiffs should have the option to call Defendants' witnesses live

3  during Plaintiffs' case-in-chief rather than relying on deposition

4  testimony. Key factual testimony in support of Plaintiffs' claims will

5  likely come from Defendants' current and former employees. Because

6  these individuals are geographically dispersed, few, if any, of these

7  witnesses can be compelled by Plaintiffs to appear at trial under the

8  Court's subpoena power. Juries pay better attention to live witnesses

9  and are notoriously bored by spliced video clips. Relegating Plaintiffs'

10  presentation of evidence to assorted video depositions while Defendants

11  offer live testimony for those same witnesses would compromise the

12  fundamental fairness of the trial.

13      In advance of the deadline for filing motions *in limine*, the parties

14  met and conferred regarding the issue raised in this motion. However,

15  because there are logistics about how the trial will be conducted that

16  may impact the resolution of this issue that are as yet unsettled, the

17  parties were not in a position to reach an agreement. The parties

18  anticipate continuing good faith discussions regarding the appearance

19  of witnesses at trial. To the extent those discussions are not fruitful,

20  Plaintiffs seek an order requiring Defendants to make available for

21  Plaintiffs' case-in-chief, those live witnesses that Defendants

22  themselves intend to bring to trial.

23      The Court has substantial jurisdiction over the presentation of

24  evidence at trial under Federal Rule of Evidence 611(a), and courts

25  have repeatedly precluded defendants from calling their own witnesses

26  to testify live at trial after failing to produce those witnesses for the

27

28

1  opposing parties' case-in-chief.[9] As courts considering this issue have

2  recognized, a witness is either available to testify at trial or not, and

3  requiring live testimony also better serves the jury. Therefore, to make

4  the trial "effective for determining the truth" under Rule 611(a)[10]

5  (should the parties be unable to resolve issues related to the

6  presentation of live witnesses through agreement), this Court should

7  use its inherent authority over the conduct of the trial to ensure a

8  balanced and efficient presentation of the evidence by requiring that

9  Defendants make the witnesses it intends to call live in its case-in-chief

10  also available in the same manner to the Plaintiffs.

11  ## IV.  CONCLUSION

12  For the foregoing reasons, Plaintiffs respectfully request that the

13  Court grant Plaintiffs' motions *in limine* two through six.

14

15

16

17

---

18  [9] *See, e.g.*, *Amgen Inc. v. F. Hoffman-La Roche Ltd.*, 2007 WL 6335374, at *1

19  (D. Mass. Aug. 10, 2007) (pre-trial memorandum of defendant noting that the
    court "stated that an adverse party can call as a live witness in its case any

20  witness identified to be called live by the other party"), ECF No. 807;

21  *Buchwald v. Renco Grp., Inc.*, 2014 WL 4207113, at *1 (S.D.N.Y. Aug. 22,
    2014) ("To prevent unfairness and avoid wasting time, numerous courts have

22  held that a party may not limit a witness that the party intends to call at

23  trial from testifying only during its own case in chief.") (collecting cases); *In
    re C.R. Bard, Inc., Pelvic Repair Sys. Prods. Liab. Litig.*, 2013 WL 3367715,

24  at *2 (S.D. W. Va. July 5, 2013) (holding that it would be inequitable to

25  permit a party to call a witness to testify live during its case-in-chief and
    then make the same witness unavailable to testify live for the opposing

26  party); *Eolas Techs., Inc. v. Microsoft Corp.*, 270 F. Supp. 2d 997, 1001 (N.D.

27  Ill. 2003); *Niebur v. Cicero,* 212 F. Supp. 2d 790, 806-07 (N.D. Ill. 2002).

28  [10] Fed. R. Evid. 611(a)(1).

1

Meet and Confer Efforts

2    On November 17, 2021, the parties participated in a telephonic

3 pre-filing meet and confer to discuss the substance of these motions and

4 potential resolution. The parties did not resolve these motions during

5 that call, and counsel for Defendants informed counsel for Plaintiffs

6 that they intend to oppose Plaintiffs' Motions *in limine* Nos. 2-5. With

7 respect to motion *in limine* No. 6, while the parties did not reach

8 resolution, they expressed their intention to continue those discussions

9 once additional information regarding the conduct of the trial is

10 determined and/or available.

11

12 Dated:  November 19, 2021          Respectfully submitted,

13                                   **KESSLER TOPAZ**
                                      **MELTZER & CHECK, LLP**

14                                   */s/ Joseph H. Meltzer*

15                                   Joseph H. Meltzer, Esq.

16                                   Terence S. Ziegler, Esq.
                                      Donna Siegel Moffa, Esq.

17                                   Lisa M. Port, Esq.

18                                   280 King of Prussia Road
                                      Radnor, PA 19087

19                                   Telephone: (610) 667-7706

20                                   Facsimile: (610) 667-7056

21                                   **LARSON O'BRIEN LLP**

22                                   Stephen G. Larson, Esq. (SBN 145225)
                                      Paul A. Rigali, Esq. (SBN 262948)

23                                   Stephen E. Bledsoe (SBN157811)

24                                   555 South Flower Street, Suite 4400
                                      Los Angeles, CA 90071

25                                   Telephone: (213) 436-4888

26                                   Facsimile: (213) 623 2000

27                                   *Counsel for Plaintiffs and the Class*

28

18

1

## <u>CERTIFICATE OF COMPLIANCE</u>

2

3

    I hereby certify that the foregoing Memorandum of Points and Authorities contains 4,936 words, as reported by Microsoft Word.

4

5

                    */s/ Joseph H. Meltzer*
                    Joseph H. Meltzer

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 19, 2021, a true and correct copy of the foregoing document was electronically filed with the Clerk of Court, is available for viewing and downloading from the ECF system, and will be served by operation of the Court's electronic filing system (CM/ECF) upon all counsel of record.

*/s/ Joseph H. Meltzer*
Joseph H. Meltzer