|  | UNITED STATES DISTRICT COURT<br>FOR THE EASTERN DISTRICT OF CALIFORNIA |  |
|---|---|---|
| EFRAIN MUNOZ, *individually and on behalf of all others similarly situated, et al.*,<br><br>　　　　Plaintiffs,<br><br>　　　　v.<br><br>PHH MORTGAGE CORPORATION, *et al.*,<br><br>　　　　Defendants. | | No. 1:08-cv-00759-MMB-BAM<br><br>**ORDER RESPECTING<br>PLAINTIFFS' MOTION<br>*IN LIMINE* #5** |

Plaintiffs' fifth motion *in limine* (ECF 468, at 12–15) requests an order "to exclude Defendants . . . from presenting any argument, evidence, or testimony, including expert testimony, that Atrium provided valuable services to the mortgage insurers other than or unrelated to actual *reinsurance* services." ECF 468, at 12 (emphasis in original).

Plaintiffs refer to what they characterize as testimony from Dr. Timothy Riddiough that the captive reinsurance agreements provided "additional benefits to the [mortgage insurers], including risk diversification, risk sharing, reduced capital requirements, the incentive on the part of the affiliated lender to originate higher quality loans to fill the reinsurance books, aka 'skin-in-the-game,' and reduced earnings volatility, in addition to the claims paying services provided by Atrium's reinsurance agreements." *Id.* at 13 (quoting ECF

409, at 7).[1] Plaintiffs contend that anything other than reinsurance is irrelevant at trial based on the court's summary judgment motion, which states that "the first step of the HUD test asks whether Atrium actually provided *reinsurance*." *Id.* (emphasis Plaintiffs') (quoting *Munoz v. PHH Mortg. Corp.*, 478 F. Supp. 3d 945, 977 (E.D. Cal. 2020) (ECF 417)). They further note that the summary judgment ruling states that the ancillary benefits depended on the provision of actual reinsurance services. *Id.* at 14 (citing *Munoz*, 478 F. Supp. 3d at 980 n.21 (ECF 417)).

Defendants respond that Plaintiffs misrepresent the services provided because they are "inextricably part of the reinsurance agreements at issue." ECF 479, at 12 (emphasis removed). Defendants argue that Plaintiffs have provided no explanation for why "risk diversification" and "risk sharing" are irrelevant to the jury's consideration of "risk transfer," and they note that "[t]he first disputed factual issue for trial is 'whether there was a real transfer of risk from the mortgage insurers to Atrium pursuant to the reinsurance agreements." *Id.* (Defendants' brackets removed) (quoting ECF 456, at 6).

---

[1] Plaintiffs' motion introduces this quotation with the words "Defendants' proffered expert, Dr. Riddiough, has opined that . . . ." *Id.* That characterization is potentially misleading because the quotation Plaintiffs provide is from Defendants' supplemental brief in response to an order the court entered on August 29, 2019. *See* ECF 408 (requiring Defendants to file a supplemental brief answering two questions). The brief, in turn, does not quote the Riddiough report and instead offers what appears to the court to be a high-level paraphrase of his conclusions. *See* ECF 409, at 6–7 (citing Riddiough report ¶¶ 61–68).

1   Defendants further contend that the various "additional benefits" to which
2   Plaintiffs object are "incident to the reinsurance agreements themselves" and
3   therefore relevant to risk transfer and price commensurability. *Id.* at 12–13.
4   They quote the HUD Letter's repeated use of the word "services" in the plural
5   to argue that the letter "contemplates that there are potentially multiple ser-
6   vice components to reinsurance agreements that all need to be analyzed in ap-
7   plying HUD's test" and they contend that Dr. Riddiough's testimony specifi-
8   cally refers to the HUD Letter's use of "services." *Id.* at 13 (citing ECF 342-3,
9   at 7). Finally, Defendants contend that the HUD Letter requires a determina-
10  tion of whether a "reasonable business justification" would motivate the par-
11  ties to enter into a captive reinsurance agreement, and they argue that the
12  "other" services are relevant to *that* determination, citing testimony from
13  Plaintiffs' experts that services other than claims payment are relevant moti-
14  vation to enter into reinsurance agreements. *Id.* at 13–14.

15      Plaintiffs' reply essentially reiterates what their motion says—the sum-
16  mary judgment order cites the HUD Letter as saying the first step of the test
17  is whether Atrium actually provided reinsurance, and Plaintiffs contend that
18  any benefits other than actual reinsurance itself are irrelevant for purposes of
19  the RESPA analysis: "The test, under RESPA, considers whether the payments
20  to Atrium were for reinsurance services provided. As the Court already ex-
21  plained, 'these ancillary benefits, however, depended on the provision of

reinsurance services. If the CRAs were in fact a "sham," then these "additional benefits" were merely illusory in nature.' " ECF 493, at 4–5 (quoting *Munoz*, 478 F. Supp. 3d at 980 n.21 (ECF 417)).

The HUD Letter provides as follows: "[S]o long as payments for reinsurance under captive reinsurance agreements are solely 'payment for goods or facilities actually furnished or for services actually performed,' these arrangements are permissible under RESPA." ECF 342-3, at 1. "The Department's view of captive reinsurance is that the arrangements are permissible under RESPA if the payments to the reinsurer: (1) are for reinsurance services 'actually furnished or for services performed' and (2) are *bona fide* compensation that does not exceed the value of such services." *Id.* at 3. If

> the lender's reinsurance affiliate actually performs reinsurance services and compensation from the primary insurer is *bona fide* and does not exceed the value of the reinsurance, then such payments would be permissible under subsection 8(c). Conversely, any captive reinsurance arrangement in which reinsurance services are not actually performed or in which the payments to the reinsurer are not *bona fide* and exceed the value of the reinsurance would violate section 8 as an impermissible referral fee.

*Id.*

The letter further prescribes a two-part test that includes subparts:

> The Department will first determine whether the reinsurance arrangement meets three requirements that establish that reinsurance is actually being provided in return for the compensation. If one or more of the requirements is not met, the inquiry will end, and the arrangement will be regarded as an impermissible captive reinsurance arrangement under RESPA. If all of the requirements

4

are met, the Department will determine whether the compensation exceeds the value of the reinsurance.

*Id.* at 5. The context makes it clear that the reference to "three requirements that establish that reinsurance is actually being provided" means that those three requirements are the ones considered in determining whether the reinsurer "actually performs reinsurance services."

The three requirements are, in turn, as follows: (1) "There must be a legally binding contract for reinsurance with terms and conditions conforming to industry standards." *Id.* at 6 (emphasis removed). (2) "The reinsurer must post capital and reserves satisfying the laws of the state in which it is chartered[,] and the reinsurance contract between the primary insurer and the reinsurer must provide for the establishment of adequate reserves to ensure that, when a claim against the reinsurer is made, funds will exist to satisfy the claim." *Id.* (emphasis removed). (3) "There must be a real transfer of risk." *Id.* (emphasis removed). As quoted above, all three of these requirements must be satisfied; if any one (or more) is not, the agreement is impermissible under RESPA.

Defendants' argument about a "reasonable business justification" relates to the HUD Letter's paragraph discussion of what a "real transfer of risk" means: "The requirement could also be met by excess loss arrangements, if the band of the reinsurer's potential exposure is such that a *reasonable business*

*justification* would motivate a decision to reinsure that band." *Id.* (emphasis added). It does not appear to the court that this sentence calls for an analysis of whether "other services" would motivate an insurer to purchase reinsurance—rather, the sentence focuses on whether "the band of the reinsurer's potential exposure is such" that it would be reasonable to purchase reinsurance.[2]

However, the HUD Letter's sentence that includes the reference to "a reasonable business justification" is the fourth sentence in the paragraph in which it appears, and the context of the entire paragraph makes clear that the sentence was intended as an example. Significantly, after the paragraph begins by setting out the overall requirement that "[t]here must be a real transfer of risk," it explains that "[t]he reinsurance transaction cannot be a sham under which premium payments (minus a ceding commission, if applicable) are given to the reinsurer even though there is no reasonable expectation that the reinsurer *will ever have to pay claims.*" *Id.* (emphasis added). The following sentences then provide examples of arrangements that could constitute "a real transfer of risk" as clarified by the quoted sentence.[3]

---

[2] The term "the band of the reinsurer's potential exposure," when used in conjunction with a reference to "excess loss arrangements," plainly refers to the common practice of arranging excess insurance in layers, such as "$25 million excess of $25 million." In this context, the HUD Letter was clearly suggesting that the examination requires a consideration of whether "a reasonable business justification" would motivate a reinsurer to participate in reinsuring a particular layer of excess coverage.

[3] One example the letter offers involves a quota share arrangement, "under which the reinsurer is bound to participate *pro rata* in every claim." *Id.* A quota share

The court concludes that the significant point is that the HUD Letter's "real transfer of risk" requirement is focused on the payment of claims. The "other services" Defendants refer to in their opposition brief, and that Dr. Riddiough discusses in his testimony, do not relate to the payment of claims. Under the HUD Letter, therefore, those "other services" are not relevant to whether there was actually a "transfer of risk."

Therefore, it is hereby **ORDERED** that Plaintiffs' motion *in limine* #5 is **GRANTED**, and it is further **ORDERED** that at trial, Defendants may not present any argument, evidence, or testimony, including expert testimony, that Atrium provided valuable services to the mortgage insurers other than or unrelated to actual reinsurance services.

Dated: January 10, 2022             /s/ *M. Miller Baker*
                                    M. Miller Baker, Judge[4]

---

arrangement involves a situation where a carrier insures a particular "part of" an insurance layer, such as "$5 million part of $25 million excess of $25 million." The carrier providing those hypothetical limits pays 20 percent of any claim that penetrates its coverage layer and therefore "is bound to participate *pro rata* in every claim"—at least in every claim that penetrates its layer.

[4] Judge of the United States Court of International Trade, sitting by designation.