UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EFRAIN MUNOZ, *individually and on behalf of all others similarly situated, et al.*, | No. 1:08-cv-00759-MMB-BAM |
| Plaintiffs, | **ORDER RESPECTING DEFENDANTS' MOTION *IN LIMINE* #6** |
| v. | |
| PHH MORTGAGE CORPORATION, *et al.*, | |
| Defendants. | |

Defendants' sixth motion *in limine* (ECF 474) seeks to preclude certain expert testimony Plaintiffs intend to offer at trial that Defendants contend either fails to meet Federal Rule of Evidence 702's standards for "being grounded in reliable facts and methods" or that is "prejudicial or otherwise inadmissible under Rule 403." ECF 474, at 1.

Specifically, Defendants seek to preclude the following five categories of testimony and other evidence from the expert witnesses identified as to each category:

- "Confusing and Prejudicial Accounting Standard Evidence" (Kent Barrett and Allan Schwartz)
- "Confusing and Prejudicial Use of Evidence Outside the Class Period" (Schwartz and J. David Cummins)
- "Unsupported Speculation/Subjective Beliefs Regarding Defendants' and the Mortgage Insurers' Motivations" (Barrett, Schwartz, Cummins, and Andrew Barile)

1  • "Unqualified Legal Conclusions/Interpretations of RESPA" (Bar-
2     rett, Schwartz, and Cummins)

3  • "Opinions Supported by Inadmissible Evidence" (Barile)

4  *Id.* at 3.[1] The court addresses each category in turn.

5  **I.    Accounting standard evidence**

6       Defendants object to Plaintiffs' experts testifying that Atrium's reinsur-

7  ance agreements did not sufficiently transfer risk under certain accounting

8  principles. ECF 474, at 7 *et seq.* Defendants contend that "whether the rein-

9  surance agreements qualify for insurance accounting treatment is not at issue

10 in this case . . . because neither RESPA nor the guidance in the HUD Letter

11 requires compliance with those accounting standards." *Id.* at 8 (emphasis re-

12 moved). They further contend that both Barrett and Schwartz acknowledge

13 that the HUD Letter does not incorporate accounting or actuarial require-

14 ments. *Id.* at 9 (citing deposition testimony and Barrett's expert report).

15      Plaintiffs respond that the court previously rejected Defendants' motion

16 to strike the portions of the Barrett and Schwartz reports that apply actuarial

17 and accounting standards to evaluate risk transfer, and they note that the

18 HUD Letter does not adopt any particular standards for assessing "real

---

[1] A footnote in Defendants' motion mentions their separate motion to strike (ECF 475) Plaintiffs' proposed expert Robert Hoyt. *See* ECF 474, at 2 n.1. The court will address the motion to strike in a separate order.

1    transfer of risk." ECF 485, at 5 (discussing *Munoz v. PHH Mortg. Corp.*, 478

2    F. Supp. 3d 945, 965 (E.D. Cal. 2020) (ECF 417)).

3         Defendants reply that while the court denied the motion to strike, the

4    court did not find the expert testimony admissible, instead finding Defendants'

5    Rule 403 arguments premature at the summary judgment stage because there

6    was no jury to be misled or confused. ECF 496, at 3 (discussing *Munoz*, 478

7    F. Supp. 3d at 965). They contend that with the case set for a jury trial, the

8    issue is now ripe because there is a "substantial likelihood" that the jurors will

9    confuse the standards set forth in RESPA and the HUD Letter with the ac-

10   counting and actuarial standards on which Barrett and Schwartz base their

11   opinions. *Id.*

12        Plaintiffs are correct that in the summary judgment ruling, the court

13   explained that the experts applied actuarial and accounting standards "in

14   reaching the conclusion that the CRAs exhibited a 'lack of real transfer of

15   risk,' " which the court then noted is directly relevant to the HUD Letter's re-

16   quirement that there be a "real transfer of risk." 478 F. Supp. 3d at 965. De-

17   fendants' objection to the "accounting standard evidence" category is similar

18   to—but not the same as—the issues raised in their motion *in limine* #4, which

19   involves evidence about Atrium's 2009 internal audit for compliance with doc-

20   umentation requirements imposed by statutory accounting principles for prop-

21   erty and casualty reinsurance. *See generally* ECF 472. In ruling on that motion,

1    the court concluded that Federal Rule of Evidence 703 resolved the issue be-

2    cause it permits an expert witness to rely on the sorts of facts or data upon

3    which an expert in the particular field would reasonably rely, even if the facts

4    or data themselves would not be admissible. Rule 703 distinguishes between

5    the *expert's opinion*—which may be admissible even though the underlying

6    facts may not be—and the *underlying facts or data*, and provides that "if the

7    facts or data would otherwise be inadmissible, the proponent of the opinion

8    may disclose them to the jury only if their probative value in helping the jury

9    evaluate the opinion substantially outweighs their prejudicial effect." Fed. R.

10   Evid. 703.

11        Thus, there are two issues relating to the court's prior ruling. It is indis-

12   putable that the court found the *expert reports* relevant under Rule 401 because

13   their "analyses of the evidence tend[ ] to make it more probable than not that:

14   (1) the CRAs did not affect a real transfer of risk; (2) Atrium did not actually

15   furnish reinsurance services; and (3) the premiums paid by the captive MIs

16   were not commensurate with the services provided." *Munoz*, 478 F. Supp. 3d

17   at 965. However, it is also clear that the court's discussion did not address

18   whether *the underlying facts and data* are themselves admissible. In other

19   words, while the court's prior ruling strikes a presumption in favor of allowing

20   the experts to testify about their conclusions, that presumption does not mean

21   the experts must be allowed to testify about the underlying facts and data.

1    The issue presented here is not exactly the same as the one presented in

2    Defendants' motion #4 because there, the question involves internal discus-

3    sions concerning whether an auditor had been provided with sufficient docu-

4    mentation to use in a risk transfer analysis under accounting standards,

5    whereas here the issue involves the actual application of those standards. In

6    other words, motion #4 is a step further removed from the issue presented here.

7    As to the relevance of the application of accounting standards, Defendants are

8    correct that the HUD Letter does not specifically incorporate those standards

9    into its analysis, *see* ECF 474, at 8–9, but Plaintiffs are also correct that the

10   HUD Letter does not set forth any specific criteria for determining what con-

11   stitutes a "real transfer of risk," *see* ECF 485, at 5.

12   The court therefore cannot conclude that the accounting standards Bar-

13   rett and Schwartz examined are irrelevant or inadmissible in the context of

14   this case. In their reply brief, Defendants argue that "[t]here is a substantial

15   likelihood that the jury will be unable to meaningfully distinguish the standard

16   set forth in RESPA and the HUD Letter from the accounting and actuarial

17   standards on which Plaintiffs' experts opine." ECF 496, at 3. As the court has

18   previously noted, however, "Rule 403 favors the admissibility of relevant evi-

19   dence," *Munoz*, 478 F. Supp. 3d at 964, and the party invoking Rule 403 has to

20   carry a "significant" burden because "exclusion under Rule 403 is an extraor-

21   dinary remedy to be used sparingly," *id.* (cleaned up). Given that standard, the

1    court cannot conclude that Defendants have carried their burden by offering a

2    single paragraph of argument in their reply brief that lacks substantive dis-

3    cussion of the particular reasons why they contend the accounting standards

4    are "separate and distinct, but substantially similar" to the HUD Letter stand-

5    ards, ECF 496, at 3 (quotation marks omitted), much less specific reasons why

6    the jury will be confused. In other words, Defendants' argument for why the

7    jury will be confused is simply *ipse dixit*. That is not enough under Rule 403,

8    so the court will deny Defendants' motion as to the accounting standard evi-

9    dence relied on by Barrett and Schwartz, but the denial is without prejudice to

10   Defendants' right to object at trial to particular pieces of evidence (as opposed

11   to the category of evidence as a whole).

12   **II.    Use of evidence outside the class period**

13        Defendants object to testimony by Schwartz and Cummins that uses

14   "data from outside the class period to make comparisons and draw conclusions

15   about Atrium's profits and average premium cede during the class period," and

16   they ask the court to "preclude evidence and testimony based on this apples to

17   oranges comparison because it risks affirmatively misleading the jury," whose

18   task is to "evaluate whether Defendants' conduct complied with RESPA during

19   the class period." ECF 474, at 10.

20        Defendants explain that the evidence demonstrates that Atrium paid out

21   more in claims than it received in premium payments during the class period,

1    so they object to Schwartz opining that Atrium's agreements did not transfer

2    risk because it received more in premiums than it paid out in claims over a 16-

3    year period, such that it was not actually at risk of losing money during the

4    class period. *Id.* Similarly, they object to Cummins's comparison of industry-

5    wide mortgage premium data between 1998–2014 with Atrium's premiums re-

6    ceived during the class period (2007–2009) to support his conclusion that

7    Atrium received too much money in premiums, as they note that an analysis

8    of premiums during the class period reflects a figure in line with industry av-

9    erages. *Id.* at 11.

10         Plaintiffs again respond by citing the summary judgment opinion, in

11   which the court stated that "the validity of those expert conclusions are not

12   necessarily vitiated by the consideration of data outside of the class period.

13   This is especially true here because defendants have not alleged or shown that

14   the practices at issue in this case changed materially between the relevant

15   class period and the additional period examined by plaintiffs' experts." *Munoz*,

16   478 F. Supp. 3d at 965–66, *cited in* ECF 85, at 7. Plaintiffs fail to mention that

17   the court described Defendants' concerns as "well-taken, especially because

18   plaintiffs attempted unsuccessfully to certify a class that included borrowers

19   who fell outside of RESPA's one-year statute of limitations." *Id.* at 965.

20         Plaintiffs further point to the opinion's discussion of the "safe harbor"

21   issue, in which the court concluded that it would be misleading to "conduct a

7

1   risk transfer analysis by looking only at individual 'snapshots' of Atrium's cash

2   flow from the 2007–09 book years, which fall within the certified class period,"

3   because

> [e]valuating whether there was an actual transfer of risk requires the court to look at multiple factors, such as the structure and contractual terms of a CRA, the rationale for and effects of cross-collateralization, *and the way defendants' own actuaries analyzed the CRAs.* But under the methodology advocated by defendants, the court would be limited to examining an individual book year in a vacuum. Indeed, it is somewhat perplexing that defendants continue to insist that the court adopt their myopic book year approach when it is undisputed that *defendants themselves analyze and distribute risk across multiple book years.*

4
5
6
7
8
9
10
11
12
13

14   *Id.* at 978 (emphasis added), *cited in* ECF 485, at 9–10.

15       In reply, Defendants assert that they are not attempting to relitigate the

16   issue of examining "book years" in isolation and instead simply wish to pre-

17   clude Schwartz and Cummins from testifying about using data from outside

18   the class period to draw conclusions about Atrium's financial performance dur-

19   ing the class period. ECF 496, at 5. They then offer a paragraph, prefaced with

20   the word "specifically," describing two particular categories of evidence they

21   seek to preclude—(1) Schwartz's opinion, based on using data from outside the

22   class period, that Atrium was "extremely profitable" during the class period

23   even though it paid out more in claims than it received in premiums during

24   that time and (2) Cummins's opinion, again based on data from outside the

25   class period, that Atrium's premium cedes were "unusually large" during the

8

1   class period even though evidence shows that its premiums were in line with

2   industry averages during the class period. *Id.* at 5–6. The court interprets the

3   word "specifically" as an indication that these two categories of evidence are

4   the particular things Defendants wish to exclude.

5         Nothing in Defendants' briefing contends that the "outside the class pe-

6   riod" evidence is *inadmissible*—rather, Defendants contend that the court

7   should exclude the evidence because it would confuse the jury and therefore be

8   prejudicial to Defendants, which the court construes as a Rule 403 argument.

9   The reason the distinction matters is that Rule 703 inverts the burden on the

10  "prejudice versus probativity" issue only "if the facts or data would otherwise

11  be inadmissible"—that is, if they would be inadmissible, the proponent of the

12  opinion (here, Plaintiffs) may disclose those facts or data to the jury only if that

13  party can demonstrate that their probative value "substantially" outweighs

14  their prejudicial effect, Fed. R. Evid. 703, but if the evidence is not otherwise

15  inadmissible, the standard Rule 403 analysis applies and the party objecting

16  to the evidence must carry the "significant" burden of showing that prejudice

17  or confusion "substantially" outweighs its probative value, Fed. R. Evid. 403;

18  *see also Munoz*, 478 F. Supp. 3d at 965.

19        The court concludes that Defendants have failed to carry that burden.

20  The analysis in Defendants' briefing is simply too conclusory to demonstrate

21  the "substantial" aspect of Rule 403's analysis. Instead, their reply brief seeks

1   to invert the burden, arguing that "Plaintiffs offer no reason why such evidence

2   should be allowed at trial." ECF 496, at 5. That is not enough. The court will

3   therefore deny Defendants' motion to preclude references to evidence from out-

4   side the class period, but, as with the accounting standard evidence, that de-

5   nial is without prejudice to Defendants' right to object to specific pieces of evi-

6   dence at trial.

7   **III.   Motivation testimony**

8       Defendants argue that "Plaintiffs' experts litter their reports with un-

9   substantiated and unsupported statements regarding the motives for Defend-

10  ants' and the four mortgage insurance companies' conduct," ECF 474, at 12,

11  citing as examples Barrett's opinion that a reinsurance agreement "was in-

12  tended to . . . limit Atrium's liability," *id*.; Schwartz's conclusion that Atrium's

13  actions were "consistent with the intent not to contribute additional capital"

14  and that Atrium "wanted to do the exact opposite" of putting in more money,

15  *id*.; Cummins's testimony about what mortgage insurers wanted to do and

16  Atrium's motivation for taking actions, *id*. at 12–13; and Barile's statement

17  that Atrium had "another agenda" aside from reinsurance, *id*. at 13. Defend-

18  ants contend that these statements are inadmissible because "they are conclu-

19  sory statements reflecting the witnesses' subjective beliefs as to someone else's

20  state of mind rather than well-supported opinions." *Id*.

1    In response, Plaintiffs concede that expert testimony regarding intent,

2  motive, or state of mind is often excludable, but they argue that "the state-

3  ments to which Defendants refer in their motion are proper opinion evidence

4  supported by the facts and evidence in the case" and assert that any objections

5  should be raised at trial. ECF 485, at 14. They contend that Barrett was opin-

6  ing as to "the import of" the contractual provision at issue and that Schwartz's

7  opinion was based on comparing Atrium's actions with Defendants' e-mail mes-

8  sages and concluding that Atrium's actions were consistent with that discus-

9  sion. *Id.* at 15.

10   Defendants reply that regardless of whether the experts' testimony is

11  consistent with record evidence, it is improper for an expert witness to opine

12  about motives or intent, as any such testimony would be impermissible specu-

13  lation.

14   "Expert testimony as to intent, motive, or state of mind offers no more

15  than the drawing of an inference from the facts of the case. The jury is suffi-

16  ciently capable of drawing its own inferences regarding intent, motive, or state

17  of mind from the evidence, and permitting expert testimony on this subject

18  would merely be substituting the expert's judgment for the jury's and would

19  not be helpful to the jury." *Siring v. Or. State Bd. of Higher Educ. ex rel. E. Or.*

20  *Univ.*, 927 F. Supp. 2d 1069, 1077 (D. Or. 2013). However, "[t]here is an im-

21  portant difference between an expert's testimony that a specific individual

11

1  possessed a specific intent, and testimony that gives meaning to the defend-

2  ant's actions." *Alcantar v. Foulk*, No. 1:14-cv-00747 LJO MJS (HC), 2016 WL

3  3001242, at *12 n.17 (E.D. Cal. May 25, 2016) (cleaned up). Thus, it may be

4  appropriate for Plaintiffs' experts to testify about whether Defendants' actions

5  were *consistent with* (or inconsistent with) what is discussed in the documen-

6  tary evidence, but it would be inappropriate for Plaintiffs' experts to ascribe an

7  *intent* or *motivation*.

8      Accordingly, the court will grant Defendants' motion on the "motivation

9  testimony" insofar as Plaintiffs' experts might seek to ascribe an intent, moti-

10 vation, agenda, or similar finding to actions taken by Defendants. However,

11 this order does not preclude Plaintiffs' experts from discussing documentary

12 evidence and opining on whether Defendants acted consistently therewith.

13 **IV.   Legal Conclusions/Interpretations of RESPA**

14     Defendants contend that the Schwartz and Cummins expert reports

15 "contain legal conclusions that purport to define or interpret the applicable law

16 and offer legal interpretations of the reinsurance agreements at issue," and

17 they seek to exclude those portions of the reports. ECF 474, at 13–14. Specifi-

18 cally, Defendants refer to Schwartz's opinion that Atrium's liability was lim-

19 ited to a particular amount based on his review and interpretation of the con-

20 tracts, *id.* at 14, and they refer to Cummins's opinions that (a) "the HUD crite-

21 ria are consistent with the usual legal and economic definition of insurance,"

12

1   *id.*; (b) "the legal and economic definitions would add a second criterion, risk

2   distribution (diversification or pooling)," *id.*; (c) the existence of a trust cap was

3   based on his interpretation of the insurance agreements, *id.*; and (d) "the

4   Atrium agreements do not satisfy the criteria set forth in the HUD Letter of

5   August 6, 1997[,] for legitimate contracts of reinsurance," *id.*

6       Plaintiffs respond that while they agree that expert witnesses generally

7   may not give legal opinions, in this case their witnesses are not doing so. First,

8   they contend that Schwartz's testimony about Atrium's liability being limited

9   is consistent with what they characterize as the court's prior determination

10   that Atrium's liability was "limited strictly to the funds contained within each

11   of the associated trust accounts," ECF 485, at 16 (quoting *Munoz*, 478 F. Supp.

12   3d at 979), and they contend that "he is appropriately interpreting and analyz-

13   ing factual evidence," *id.* Second, they contend that Cummins's testimony re-

14   lies on analyzing the captive reinsurance agreements and Atrium's financial

15   records to use "his wealth of experience in the field to opine that the CRAs are

16   not legitimate contracts of reinsurance because they do not result in a real

17   transfer of risk and, in various ways, are contrary to the usual regulatory and

18   operating practices in the insurance and reinsurance industry." *Id.* at 17.

19       Defendants reply that regardless of how Plaintiffs characterize the tes-

20   timony, it consists of legal conclusions. They argue that Schwartz's testimony

21   does not focus on how the captive reinsurance agreements' terms are commonly

1    understood in the industry but rather interprets the agreements themselves to

2    conclude that Atrium's liability is limited. ECF 496, at 9. They similarly con-

3    tend that Cummins's testimony that the agreements do not satisfy the HUD

4    Letter's criteria is an obvious legal conclusion. *Id.* at 9–10.

5        Defendants are correct that contract interpretation is a question of law.

6    *See, e.g.*, *Mendler v. Winterland Prod., Ltd.*, 207 F.3d 1119, 1121 (9th Cir.

7    2000). "Generally, contract interpretation is not an appropriate subject for ex-

8    pert testimony, because it requires an expert to make conclusions of law." *U.S.*

9    *Postal Serv. v. Jamke*, No. 1:15-cv-01806, 2017 WL 131991, at *5 (E.D. Cal.

10   Jan. 12, 2017) (citing *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998,

11   1016 (9th Cir. 2004)); *see also Aerojet Rocketdyne, Inc. v. Global Aerospace, Inc.*,

12   No. 2:17-cv-1515 KJM-AC, 2021 WL 1839695, at *3 (E.D. Cal. May 7, 2021)

13   (Mueller, C.J.) (excluding portions of expert's proposed testimony that reflected

14   contracted interpretation because they were "inadmissible as treading on ulti-

15   mate issues of law"). Schwartz's testimony that the agreements limit Atrium's

16   liability is a conclusion of law. Likewise, Cummins's testimony that the Atrium

17   agreements do not satisfy the HUD Letter's criteria is a conclusion of law. He

18   even testified that he concluded the captive reinsurance agreements had a

19   trust cap "because there was one, according to my interpretation," which—in

20   response to counsel's follow-up question—he confirmed meant according to *his*

21   *interpretation of the agreements*. ECF 474-8, at 86:20–87:5.

14

1        On the other hand, Plaintiffs are correct that "[e]xpert testimony is al-

2 lowed where the expert testifies that an insurer violated customs and practices

3 in the insurance industry." *Edmark Auto, Inc. v. Zurich Am. Ins. Co.*, No. 1:15-

4 cv-00520-BLW-CWD, 2019 WL 1002952, at \*7 (D. Idaho Mar. 1, 2019) (citing

5 *Hangarter*, 373 F.3d at 998). The *Hangarter* court affirmed a district court's

6 decision to allow an expert witness to testify about how an insurance carrier's

7 conduct deviated from industry norms, without stating that it constituted bad

8 faith under the law, "because he (1) identified specific conduct of the insurer,

9 (2) explained its consequences for the insured, and (3) demonstrated how that

10 conduct deviated from industry standards, all without rendering a conclusion

11 on the legal significance of the conduct." *Id.* (citing *Hangarter*, 373 F.3d at

12 1016).

13        Therefore, the court will grant Defendants' motion as to the "legal con-

14 clusions" issue to the extent Schwartz and Cummins intend to interpret the

15 captive reinsurance agreements, discuss whether they comply with the HUD

16 Letter's criteria, opine that they limit Atrium's liability, or offer other similar

17 testimony. However, the court will deny the motion to the extent Schwartz and

18 Cummins intend to testify about whether the captive reinsurance agreements

19 are contrary to the usual regulatory and operating practices in the insurance

20 and reinsurance industry—they may so testify as long as they do so without

21 interpreting the agreements or otherwise offering a legal conclusion.

1    **V.    Opinions supported by inadmissible evidence**

2    Defendants seek to exclude evidence and testimony from Barile that is

3    based on reinsurance agreements between Radian and "three unknown rein-

4    surers based in Turks & Caicos, Bermuda[,] and Pennsylvania." ECF 474, at

5    15. Defendants contend that the agreements are inadmissible hearsay, so they

6    should be excluded and no reference to them should be admitted, and they seek

7    to exclude Barile's testimony based on those agreements because they contend

8    the agreements' prejudicial effect outweighs any probative value. *Id*. They ob-

9    ject to Barile's testimony because he opines that the three reinsurance agree-

10   ments are typical of the industry standard and then compares provisions of

11   Atrium's agreements to them despite "not provid[ing] any information on the

12   provenance of these three agreements, who created them, when they were cre-

13   ated, or any other information necessary both to lay the foundation for why

14   those three agreements would be admissible in court and allow Defendants to

15   challenge his conclusions about the agreements." *Id*. at 15–16.

16   Plaintiffs contend that Barile's testimony is appropriate because it re-

17   lates to industry standards and is "highly probative of whether the CRAs at

18   issue conform to industry custom and constitute valid reinsurance." ECF 485,

19   at 13. They argue that Defendants' "concern over the provenance" of the agree-

20   ments is "overblown" because the documents were produced during discovery

21   and were a subject about which he was questioned at his deposition. *Id*.

1   Finally, they assert that Rule 703 renders Barile's opinions admissible because

2   the underlying data need not be. *Id.* at 13–14.

3        Notably, despite invoking Rule 703, Plaintiffs do not address whether

4   the three reinsurance agreements themselves are actually admissible, instead

5   seeming just to assume that they are. Nor do they respond in any way to De-

6   fendants' contention that the agreements are inadmissible hearsay. Defend-

7   ants' reply brief argues, correctly, that Rule 703 requires that where an expert

8   relies on otherwise-inadmissible evidence, the party seeking to introduce the

9   evidence must demonstrate how its probative value substantially outweighs

10  its prejudicial effect. ECF 496, at 11.

11       Moreover, even outside of the Rule 703 context, as a general rule the

12  proponent of evidence has the burden of establishing its admissibility. *Shorter*

13  *v. S. Cal. Buick Pontiac GMC Dealers Inc.*, No. CV 16-7181-DMG (FFMx), 2018

14  WL 6075324, at *3 (C.D. Cal. Mar. 26, 2018) (citing *In re Extradition of Santos*,

15  228 F. Supp. 3d 1034, 1037 (C.D. Cal. 2017)). Because Plaintiffs have failed to

16  attempt to demonstrate that the three reinsurance agreements are admissible

17  and have not responded at all to Defendants' argument that the agreements

18  are inadmissible hearsay, they have failed to carry their burden, and the court

19  will construe their silence as a tacit admission that the agreements would be

20  inadmissible. That does not mean that Barile cannot rely on those documents,

21  but it does mean that neither he nor Plaintiffs can disclose them to the jury

17

1    because Plaintiffs have also not attempted to demonstrate that their probative

2    value substantially outweighs their prejudicial effect. Accordingly, the court

3    will grant Defendants' motion as to the "inadmissible evidence" issue insofar

4    as Barile's testimony would refer to the three reinsurance agreements. To the

5    extent he is able to testify about industry standards without referring to those

6    agreements or comparing the ones at issue here to them, he may still do so

7    without prejudice to Defendants' right to raise other objections if necessary.

8    **Conclusion**

9    For the foregoing reasons, it is hereby **ORDERED** that Defendants' mo-

10    tion *in limine* #6 is **GRANTED IN PART and DENIED IN PART** as follows:

11    1.    The motion is **DENIED** as to the accounting standard evidence

12    relied on by Barrett and Schwartz, but that denial is without prejudice to De-

13    fendants' right to object at trial to particular pieces of evidence (as opposed to

14    the category of evidence as a whole).

15    2.    The motion is **DENIED** as to Defendants' request to preclude ref-

16    erences to evidence from outside the class period, again without prejudice to

17    Defendants' right to object to specific pieces of evidence at trial.

18    3.    The motion is **GRANTED** as to "motivation testimony" insofar as

19    Plaintiffs' experts might seek to ascribe an intent, motivation, agenda, or sim-

20    ilar finding to actions taken by Defendants. However, this order does not

1    preclude Plaintiffs' experts from discussing documentary evidence and opining

2    on whether Defendants acted consistently therewith.

3         4.    The motion is **GRANTED** as to the "legal conclusions" issue to the

4    extent Schwartz and Cummins intend to interpret the captive reinsurance

5    agreements, discuss whether they comply with the HUD Letter's criteria, opine

6    that they limit Atrium's liability, or offer other similar testimony, but the mo-

7    tion is **DENIED** as to that issue to the extent Schwartz and Cummins intend

8    to testify about whether the captive reinsurance agreements are contrary to

9    the usual regulatory and operating practices in the insurance and reinsurance

10    industry.

11         5.    The motion is **GRANTED** as to the "inadmissible evidence" issue

12    insofar as Barile's testimony would refer to three reinsurance agreements to

13    which he seeks to compare Atrium's agreements as a basis for opining that

14    they do not comply with industry standards, but the motion is **DENIED** to the

15    extent it seeks to preclude Barile's testimony as to compliance with industry

16    standards insofar as he is able to offer that testimony without referring to

17    those agreements or comparing the ones at issue here to them.

18    Dated: January 14, 2022           /s/ *M. Miller Baker*

19                                    M. Miller Baker, Judge[2]

---

[2] Judge of the United States Court of International Trade, sitting by designation.