# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

EFRAIN MUNOZ, *individually and on behalf of all others similarly situated, et al.,*

      Plaintiffs,

      v.

PHH MORTGAGE CORPORATION, *et al.,*

      Defendants.

No. 1:08-cv-00759-MMB-BAM

**OPINION GRANTING
FINAL APPROVAL
OF CLASS ACTION
SETTLEMENT AND AWARDS
OF FEES, COSTS, AND
INCENTIVE AWARDS**

This matter is before the court on Plaintiffs' unopposed motions for final approval of a class action settlement, *see* ECF 618, and for an award of attorneys' fees, costs, and representative plaintiff incentive awards, *see* ECF 619.[1] In August 2025, the court granted preliminary approval of the settlement and conditionally certified the settlement class. *See* ECF 615. The court conducted a fairness hearing in December 2025. It has not received, and is not aware of, any objections (timely or otherwise) to, or timely opt-outs from, final approval. *See also* ECF 622, at 2 & n.2 (advising that no class member timely objected or opted out and that one opt-out request came in 15 days after the deadline). For the reasons stated below, the court approves the settlement, awards $9,031,000.00 in attorneys' fees and $2,074,556.63 of litigation costs, and

---

[1] Plaintiffs also filed a consolidated reply in support of both motions. *See* ECF 622.

1  grants service incentive awards of $5,000.00 to each of the five named repre-

2  sentative plaintiffs.[2]

3  ### Background

4      As noted in the preliminary approval order, *see* ECF 615, at 1–2, various

5  prior court orders amply summarize this case's lengthy factual and procedural

6  history dating to 2008. *See, e.g.*, *Munoz v. PHH Mortg. Corp.*, 478 F. Supp. 3d

7  945, 954–61 (E.D. Cal. 2020) (ECF 417); ECF 538, at 2–7. In short, Plaintiffs

8  alleged that Defendants violated the Real Estate Settlement Procedures Act

9  (popularly known as RESPA), 12 U.S.C. § 2607, by establishing captive rein-

10  surance agreements with lenders that ultimately allowed Defendants to re-

11  ceive unearned portions of private mortgage insurance premiums. Plaintiffs

12  contended that the captive reinsurance agreements were a mechanism for De-

13  fendants to obtain kickbacks from the mortgage insurers. *See* 478 F. Supp. 3d

14  at 955 (summarizing the facts).

15      In March 2025, about a week before a scheduled *Daubert*[3] hearing and

16  bench trial on economic harm to resolve the disputed issue of Plaintiffs' stand-

17  ing, the parties notified the court that they had reached an agreement in

---

[2] At the fairness hearing, the parties told the court that they had agreed to honor the sole untimely opt-out request. The court's concurrent order approving the settlement reflects that agreement.

[3] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

1    principle to settle. *See* ECF 615, at 2. The court cancelled both the March 2025

2    hearing and the jury trial scheduled for mid-October. *See* ECF 608.

3         The settlement agreement proposed that each eligible class member

4    would receive an $875 payment per affected loan. *See* ECF 615, at 8 & n.2

5    (citing ECF 614-2, at 12). There would be no cap on the gross settlement

6    amount—an eligible class member would receive the full $875 per loan regard-

7    less of the number of other claimants and regardless of the amounts awarded

8    for attorneys' fees and litigation costs. *Id.* at 8–9 (citing ECF 614, at 22, 23).

9    Based on their review of Defendants' records and their approximation of over-

10   all class membership, the parties estimated a total class payout of about

11   $30,500,000. *Id.* at 9 (citing ECF 614, at 22). They have since revised that fig-

12   ure to $29,494,500. *See* ECF 620, ¶ 6.

13        In granting preliminary approval, the court approved the parties' pro-

14   posed notice program, *see* ECF 615, ¶¶ 10–15; appointed the named plaintiffs

15   as settlement class representatives, *see id.* ¶ 7; appointed Kessler Topaz Melt-

16   zer Check, LLP, and Larson LLP as settlement class counsel, *see id.* ¶ 8; and

17   named JND Legal Administration as settlement administrator, *see id.* ¶ 9.

18        As part of the documentation supporting the motion for final approval,

19   Plaintiffs submitted two declarations from Heather Follensbee, a director at

20   JND. *See* ECF 620-2, ECF 622-1 (supplemental declaration supporting reply).

21   Her initial declaration describes the efforts taken to provide notice to class

3

1    members and states that the company mailed notice and claim forms to 48,413

2    unique settlement class member borrower addresses. ECF 620-2, ¶ 15. Of

3    those, 4,640 were returned as undeliverable, although JND was able to obtain

4    updated addresses (either from the U.S. Postal Service or through other re-

5    search) for 1,123 of the returned notices. *Id.* ¶ 16. Further research yielded

6    updated addresses for an additional 428 class members; of those notices, 56

7    were returned. ECF 622-1, ¶ 4. In total, as of December 1, 2025, 44,887 of the

8    48,413 mailed notices—92.7%—were successfully delivered. *Id.* ¶ 5.

9        JND also provided e-mail notice to 21,832 addresses, of which 16,081

10   were delivered successfully. ECF 620-2, ¶¶ 17–18. The company ran digital

11   advertisements for 28 days in September and October of 2025; the ads were

12   viewed over 10.4 million times. *Id.* ¶ 19. As of the date of Ms. Follensbee's sup-

13   plemental declaration, JND had received 7,692 claim form submissions and

14   zero objections. ECF 622-1, ¶ 17.

15       The court held a fairness and final approval hearing on December 17,

16   2025.[4] In response to the court's request for updated figures, *see* ECF 623, ¶ 1,

17   counsel advised that since the date of Ms. Follensbee's supplemental declara-

18   tion, the number of claims received had increased to 7,998, along with the one

---

[4] Because no class member submitted either an objection to the proposed settlement or notice of intent to appear at the hearing, the court conducted the proceeding by videoconference to avoid having counsel incur the unnecessary expense of travel to Sacramento. *See* ECF 621.

1    untimely opt-out and zero objections (timely or otherwise). Counsel also stated

2    that based on their experience, the claims pace will increase again in mid-2026

3    as the August deadline for submitting claims approaches, and they advised

4    that JND will send out a reminder in June 2026 to class members who have

5    not yet submitted claims.

6         In response to the court's question about undeliverable notice, counsel

7    stated that JND has continued to pursue further research for all but eight of

8    the returned notices and has successfully delivered another 443 of them. Fi-

9    nally, the parties told the court that they agreed to honor the one untimely opt-

10   out received so far but did not anticipate honoring any that might be received

11   after the court approves the settlement.[5] They said they will, however, notify

12   any class member whose claim is rejected for deficient information so as to

13   allow that member to fix the problem, and that process will continue after the

14   claims deadline in August 2026.

15   **I.    Motion for final approval of settlement**

16        **A.    Class certification and adequacy of notice**

17        Earlier this year, the court granted conditional class certification for set-

18   tlement purposes and found the requirements of Rules 23(a) and 23(b)(3) sat-

19   isfied. *See* ECF 615, at 5–7. In so doing, the court observed that the Magistrate

---

[5] The court's concurrent approval order provides that any untimely opt-outs received
after entry of such order shall not be honored.

5

1    Judge had provided "an exceptionally comprehensive analysis" in 2013 when

2    recommending class certification and stated that it could "find no reason to

3    depart from its previous analyses." *Id.* at 6. The court also found the notice

4    procedure to be "adequate to provide class members with sufficient information

5    to make informed decisions" and "in compliance with Rule 23(e)'s requirement

6    that they include 'sufficient detail simply to alert those with adverse view-

7    points to investigate and to come forward and be heard.'" ECF 615, at 14 (quot-

8    ing *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 946 (9th Cir. 2015)).

9    As to the adequacy of notice, while 9.5 percent of the mailed notices were ini-

10   tially returned as undeliverable, JND found updated information for 33 per-

11   cent of the returned notices, and only a minuscule number of those were re-

12   turned a second time. It is hardly surprising that some number of class mem-

13   bers' address information would be stale after 17 years of litigation. The court

14   concludes that the notice program was as sufficient as practicable.

15       Aside from the data on notice, there has been no change in any of the

16   underlying facts since the court granted preliminary approval, and there have

17   been no objections to class certification. "Accordingly, there is no need for the

18   [c]ourt to repeat the analysis on these issues here." *Carlin v. DairyAmerica,*

19   *Inc.*, 380 F. Supp. 3d 998, 1008 (E.D. Cal. 2019) (citing cases). The court there-

20   fore finalizes its certification of the class.

1      **B.    Legal standards for approving settlement**

2      Federal Rule of Civil Procedure 23 governs class actions. Court approval

3  is required for any settlement, voluntary dismissal, or compromise of "[t]he

4  claims, issues, or defenses of a certified class . . . ." Fed. R. Civ. P. 23(e). The

5  Ninth Circuit holds district courts to a "higher procedural standard" when con-

6  sidering whether a proposed class-action settlement is substantively fair. *Roes,*

7  *1–2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1043 (9th Cir. 2019). The "height-

8  ened inquiry" applies regardless of whether the settlement comes before or af-

9  ter class certification. *Briseño v. Henderson*, 998 F.3d 1014, 1023 (9th Cir.

10  2021). The concern is to ensure that there is no collusion or conflict of interest

11  that would breach "the fiduciary duty owed the class during settlement." *In re*

12  *Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946–47 (9th Cir. 2011).

13      The court must balance eight factors to the extent they are relevant:[6]

14      (1) the strength of the plaintiffs' case; (2) the risk, expense, com-
15      plexity, and likely duration of further litigation; (3) the risk of
16      maintaining class action status throughout the trial; (4) the
17      amount offered in settlement; (5) the extent of discovery completed
18      and the stage of the proceedings; (6) the experience and views of
19      counsel; (7) the presence of a governmental participant; and (8) the
20      reaction of the class members to the proposed settlement.

21  *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575, 576 n.7 (9th Cir. 2004)

22  (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998),

---

[6] The seventh factor is not relevant here.

1    *overruling on other grounds recognized by DZ Reserve v. Meta Platforms, Inc.,*

2    96 F.4th 1223, 1238 (9th Cir. 2024); *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d

3    1370, 1375 (9th Cir. 1993)). "It is the settlement taken as a whole, rather than

4    the individual component parts, that must be examined for overall fairness."

5    *Hanlon*, 150 F.3d at 1026.

6        The court must also examine whether there are "more subtle signs that

7    class counsel have allowed pursuit of their own self-interests and that of cer-

8    tain class members to infect the negotiations." *Bluetooth*, 654 F.3d at 947. Ex-

9    amples of such signs include situations where counsel receives a disproportion-

10   ate share of the settlement or where the settlement provides that fees not

11   awarded will revert to the defendants rather than being added to the class

12   fund. *Id.* Another significant one is where "the parties negotiate a 'clear sailing'

13   arrangement providing for the payment of attorneys' fees separate and apart

14   from class funds, which carries the potential of enabling a defendant to pay

15   class counsel excessive fees and costs in exchange for counsel accepting an un-

16   fair settlement on behalf of the class." *Id.* (cleaned up)

17       While the court's opinion and order granting preliminary approval did

18   not include a full fairness analysis examining all eight *Churchill Village* fac-

19   tors because it was premature to do so at that time, *see* ECF 615, at 5, the court

20   did examine the *Bluetooth* factors, *see id.* at 8–11. It reconsiders those factors

21   in full here for two reasons—first, because of the importance the Ninth Circuit

1    places on ensuring the absence of collusion or conflict of interest, and second,

2    because the court's previous opinion instructed the parties to be prepared to

3    discuss the "clear sailing" issue at the final fairness hearing, *see id.* at 10.

4    **C.    Analysis**[7]

5        **1.    Factors 1–3: strength of Plaintiffs' case; risk, ex-**
6            **pense, complexity, and likely duration of further**
7            **litigation; risk of maintaining class action status**
8            **through trial**

9        In assessing the strength of Plaintiffs' case, the court may not "reach any

10   ultimate conclusions on the contested issues of fact and law which underlie the

11   merits of the dispute." *Officers for Justice v. Civ. Serv. Comm'n of City & Cnty.*

12   *of San Francisco*, 688 F.2d 616, 625 (9th Cir. 1982). It would be premature for

13   the court to render such a determination because a settlement before trial nec-

14   essarily means the evidence has not been fully presented. *In re Wash. Pub.*

15   *Power Supply Sys. Sec. Litig.*, 720 F. Supp. 1379, 1388 (D. Ariz. 1989). The

16   court concludes, however, that Plaintiffs' case has significant strength. In

17   2020, they obtained partial summary judgment as to the first three elements

18   of their primary claim and as to one affirmative defense. *See* 478 F. Supp. 3d

19   at 988 (summarizing conclusions). The court also denied multiple motions by

20   Defendants to decertify the class. *See id.* at 984–88; ECF 538, at 18–20.

---

[7] Rather than addressing the *Churchill Village* factors singly, this opinion treats
them in groups because of how some of them logically relate to each other.

9

1    It is also impossible for the court—or the parties—to foresee how a jury

2  would rule at trial. A jury trial obviously represents an inherent risk because

3  of the possibility that the jury will find for the opposing party (here, Defend-

4  ants). Proceeding to trial would have inevitably resulted in substantial addi-

5  tional expense in terms of legal fees, litigation costs, and related expenses such

6  as costs for counsel to travel to Sacramento for both the *Daubert* hearing and

7  the jury trial. And while the potential for the jury trial to have concluded by

8  mid-November 2025 is a short delay in the overall context of this case's 17-year

9  history, the possibility of further appeals to the Ninth Circuit and potential

10  post-remand litigation in this court also demonstrates the risk of significant

11  delay and cost Plaintiffs would have faced. *See Rodriguez v. West Publ'g Corp.*,

12  563 F.3d 948, 966 (9th Cir. 2009) ("Inevitable appeals would likely prolong the

13  litigation, and any recovery, for years."). Considering how strenuously the par-

14  ties have disputed the issues over the years, the case might have reached its

15  20th birthday if litigation had continued.

16    Finally, the risk of an adverse ruling on standing following the *Daubert*

17  hearing and bench trial underscores the potential risk to Plaintiffs of seeking

18  to maintain a class action through a jury trial. Had the court ruled against

19  Plaintiffs on standing, it would have been required to dismiss the case. *See*

20  ECF 615, at 13 (recognizing that "the class members faced a material risk of

21  obtaining no relief had the case continued").

10

1    Accordingly, the first three factors all weigh in favor of approving the

2    settlement.

3           **2.      Factors 4 and 8: amount offered in settlement**
4                    **and reaction of class members**

5           "The amount offered in settlement is generally considered to be the most

6    important consideration[ ] of any class settlement." *Carlin*, 380 F. Supp. 3d at

7    1011. To determine whether the amount is reasonable, the court is to weigh

8    the estimated aggregate settlement amount (assuming all eligible class mem-

9    bers submit valid claims) against the estimated value of class claims if success-

10   fully litigated. *Id.* The estimated overall settlement payout is approximately

11   $29.5 million. Plaintiffs' trial brief on damages stated that they expected to

12   present evidence of over $130 million in the aggregate. ECF 531, at 7. The

13   settlement therefore represents approximately 22.7 percent of the estimated

14   damages.[8] "Courts regularly approve class settlements where class members

15   recover less than one quarter of the maximum potential recovery amount."

16   *Carlin*, 380 F. Supp. 2d at 1011 (citing cases in which approved class-action

---

[8] RESPA provides that a defendant found to have violated the statute's prohibitions is liable for "an amount equal to three times the amount of any charge paid." 12 U.S.C. § 2607(d)(2). The Ninth Circuit has held that it is not necessarily error for a district court to evaluate a settlement based on single damages—the court may consider tre-ble damages but need not always do so. *See Rodriguez*, 563 F.3d at 955.

1  settlements paid 7.5 and 8.5 percent of estimated maximum damages).[9] The

2  settlement amount here thus weighs in favor of approval.

3      Similarly, "[t]he absence of a large number of objections to a class settle-

4  ment raises a strong presumption that the terms . . . are favorable to the class

5  members." *Id.* at 1013. As noted, the settlement administrator has received

6  only one untimely opt-out and no objections. In contrast, approximately 22.8

7  percent of eligible class members have submitted claims, and the submission

8  period still has more than half a year remaining. *See* ECF 622, at 2.[10] The

9  claims submission rate is significantly higher than the approximately 10 per-

10  cent average class-action response rate reported by the Federal Trade Com-

11  mission. *See* FTC Staff Report, *Consumers and Class Actions: A Retrospective*

12  *and Analysis of Settlement Campaigns* at 11 (Sept. 2019).[11] The class members'

13  reaction shows they regard the $875-per-loan settlement payout as fair.

14      These two factors therefore point in favor of approval.

---

[9] For this reason, the court would reach the same conclusion using potential treble damages. Multiplying the estimated single-damages figure by three yields $390 million, and $29.5 million is approximately 7.5 percent of that number.

[10] The claim deadline is August 11, 2026. *Id.*

[11]    https://www.ftc.gov/system/files/documents/reports/consumers-class-actions-retrospective-analysis-settlement-campaigns/class_action_fairness_report_0.pdf.

1
2

### 3.  Factor 5: extent of discovery completed and stage of proceedings

3      The key principle in determining whether the discovery undertaken was

4  adequate is whether "the parties have sufficient information to make an in-

5  formed decision about settlement." *Linney v. Cellular Alaska P'ship*, 151 F.3d

6  1234, 1239 (9th Cir. 1998). When considerable discovery has been completed,

7  a court should favor settlement because "it suggests that the parties arrived at

8  a compromise based on a full understanding of the legal and factual issues

9  surrounding the case." *Carlin*, 380 F. Supp. 3d at 1012 (quoting *Adoma v. Univ.*

10  *of Phoenix, Inc.*, 913 F. Supp. 2d 964, 977 (E.D. Cal. 2012)).

11      This factor supports granting final approval because discovery had been

12  completed by the time the parties reached agreement. They had full infor-

13  mation on which to assess the strengths and weaknesses of their cases.

### 4.  Factor 6: the experience and views of counsel

15      In support of their motions for final approval and for attorneys' fees,

16  Plaintiffs submitted the declaration of Joseph H. Meltzer, partner at Kessler

17  Topaz Meltzer & Check, LLP, one of the law firms representing Plaintiffs and

18  acting as court-appointed class counsel. *See generally* ECF 620. He states that,

19  "[g]iven the substantial risk and [his] detailed understanding of this case, [he]

20  believe[s] that Plaintiffs maximized the recovery they could have achieved for

21  the class in settlement of this matter." *Id.* ¶ 26. He adds that, "[b]ased on [his]

13

1    many years of complex litigation experience and [his] personal involvement in

2    the prosecution of this case from start to finish, [he] believe[s] the settlement

3    is not only fair, reasonable, [and] adequate, but also is in the best interests of

4    all settlement class members in light of all known facts and circumstances and

5    should therefore be given final approval." *Id.* (capitalization normalized).

6        In recommending class certification in 2013, the Magistrate Judge ob-

7    served that

8        Defendants do not argue that Plaintiffs' counsel is inadequate or
9        has any conflicts of interest with the proposed class. Defendants
10       do not dispute that Plaintiffs' counsel would vigorously prosecute
11       this case on behalf of the class. Indeed, there is nothing in the rec-
12       ord to suggest Plaintiffs' counsel would not fairly and adequately
13       protect the interests of the class. The court finds Plaintiffs' counsel
14       are experienced counsel and will represent the class adequately.

15   ECF 230, at 33–34 (capitalization normalized). Defendants have raised no ob-

16   jections to the views expressed by Plaintiffs' counsel and have not challenged

17   counsel's qualifications. Accordingly, the court sees no reason to depart from

18   the Magistrate Judge's analysis about counsel's experience and qualifications.

19   Given counsel's view that the settlement is fair, reasonable, adequate, and in

20   the best interest of all class members, the court finds that this factor favors

21   approval.

22        **5.    Absence of collusion**

23        In addition to the *Churchill Village* factors, the court must consider the

24   *Bluetooth* criteria to assess whether the settlement agreement is the product

14

1    of collusion. The Ninth Circuit requires an examination of whether counsel's

2    share of the settlement is disproportionate, whether there is a "clear sailing

3    arrangement" under which the defendant will not object to a specific attorneys'

4    fee request by class counsel, and whether unawarded fees will revert to the

5    defendant. *See Bluetooth*, 654 F.3d at 947.

6        The first factor is not present here. Class counsel seek a fee award of

7    $9,031,000. As noted above, the maximum estimated claims payment figure is

8    approximately $29.5 million. The fee amount is thus approximately 30.6 per-

9    cent of the claims payout. While greater clarification on the number of poten-

10   tial claims means this percentage is slightly higher than the 29.6-percent fig-

11   ure cited in the order granting preliminary approval,[12] *see* ECF 615, at 9, it is

12   not significantly higher. More importantly, it remains lower "than the one-

13   third figure that is common in contingent-fee arrangements," *id.*, and it con-

14   tinues to cover more than 17 years of work. If anything, the fee amount is on

15   the low side given the recovery and counsel's efforts.

16       As to the second factor, in the preliminary approval order the court noted

17   that the settlement agreement provides for a "clear sailing" arrangement

---

[12] In response to the court's question at the fairness hearing about why the settlement amount decreased from the preliminary figure originally provided, counsel advised that the original estimate was based on imperfect data Defendants provided and that matching loan numbers to the list of class members revealed the need for de-duplication work. That process resulted in the smaller final figure. That explanation is reasonable.

1    because Defendants had agreed not to object to an award of attorneys' fees up

2    to an agreed figure. *Id.* at 9–10. While the court concluded that "on balance the

3    benefit to the class members is significant enough to overcome the prospect of

4    conclusion," it directed the parties to be prepared to discuss the issue at the

5    final fairness hearing "in view of the importance the Ninth Circuit places on

6    it," especially as to "the relationship between attorneys' fees and benefit to the

7    class." *Id.* at 10 (quoting *Kim v. Allison*, 8 F.4th 1170, 1180 (9th Cir. 2021)).

8        The court noted that the theoretical problem with a clear sailing arrange-

9    ment is that if the number of claims falls significantly short of the estimated

10   maximum, or if the administrator rejects claims, class counsel's payment then

11   represents a higher percentage of the class members' recovery. *Id.* at 9–10. In

12   other words, a clear sailing arrangement could, in theory, provide a disincen-

13   tive to the giving of adequate notice and the facilitation of claims submissions.

14   The record of this case shows that in practice that outcome has not occurred.

15   As noted above, the pace of claims submissions has significantly exceeded the

16   rate cited by the Federal Trade Commission as a reasonable expectation, which

17   confirms the adequacy of notice and the class members' view of the settlement's

18   fairness.

19       Finally, as to the third factor, the preliminary approval order observed

20   that the class payout is independent of legal fees—the class payout will be $875

1    multiplied by the number of valid timely claims, regardless of attorneys' fees.

2    *Id.* at 10–11. The same remains true, so this factor points against collusion.

3                              *    *    *

4        In sum, all seven of the relevant *Churchill Village* factors support a find-

5    ing of fairness, and all three of the *Bluetooth* factors suggest an absence of

6    collusion. The court is therefore convinced that the settlement is fair, reasona-

7    ble, adequate, and free from conclusion, so it grants the unopposed motion for

8    final approval of the settlement (ECF 618). A separate order will enter.

9    **II.    Motion for fees, expenses, and incentive awards**

10       **A.    Attorneys' fees**

11       "In a certified class action, the court may award reasonable attorney's

12   fees and nontaxable costs that are authorized by law or by the parties' agree-

13   ment." Fed. R. Civ. P. 23(h). RESPA authorizes such an award by providing

14   that "[i]n any private action brought pursuant to [12 U.S.C. § 2607(d)], the

15   court may award to the prevailing party the court costs of the action together

16   with reasonable attorneys fees." 12 U.S.C. § 2607(d)(5). The court has "an in-

17   dependent obligation to ensure that the award, like the settlement itself, is

18   reasonable, even if the parties have already agreed to an amount." *Bluetooth*,

19   654 F.3d at 941. The court must assess the reasonableness of a fee claim

20   against the entire estimated class recovery, rather than against claims

17

1    actually submitted. *See Williams v. MGM-Pathe Commc'ns Co.*, 129 F.3d 1026,

2    1027 (9th Cir. 1997).

3        The Ninth Circuit has held that the use of the "lodestar method" for cal-

4    culating a reasonable fee award "is appropriate in class actions brought under

5    fee-shifting statutes." *Bluetooth*, 654 F.3d at 941. An alternative method, the

6    "percentage-of-recovery method," is appropriate "[w]here a settlement pro-

7    duces a common fund for the benefit of the entire class." *Id.* at 942. This case

8    involves claims asserted under a fee-shifting statute, and the settlement does

9    not establish a common fund because it is instead an uncapped claims-made

10   arrangement. Accordingly, the lodestar method is proper.

11       The court calculates the lodestar by multiplying the number of hours the

12   prevailing party reasonably spent on the case by a reasonable hourly rate for

13   the region and counsel's experience. *Id.* at 941. The resulting figure is "pre-

14   sumptively reasonable," *id.* (quoting *Cunningham v. Cnty. of Los Angeles*, 879

15   F.2d 481, 488 (9th Cir. 1988)), provided the benefit obtained for the class is

16   sufficient, *id.* at 942 (citing *Hensley v. Eckerhart*, 461 U.S. 424, 434–36 (1983),

17   to observe that "limited success" would require a reduced award).

18       The total cumulative lodestar claimed in this case is $30,598,872.25.

19   ECF 620, ¶ 48. That figure covers all four law firms involved in representing

20   the class, using the hourly billing rates for each attorney or staff member and

21   their hours expended from the case's inception through the date of preliminary

18

1   approval of the settlement.[13] *Id.* Using a figure of 63,178.01 hours worked,

2   class counsel calculated a "blended average billing rate" for the work done by

3   all timekeepers at all four firms of $484.33 per hour. *Id.* ¶ 65.

4       The $484.33 hourly rate is well within the range of what courts in this

5   district consider to be reasonable. *See, e.g., Klein v. Jelly Belly Candy Co.*, No.

6   2:23-cv-00035, 2023 WL 12171438, at *10 (E.D. Cal. 2023) (Drozd, J.) ("The

7   undersigned has previously found the following ranges of hourly rates to be

8   reasonable: $650–$750 for senior partners with over thirty years of experience;

9   $545–$695 for partners and senior counsel; $475–$575 for senior associates;

10  $330–$400 for junior associates; $200 for paralegals.") (citing cases); *Weiner v.*

11  *Ocwen Fin. Corp.*, No. 2:14-cv-02597, 2024 WL 4458383, at **6–7 (E.D. Cal.

12  2024) (Calabretta, J.) (observing that a blended average hourly rate of $748.60

13  was "on the high end of rates approved for attorneys in this district but still

14  within the range of what courts consider to be reasonable," especially where

15  "the bulk of work performed by attorneys was done by partners due to the chal-

16  lenging nature of perusing RICO claims"). And the number of hours is reason-

17  able given this case's 17-year history of tenacious litigation by both sides.

18  But—as reflected by the fact that the fee motion does not seek the full

---

[13] To clarify, counsel excluded all time expended since the date of the order granting preliminary approval, including time spent preparing the motions for fees and expenses and supporting documentation. *See id.* ¶ 58.

19

1   amount—it would be *unreasonable* for the court to award the total lodestar

2   amount because it exceeds the maximum estimated class payout of approxi-

3   mately $29.5 million and would therefore be the epitome of a "windfall." *See*

4   *Lowery v. Rhapsody Int'l, Inc.*, 75 F.4th 985, 994 (9th Cir. 2023) ("[I]t is unrea-

5   sonable to award attorneys' fees that exceed the amount recovered for the class,

6   absent meaningful nonmonetary relief or other sufficient justification.").

7       Instead of that full amount, class counsel seek a fee award of $9,031,000,

8   which is approximately 29.5 percent of the total lodestar. As the court found in

9   granting preliminary approval, the total sought is also "somewhat less than

10  the one-third figure that is common in contingent-fee arrangements." ECF 615,

11  at 9. Considering the significant reduction from the lodestar amount, the total

12  fee value representing less than a customary contingent fee, the fact that the

13  award will not reduce the class members' potential recovery, the lack of objec-

14  tion by anyone to the requested fee amount, and the substantial relief awarded

15  to the class, the court approves the requested fee award of $9,031,000.

16      **B.   Expenses**

17      Class counsel seek an award of $2,074,566.63 for reimbursement of ex-

18  penses incurred in litigating this case. ECF 619, at 16. As with the fee award,

19  any expense reimbursement will be separate from the amounts paid to class

20  members under the settlement. *Id.* "[A]n award of expenses should be limited

21  to typical out-of-pocket expenses that are charged to a fee paying client and

20

1  should be reasonable and necessary." *In re Immune Response Sec. Litig.*, 497

2  F. Supp. 2d 1166, 1177 (S.D. Cal. 2007) (cleaned up) (citing *In re Media Vision*

3  *Tech. Sec. Litig.*, 913 F. Supp. 1362, 1366 (N.D. Cal. 1996), and *Harris v.*

4  *Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994)).

5      Counsel here seek reimbursement for (1) class administration fees,

6  (2) court reporter expenses for depositions, (3) fees for expert witnesses and

7  consultants, (4) court filing fees, (5) mediation expenses, (6) costs for messen-

8  ger services, (7) amounts spent on overnight delivery services such as FedEx,

9  (8) standard postage, (9) charges from process servers hired to serve deposition

10  and trial subpoenas, (10) case-specific research charges, (11) photocopying and

11  printing charges, (12) the cost of hosting electronic document discovery data-

12  bases online, and (13) expenses for travel—including transportation, meals,

13  and lodging—for depositions, court appearances, mediation, and counsel and

14  client meetings. ECF 620, at 24–27. Counsel provided declarations detailing

15  the expenses. *See id.*; ECF 620-5, at 3; ECF 620-6, at 3–4; ECF 620-7, ¶ 6; ECF

16  620-8, at 3.

17      The court finds the expenses described above to be reasonable and nec-

18  essary. Class counsel are located in Los Angeles and in Radnor, Pennsylvania,

19  so travel was an inherent requirement of handling this case. Expenses for post-

20  age and expedited delivery services, as well as photocopy and print charges,

21  are necessary litigation expenses, and the Ninth Circuit has approved of

21

reimbursement for messenger services. *See Harris*, 24 F.3d at 19. The court also finds that electronic legal research and the management of electronic discovery related to document production are essential parts of managing a modern, efficient law office, such that those costs are reasonable. *See Immune Response*, 497 F. Supp. 2d at 1177–78.

To award reimbursement for expert witness fees, the court "must find that the expert testimony submitted was crucial or indispensable." *Id.* at 1178 (cleaned up). That was plainly the case here. Had the parties not settled, the court would have proceeded with a *Daubert* hearing and bench trial that would essentially have constituted a "battle of the experts" regarding whether Plaintiffs could prove economic harm and thus Article III standing. Had the case gone to trial, expert testimony would have been essential to aiding the jury in understanding the complicated mortgage industry and the regulations involved. Given the complexity of the matter, the court finds that reimbursement for experts and consultants is reasonable.

Finally, while neither mediation succeeded in directly producing a settlement, the court is convinced that the sessions helped the parties assess the strengths and weaknesses of their cases to inform them in negotiating the settlement they ultimately did reach. The court therefore finds the mediation expenses reasonable and necessary.

1    There have been no objections to the requested costs, and an award

2    would have no impact on class members' recovery. The court therefore grants

3    class counsel's request for reimbursement of $2,074,566.63 in costs incurred

4    while litigating this matter.

5    ### C.    Class representative incentive awards

6    The five named plaintiffs, who also served as class representatives, seek

7    incentive awards of $5,000.00 each. "Incentive awards are intended to compen-

8    sate class representatives for work done on behalf of the class, to make up for

9    financial or reputational risk undertaken in bringing the action, and, some-

10   times, to recognize their willingness to act as a private attorney general." *Car-*

11   *lin*, 380 F. Supp. 3d at 1024 (cleaned up) (citing *Rodriguez*, 563 F.3d at 958–

12   59). The court "must evaluate the service awards individually, using relevant

13   factors including the actions the plaintiff has taken to protect the interests of

14   the class, the degree to which the class has benefitted from those actions, the

15   amount of time and effort the plaintiff expended in pursuing the litigation[,]

16   and reasonable fears of retaliation." *Id.* (cleaned up) (citing *Staton v. Boeing*

17   *Co.*, 327 F.3d 938, 977 (9th Cir. 2003)). Courts in this circuit, however, have

18   found that $5,000.00 is a "presumptively reasonable" service award. *Id.*

19   The class representatives have submitted declarations discussing the

20   sorts of work and litigation activity they undertook on behalf of the class, in-

21   cluding, for example, participating in document production and written

23

1    discovery, preparing for and sitting for depositions and performing the "read

2    and sign" transcript-review task, and participating in settlement discussions.

3    *See* ECF 620-9, ¶ 6; ECF 620-10, ¶ 6; ECF 620-11, ¶ 6; ECF 620-12, ¶ 6; ECF

4    620-13, ¶ 6. Thus, they did not merely lend their names to the litigation effort.

5    And the class members plainly benefited from the representatives' involve-

6    ment with the favorable settlement.

7        Finally, as the court noted in granting preliminary approval to the set-

8    tlement, the aggregate incentive award amount here—$25,000—is a "minus-

9    cule fraction . . . of the estimated total class payout." ECF 615, at 12 n.5. And,

10   as with the attorneys' fees and litigation expenses, the incentive awards will

11   not reduce the amounts payable to other class members.

12       Therefore, based on the effort invested by the named plaintiffs over the

13   past 17 years and the presumptively reasonable amount of the awards both

14   individually and in the aggregate as compared to the settlement value, the

15   court finds the requested awards reasonable and grants $5,000.00 to each

16   named plaintiff for their work as class representatives.

17                              *    *    *

24

1    For the reasons stated above, the court grants Plaintiffs' unopposed mo-

2    tions for approval of the settlement and for an award of attorneys' fees, litiga-

3    tion expenses, and class representative incentive awards. Separate orders will

4    issue.

5    Dated: December 19, 2025                 /s/ *M. Miller Baker*
6                                              M. Miller Baker, Judge*

---

* Judge of the United States Court of International Trade, sitting by designation.